IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN FLYNN, JAMES BOLAND, GERALD O'MALLEY, )
KEN LAMBERT, GERARD SCARANO, H. J. BRAMLETT, )
EUGENE GEORGE, PAUL SONGER, WILLIAM )
MCCONNELL, CHARLES VELARDO, MATTHEW )
AQUILINE, GREGORY R. HESS, MICHAEL )
SCHMERBECK, VINCENT DELAZZERO, and )
BENJAMIN CAPP )
as Trustees of, and on behalf of, the )
BRICKLAYERS & TROWEL TRADES INTERNATIONAL )
PENSION FUND, )
    620 F Street, N.W. )
    Washington, DC  20004 )
    (202) 783-3788, )
     )
    and )
     )
JIM ALLEN, MATTHEW AQUILINE, LON BEST, JAMES )
BOLAND, TED CHAMP, RAYMOND CHAPMAN, )
VINCENT DELAZZERO, BRUCE DEXTER, JOHN )
FLYNN, EUGENE GEORGE, GREGORY HESS, FRED )
KINATEDER, DAN KWIATKOWSKI, KEN LAMBERT, )
SANTO LANZAFAME, DICK LAUBER, WILLIAM )
MCCONNELL, EDWARD NAVARRO, GERALD )
O'MALLEY, JOHN PHILLIPS, CHARLES RASO, MARK )
ROSE, KEVIN RYAN, GERARD SCARANO, MICHAEL )
SCHMERBECK, PAUL SONGER, JOSEPH SPERANZA, )
and FRED VAUTOUR )
as Trustees of, and on behalf of, the )
INTERNATIONAL MASONRY INSTITUTE, )
    620 F Street, N.W. )
    Washington, DC  20004 )
    (202) 783-3788, )
     )
                Plaintiffs, )  Civil Action No.
     )
                v. )
     )
TITAN STONE, TILE & MASONRY, INC., )
    70 Supor Boulevard, Building C )
    Harrison, NJ  07029, )
     )

2332959



TITAN STONE, TILE & MASONRY OF FLORIDA, LLC,     )
    730 NW 7th Street     )
    Fort Lauderdale, FL  33311,     )
        )
TITAN INTERIORS, LLC,     )
    206 Route 46, Second Floor     )
    Fairfield, NJ  07004,     )
        )
TITAN EXTERIOR WALL SYSTEMS, INC.,     )
    70 Supor Boulevard, Building C     )
    Harrison, NJ  07029,     )
        )
    and     )
        )
TITAN STONE & TILE OF NEVADA, LLC,     )
    9430 Supernova Court     )
    Las Vegas, NV  89123,     )
        )
        Defendants.     )
        )

## COMPLAINT

Plaintiffs, by their attorneys, DICKSTEIN SHAPIRO LLP, complaining of Defendants, allege as follows:

### CAUSE OF ACTION

### Jurisdiction and Venue

1.    This is an action brought by the fiduciaries of the Bricklayers & Trowel Trades International Pension Fund ("IPF"), and the fiduciaries of the International Masonry Institute ("IMI") to enforce the terms of the Plan and Trust Agreements adopted by the IPF and IMI, and the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  This action arises under the laws of the United States, specifically Sections 502(a)(3), 502(g)(2), and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3), 1132(g)(2), 1145.  Pursuant to

2

Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), jurisdiction is therefore conferred on this Court.

2.      The IPF and IMI are administered in the District of Columbia.  Venue for the claims asserted by the IPF and IMI is conferred on this Court pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), which provides:

> (2)  Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

### Parties

3.      Plaintiffs, John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano, H. J. Bramlett, Eugene George, Paul Songer, William McConnell, Charles Velardo, Matthew Aquiline, Gregory R. Hess, Michael Schmerbeck, Vincent DeLazzero and Benjamin Capp, are Trustees of, and sue on behalf of, the IPF.  The IPF is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37).  The IPF trustees bring this action on behalf of, and for the benefit of, the beneficiaries of the IPF in their respective capacities as fiduciaries.

4.      The IPF also is authorized to effect collections on behalf of the IMI, pursuant to written Assignments of Claim and the Collection Procedures of the Central Collection Unit of the Bricklayers and Allied Craftworkers ("Collection Procedures").

2332959

5.     Plaintiffs, Jim Allen, Matthew Aquiline, Lon Best, James Boland, Ted Champ, Raymond Chapman, Vincent Delazzero, Bruce Dexter, John Flynn, Eugene George, Gregory Hess, Fred Kinateder, Dan Kwiatkowski, Ken Lambert, Santo Lanzafame, Dick Lauber, William McConnell, Edward Navarro, Gerald O'Malley, John Phllips, Charles Raso, Mark Rose, Kevin Ryan, Gerard Scarano, Michael Schmerbeck, Paul Songer, Joseph Speranza and Fred Vautour, are Trustees of, and sue on behalf of, the IMI.  The IMI is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37).  The IMI trustees bring this action on behalf of, and for the benefit of, the beneficiaries of the IMI in their respective capacities as fiduciaries.

6.     The IPF also is authorized to file suit on behalf of certain affiliated Local Bricklayer funds: The B.A.C. Local 4 Pension and Annuity Funds, New Jersey B.A.C. Health Fund, and New Jersey BM&P Apprentice and Education Fund ("Local 4 New Jersey Funds"); Tile Layers Local Union 52 Pension, Insurance and Welfare, Annuity and Vacation Funds, Tile Helpers Local 88 Welfare, Annuity and Vacation Funds, and Tile Finishers Local Union No. 77 of NY & NJ Pension, Welfare and Annuity Funds ("Local 7 New York/New Jersey Funds"); and Bricklayers Local 1 Joint Apprenticeship, The Florida Trowel Trades Pension Trust Fund and The Florida Trowel Trades Health & Welfare Fund ("Local 1 Florida Funds"), hereinafter known collectively as "Local Funds," pursuant to assignments of claim.

4

7.     Defendant, Titan Stone, Tile & Masonry, Inc. ("Titan Stone") is, and at all times hereinafter mentioned was, a company maintaining offices and conducting business in the State of New Jersey.

8.     Defendant, Titan Stone, Tile, & Masonry of Florida, LLC ("Titan Florida") is, and at all times hereinafter mentioned was, a company maintaining offices and conducting business in the State of Florida.

9.     Defendant, Titan Interiors, LLC ("Titan Interiors") is, and at all times hereinafter mentioned was, a company maintaining offices and conducting business in the State of New Jersey.

10.     Defendant, Titan Exterior Wall Systems, Inc. ("Titan Exteriors") is, and at all times hereinafter mentioned was, a company maintaining offices and conducting business in the State of New Jersey.

11.     Defendant, Titan Stone & Tile of Nevada, LLC ("Titan Nevada") is, and at all times hereinafter mentioned was, a company maintaining offices and conducting business in the State of Nevada.

12.     Defendants are building and construction industry employers.  Titan Stone, Titan Florida, and Titan Interiors have employed members of the International Union of Bricklayers and Allied Craftworkers and affiliated local unions ("Union"), and performed work within the work jurisdiction of the Union and the collective bargaining agreements signed with the Union by Titan Stone, Titan Florida, and/or Titan Interiors.  Titan Exteriors and Titan Nevada have also performed work within the work jurisdiction of the Union and the collective

5

2332959

bargaining agreements signed with the union by Titan Stone, Titan Florida, and/or Titan Interiors.

## Violation Charged

13.     Titan Stone, acting through its authorized agents or officers, executed collective bargaining agreements with the Union.  Those collective bargaining agreements are annexed hereto as Exhibits A and B.

14.     Titan Florida, acting through its authorized agents or officers, executed a collective bargaining agreement with the Union.  That collective bargaining agreement is annexed hereto as Exhibit C.

15.     Titan Interiors, acting through its authorized agents or officers, executed a collective bargaining agreement with the Union.  That collective bargaining agreement is annexed hereto as Exhibit D.

16.     Exhibits A through D are hereinafter referred to as "the Agreements." Pursuant to the Agreements, Titan Stone, Titan Florida, and Titan Interiors agreed to make payments to the IPF, IMI, and the Local Funds on behalf of employees and/or subcontractors performing covered work.

2332959

17.     Having submitted some contributions pursuant to the Agreements, Defendants Titan Stone, Titan Florida, and Titan Interiors have demonstrated an awareness of their obligation to make those payments.

18.     An examination of Titan Stone's books and records ("Audit") performed by the independent accounting firm of Ennis, Prezioso & Company, LLC, covering the time period of January 1999 through December 2003, revealed that Titan Stone failed to properly submit required reports and fringe benefit contributions for covered work performed during this time period within the geographic jurisdiction of the Local 7 New York/New Jersey Funds.

19.     As determined by the audit of Titan Stone, the total due the IPF, IMI, and Local Funds by Titan Stone for covered work performed by Titan Stone and/or its subcontractors during the period of January 1999 through December 2003 is $233,413.06, which represents contributions, interest, associated costs and additional interest or liquidated damages.

20.     On May 3, 2006, this Court entered a judgment against Titan Stone and in favor of Plaintiffs in the amount of $233,413.06, representing the amounts owed by Titan Stone pursuant to the audit and fees associated with the cost of litigation, which is annexed hereto as Exhibit E.  Of that judgment, Titan Stone has paid $50,000.00 to Plaintiffs, leaving a balance of $183,413.06 remaining to satisfy that judgment.

21.     Titan Stone also owes Plaintiffs $36,737.93 which represents contributions, interest calculated at 15 percent per annum, and an additional computation of interest calculated

7

at 15 percent per annum from the Due Date through October 10, 2007 for covered work performed within the geographic jurisdiction of the Local 4 New Jersey Funds during the months of January 2006 through April 2006 and September 2006 as determined by shop steward reports.

22.     An audit of Titan Florida's books and records performed by the independent accounting firm of Gordon & Schwartz, PA, covering the time period January 2000 through March 2005, revealed that Titan Florida failed to properly submit required reports and contributions for covered work performed during this time period within the geographic jurisdiction of the Local 1 Florida Funds.

23.     As determined by the audit of Titan Florida, the total due the IPF, IMI, and Local Funds for covered work performed by Titan Florida and/or its subcontractors during the period of January 2000 through March 2005 is $58,918.35, which represents contributions, interest calculated at 15 percent per annum, an additional computation of interest at 15 percent per annum calculated from the Due Date through March 31, 2005, and audit fees.

24.     Upon information and belief, Titan Interiors has also failed to properly submit required reports and contributions for hours worked pursuant to the agreement it signed. Plaintiffs therefore seek to conduct an audit of Titan Interiors' books and records in order to determine any amounts which may be owed for covered work performed by Titan Interiors and/or its subcontractors, as provided for by the Plan and Trust Agreement adopted by the IPF

8

Board of Trustees, the General Collection Procedures of the Central Collection Unit of the Bricklayers and Allied Craftworkers ("CCU Procedures"), and Supreme Court precedent.

25.    Despite several requests by Plaintiffs or a representative of Plaintiffs for access to Titan Interiors' books and records so that Plaintiffs' auditor can determine whether contributions have been made in compliance with Titan Interiors' obligations, Titan Interiors has failed to grant Plaintiffs' auditor such access to its books and records.

26.    At the present time, despite Titan Interiors' refusal to submit to an audit, Plaintiffs have determined through shop steward reports that Plaintiffs are owed the amount of $10,322.34 which represents contributions, interest calculated at 15 percent per annum, and an additional computation of interest calculated at 15 percent per annum from the Due Date through October 10, 2007 for covered work performed by Titan Interiors and/or its subcontractors within the geographic jurisdiction of the Local 4 New Jersey Funds during the months of March 2006, April 2006, May 2006 and September 2006.  The amounts owed for covered work performed by Titan Interiors and/or its subcontractors during other periods is not yet known because of Titan Interiors' refusal to submit to an audit.

27.    Under the terms of the Plan and Trust Agreements adopted by the IPF and IMI, Plaintiffs are entitled to interest on the total amount of delinquent contributions owed by Defendants at the rate of 15 percent per annum, and the greater of either an additional computation of interest calculated from the Due Date at the rate of 15 percent per annum or liquidated damages calculated at the rate of 20 percent.

9

2332959

28.     Plaintiffs have brought this action in faithful performance of the fiduciary duties imposed upon them under Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1). Plaintiffs have been, and are, incurring additional attorney's fees as a direct result of Defendants' failure to make contributions in accordance with the terms and conditions of the Agreements.

29.     Upon information and belief, Titan Stone, Titan Florida, and Titan Interiors, parties to Union collective bargaining agreements, and Titan Exteriors and Titan Nevada, are and were, at all relevant times, alter egos in that, *inter alia,* they were under common control, and some or all of them operated from the same building, engaged in the same business, shared some of the same employees, members, officers, and owners, were operated and controlled by the same individual(s), and/or intermingled assets.

30.     As alter egos, Defendants are jointly and severally liable for each other's debts and obligations, including any and all contributions and other amounts that should have been paid to the IPF, IMI, and/or Local Funds for covered work performed by Defendants' employees and/or subcontractors.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.     For the total amount of $289,741.68 which is calculated as follows:

a.  For $220,150.99, representing the amounts owed by Titan Stone for the remaining unpaid audit and judgment balance, plus the additional delinquent contributions, interest and additional interest owed for  covered work performed by Titan Stone during the

10

2332959

period of January 1999 through September 2006 (ERISA Section 502(g)(2)(A); ERISA Section 502(g)(2)(B); ERISA Section 502(g)(2)(C); CCU Procedures);

 b. For $58,918.35, representing the amounts owed for covered work performed by Titan Florida during the audit period of January 2000 through March 2005 (ERISA Section 502(g)(2)(A); ERISA Section 502(g)(2)(B); ERISA Section 502(g)(2)(C)(i); CCU Procedures);

 c. For $10,322.34, representing contributions, interest and an additional calculation of interest owed for covered work performed by Titan Interiors during the months of March 2006, April 2006, May 2006 and September 2006 (ERISA Section 502(g)(2)(A); ERISA Section 502(g)(2)(B); ERISA Section 502(g)(2)(C)(i); CCU Procedures);

 d. For an order declaring that Defendants Titan Stone, Titan Florida, Titan Interiors, Titan Exteriors and Titan Nevada are alter egos and jointly and severally liable for the total amount of $289,741.68 owed to Plaintiffs, plus any additional unknown amounts, and/or additional interest, or liquidated damages owed to Plaintiffs by Defendants;

 e. For an order directing each of Defendants to turn over to Plaintiffs' auditor their books and records including, but not limited to, their payroll records and general ledgers;

 f. For the costs of filing this action in the amount of $350.00 (ERISA Section 502(g)(2)(D)).

 2. For attorney's fees and costs incurred in this action, in an amount to be determined at a later date (ERISA Section 502(g)(2)(D)).

11

2332959

3.    For an order directing Defendants to comply with their obligations to submit all required reports and make all contributions due and owing the IPF, IMI, and Local Funds.

4.    For such other relief as this Court deems appropriate, including judgment for any contributions and interest thereon that may accrue subsequent to the filing of this Complaint, as well as any resulting statutory damages thereon under ERISA.

Dated: _Oct - 12,_____, 2007        By: _____

Ira R. Mitzner, DC Bar No. 184564
Charles V. Mehler III, DC Bar No. 475909
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006
(202) 420-2200

*Attorneys for Plaintiffs*

12

EXHIBIT A

# A G R E E M E N T

*Between*

*Tile Layers Subordinate Union*

*of New York & New Jersey*

*of the*

*International Union of*

*Bricklayers and Allied Crafts*

*and*

*Employer*

# Local 7

From May 5, 1997 to May 4, 2000

**DE AGREEMENT** between **THE GREATER NEW YORK TILE CONTRACTORS ASSOCIATION** and **TILE CONTRACTORS ASSOCIATION OF NEW JERSEY, INC.**, hereinafter each referred to as the ("Association" or the "Employer") on their behalf and on behalf of their respective members, who are members at the time of the execution of this Trade Agreement or may become members during the life of this Trade Agreement and any extension or renewals thereof, and the **TILE LAYERS SUBORDINATE UNION OF NEW YORK & NEW JERSEY OF THE INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTSMEN**, Four Court Square, Long Island City, New York 11101 (hereinafter referred to as the "Union.")

**WHEREAS**, the Association is an incorporated association of tile contractors engaged in the installation of tile and related materials in New York City, New Jersey, Long Island, and certain other counites, identified below, in the State of New York.

**WHEREAS**, the Union is an unincorporated association of mechanics employed in the tile industry, performing the labor described herein.

Now, therefore, the parties agree as follows:

## ARTICLE 1
### The Bargaining Unit

**Section 1.**

(A)  The Employer recognizes the Union as the sole collective bargaining agent for Tile Setters and Apprentices (hereinafter referred to collectively as "Tile Layers") employed by the Employer within New York City, the State of New Jersey, Long Island, and the following counties in the State of New York: Westchester, Rockland, Putnam, Orange, Sullivan, Dutchess and Ulster.

1

**Section 2.**

Tile Layers work ... .ludes, but is not limited to, the work defined as:

(A)  The laying, cutting, or setting of all tile where used for floors, walls, ceilings, walks, promenade roofs, exterior veneers, stair treads, stair risers, facings, hearths, fireplaces and decorative inserts, together with any marble plinths, thresholds or window stools used in connection with any tile work; also to prepare and set all concrete, cement, brickwork, or other foundations or material that may be required to properly set and complete such work.

(B)  The application of a float coat or coats of portland cement mortar prepared to proper tolerance to receive tile on floors, walls and ceilings regardless of whether the portland cement mortar coat is wet or dry at the time the tile is applied to it.

(C)  The setting of all tile bonded with portland cement mortar, where the bed is floated, screeded, slabbed or buttered and where joints are not filled in the same operation.

(D)  The setting of all tile by the adhesion method with organic and/or inorganic thin-bed bonding materials where such bonding material is applied to the backing surface and/or the back of tile units or sheets of tile.

(E)  The setting of tile as herein provided shall include the installation of accessories and the insertion of decorative tile inserts in other materials.

(F)  The mounting, setting, sealing and installation of prefabricated tile panels in shop and at the job.

(G)  The setting of accessories when built into tile walls.

(H)  The setting of decorations, of mantels and counters.

(I)  The patching of old and new work.

(J)  Thin-set waterproofing.

(K)  All work usually and customarily performed by Tile Layers.    2

**Section 3.**

"TILE" is herein defined as the following products, which are not limited in size or thickness:

(A)  All burned clay products, as used in the tile industry, either glazed or unglazed.

(B)  All composite materials, marble tiles, glass, mosaics, brickettes, terra cotta, glass mosaics, and all substitute materials for tile made in tile like units.

(C)  All materials in the tile like forms of cement, metals, plastics and other materials, that are made for or intended for use as a finished floor surface, stair treads, promenade floors, walks, walls, ceilings, swimming pools and all other locations where tile is used to form a finished interior or exterior surface for practical use, sanitary finish or decorative purposes.

## ARTICLE II
## Union Security

**Section 1.**

Membership in the Union shall be required as a condition of continued employment of all employees covered by this Agreement on the eighth (8th) day following the beginning of such employment or the effective date of the Trade Agreement, whichever is later.

**Section 2.**

The Employer and the Union agree there will be no discrimination against any employee, or applicant for employment, with respect to race, creed, color, national origin, sex, age, handicap, marital status, sexual orientation or affectional preference in all employment decisions, including, but not limited to, recruitment, hiring, compensation, training and apprenticeship, promotion, upgrading, demotion, downgrading, transfer, layoff and termination, and all other terms and conditions of employment, except as provided by law.    3

## ARTICLE II-A
### Other Contractors and Travelling Contractors

**Section 1.**

No Tile Setter shall work for any Employer or individual who has failed to sign an Agreement with the Union or does not comply with the terms and conditions of employment in said Agreement.

**Section 2.**

In order to protect and preserve for the employees covered by this Agreement, all work heretofore performed by them, and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any bargaining unit work of the type covered by this Agreement, and within the geographical jurisdiction of the Union, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including joint venture, the terms and conditions of this Agreement shall be applicable to all such work: (A) where the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision and/or ownership; and (B) where there exists between the Employer and such other business entity, interrelation of operations, common management, centralized control of labor relations and/or common ownership. In determining the existence of the aforementioned criteria, the presence of the requisite control or commonality at any level of management shall be deemed to satisfy those criteria. Should the Employer establish or maintain such other entity within the meaning of this Section, the Employer is under an affirmative obligation to notify the Union of the existence and nature of and work performed by such other entity and the nature and extent of its relationship to the Employer.

**Section 3.**

The Employer, whether as an individual, partner or employee of a partnership, or as an officer, director, stockholder or employee of a corporation, agrees to remain bound by the terms and conditions of this Agreement, although doing business as an individual under another trade name, or as a partner or employee of another partnership, or as an officer, director, stockholder or employee of another corporation, or as a joint venturer.

**Section 4.**

In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them, and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement at the site of a construction project, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer (including its officers, directors, owners, partners or stockholders) exercises either directly or indirectly (such as through family members) any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work.

**Section 5.**

All charges of violations of Section 4 of this Article shall be considered as a dispute under this Agreement and shall be processed in accordance, with the procedures for the handling of grievances and the final binding resolution of disputes, as provided in Article XV of this Agreement. As a remedy for violations of this Section, the arbitration body provided for in Article XV is empowered, at the request of the Union, to require an Employer to (1) pay to affected

4

5

employees covered this Agreement the equivalent of wages lost by such employees as a result of the violations, and (2) pay into the affected joint trust funds established under this Agreement any delinquent contributions to such funds which have resulted from the violations, including such interest as may be prescribed by the trustees or by law. Provision for this remedy herein does not make such remedy the exclusive remedy available to the Union of such joint trust funds for violation of this Section; nor does it make the same or other remedies unavailable to the Union or such joint trust funds for violations of other sections or articles of this Agreement.

### Section 6.

If, as a result of violation of this Article, it is necessary for the Union and/or trustees of the joint trust funds to institute court action to enforce an award rendered in accordance with Section 5 above, or to defend an action which seeks to vacate such an award, the Employer shall pay any accountants' and attorneys' fees incurred by the Union and/or the fund trustees, plus costs of the litigation, which have resulted from the bringing of such court action.

### Section 7.

When the Employer has any work specified in Article I of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by an agreement with another affiliate of the International Union of Bricklayers and Allied Craftsmen, the Employer agrees to abide by the full terms and conditions of the Agreement in effect in the jobsite area. Employees covered by this Agreement who are sent to projects outside of the area covered by this Agreement shall be paid at least the established minimum wage scale specified in Article III but in no case less than the established minimum wage scale of the local Agreement covering the territory in which such

6

work is being performed plus all contributions specified in the jobsite Local Agreement. The Employer shall in all other matters be governed by the provisions established in the jobsite local Agreement. If employees are sent to work on a project in an area where there is no local Agreement covering the work specified in Article I of this Agreement, the full terms and conditions of this Agreement shall apply.

## ARTICLE III
### Hours, Wages and Fringe Benefits

### Section 1.  Hours

(A)  Seven (7) hours will constitute a regular day's work. Regular working hours are Monday through Friday from 8:00 A.M. to 12 Noon, and from 12:30 P.M. to 3:30 P.M. When a specific job requires a 9:00 A.M. starting time, the regular seven (7) hours are Monday through Friday from 9:00 A.M. to 1:00 P.M., and from 1:30 P.M. to 4:30 P.M.

(B)  No work is to be done or paid for between the hours of 7:00 A.M. and 8:00 A.M. or 3:30 P.M. to 4:30 P.M. except in an emergency. When no emergency is involved, a starting time of 7:00 A.M. for the normal work day for a specific job will be approved by the Union based on the Employer providing evidence of this requirement.

(C)  Should a Tile Layer leave a job by his own volition before 12 noon or before 3:30 P.M., his pay for that day shall be proportionately reduced. The Employer must deduct the proportioned hourly amount from such employee's pay for that day.

(D)  Tile Layers may be laid off as of 12 noon or 3:30 P.M. When laid off, a Tile Layer shall be notified of such action no later than one hour before the time of such layoff. Failure of the Employer to notify the Tile Layer of layoff and to pay wages in full as herein prescribed, will obligate

7

the Employer to continue the Tile Layers in his employ another one-half (½) day or to pay the equivalent in waiting time be it 12 noon or 3:30 P.M.

(E) No work shall be performed on Saturdays, Sundays or holidays, unless notification is given to the Union and the Union consents to the performance of work on such day.

(F) No Tile Layer work shall be performed for more than seven (7) consecutive hours except in an emergency.

(G) No Tile Layer shall be required to report to the Shop after regular working hours or before 7:30 A.M.

**Section 2.**

(A) Wage rates and fringe benefit contribution rates for employees within the bargaining unit during regular working hours shall be:

### NEW YORK TILE SETTERS

|  | 5/4/97 | 11/1/97 | 5/1/98 | 11/1/98 |
|---|---|---|---|---|
| WAGES | $29.14 | $29.16 | $29.41 | $29.76 |
| Dues C/O | $ 1.36 | $ 1.38 | $ 1.40 | $ 1.42 |
| BENEFITS |  |  |  |  |
| Pension | $ 2.25 | $ 2.25 | $ 2.25 | $ 2.25 |
| I.P.F. | $ .75 | $ .75 | $ .75 | $ .75 |
| Annuity | $ 4.51 | $ 4.84 | $ 5.09 | $ 5.44 |
| Welfare | $ 5.18 | $ 5.28 | $ 5.28 | $ 5.38 |
| Promotion | $ .05 | $ .05 | $ .05 | $ .05 |
| I.M.I | $ .15 | $ .20 | $ .20 | $ .25 |
| **TOTAL** | **$42.03** | **$42.53** | **$43.03** | **$43.88** |

|  | 5/1/99 | 11/1/99 |
|---|---|---|
| WAGES | $30.26 | $31.26 |
| Dues C/O | $ 1.45 | $ 1.50 |
| BENEFITS |  |  |
| Pension | $ 2.25 | $ 2.25 |
| I.P.F. | $ .75 | $ .75 |
| Annuity | $ 5.84 | $ 6.34 |
| Welfare | $ 5.48 | $ 5.48 |
| Promotion | $ .06 | $ .05 |
| I.M.I | $ .25 | $ .25 |
| **TOTAL** | **$44.88** | **$46.38** |

8

### UPSTATE NEW YORK RATES
### Dutchess, Orange, Sullivan, and Ulster Counties

|  | 5/4/97 | 11/1/97 | 5/1/98 | 11/1/98 |
|---|---|---|---|---|
| WAGES | $18.64 | $18.66 | $18.91 | $19.26 |
| Dues C/O | $ 1.02 | $ 1.04 | $ 1.05 | $ 1.08 |
| BENEFITS |  |  |  |  |
| Pension | $ 2.25 | $ 2.25 | $ 2.25 | $ 2.25 |
| I.P.F. | $ .75 | $ .75 | $ .75 | $ .75 |
| Annuity | $ 4.51 | $ 4.84 | $ 5.09 | $ 5.44 |
| Welfare | $ 5.18 | $ 5.28 | $ 5.28 | $ 5.38 |
| Promotion | $ .05 | $ .05 | $ .05 | $ .05 |
| I.M.I. | $ .15 | $ .20 | $ .20 | $ .25 |
| **TOTAL** | **$31.53** | **$32.03** | **$32.53** | **$33.38** |

|  | 5/1/99 | 11/1/99 |
|---|---|---|
| WAGES | $19.76 | $20.76 |
| Dues C/O | $ 1.11 | $ 1.16 |
| BENEFITS |  |  |
| Pension | $ 2.25 | $ 2.25 |
| I.P.F. | $ .75 | $ .75 |
| Annuity | $ 5.84 | $ 6.34 |
| Welfare | $ 5.48 | $ 5.48 |
| Promotion | $ .05 | $ .05 |
| I.M.I. | $ .25 | $ .25 |
| **TOTAL** | **$34.38** | **$35.88** |

9

### SOUTHERN NEW JERSEY RATES
### Ocean, Burlington, Atlantic City, Cape May, Cumberland, Camden, Gloucester, Salem & South of Route 33 Counties

|  | 5/4/97 | 11/1/97 | 5/1/98 | 11/1/98 |
|---|---|---|---|---|
| WAGES | $24.28 | $24.58 | $25.08 | $25.43 |
| Dues C/O | $ 1.17 | $ 1.21 | $ 1.24 | $ 1.25 |
| BENEFITS |  |  |  |  |
| Pension | $ 2.25 | $ 2.25 | $ 2.25 | $ 2.25 |
| I.P.F. | $ .75 | $ .75 | $ .75 | $ .75 |
| Annuity | $ 3.45 | $ 4.00 | $ 4.50 | $ 4.50 |
| Welfare | $ 5.18 | $ 5.28 | $ 5.28 | $ 5.38 |
| Promotion | $ .05 | $ .05 | $ .05 | $ .05 |
| I.M.I. | $ .15 | $ .20 | $ .20 | $ .25 |
| **TOTAL** | **$36.11** | **$37.11** | **$38.11** | **$38.61** |

|  | 5/1/99 | 11/1/99 |
|---|---|---|
| WAGES | $25.83 | $26.33 |
| Dues C/O | $ 1.29 | $ 1.30 |
| BENEFITS |  |  |
| Pension | $ 2.25 | $ 2.25 |
| I.P.F. | $ .75 | $ .75 |
| Annuity | $ 5.00 | $ 5.00 |
| Welfare | $ 5.48 | $ 5.48 |
| Promotion | $ .05 | $ .05 |
| I.M.I. | $ .25 | $ .25 |
| **TOTAL** | **$39.61** | **$40.11** |

10

The Union in its sole absolute discretion reserves the right to allocate any of the foregoing increases to wages or any of the Fringe Benefit Funds. All Allocations shall be subject to all IRS regulations including, but not limited to, the IRS 25% rule. The employers are to be notified of the allocation thirty (30) days prior to the effective date of the increase.

(B) Wages are payable by cash or by check. Tile Layers shall be paid not later than 3:30 P.M. on Wednesdays, if paid by check or on Thursday if paid in cash for all services rendered for the week ending on Sunday.

(C) Should an Employer's check not be honored or liable for waiting time, not to exceed two (2) days, Employers whose checks are dishonored may not thenceforth pay wages by check.

(D) Except for conditions beyond the control of the Employer, a Tile Layer who is sent to a job by an Employer which is not ready shall be paid a half (½) day's pay.

(E) Overtime is to be paid at the rate of 1½ times the regular rate of pay for work performed after 3:30 P.M. on any job that commences at 8:00 A.M. and is not completed by 3:30 P.M.

(F) Double time shall be paid on Sundays and Holidays.

(G) Tile Layers who are required to work on Saturday shall receive one and one half (1½) times the regular straight time rate to pay for all hours worked that day.

(H) The Employer shall have the right to utilize a work day shift other than the regular seven (7) hour shift where job conditions require it. Tile Layers who perform such off-shift work shall receive a shift differential rate of 1¼ times the regular straight time rate of pay for the seven (7) hours of actual off-shift work.

(I) A wage-fringe rate of 50% of the wage-fringe package set forth above, the reduction to be applied across the

11

board, shall be esta___ ___ed for residential single family two story garden apart_ ___ s and fast food free standing and fast food type work. Employees working under the reduced rate shall not be eligible to work on standard rate jobs for the duration of this agreement.

(J)   Wage rates of Apprentices under this Agreement shall be as follows:

| Hours of Experience | Wage Rate |
|---|---|
| 1 - 750 Hours of Work | 50% of Tile Layer's Rate |
| 751 - 1,500 Hours of Work | 55% of Tile Layer's Rate |
| 1,501 - 2,250 Hours of Work | 65% of Tile Layer's Rate |
| 2,251 - 3,000 Hours of Work | 75% of Tile Layer's Rate |
| 3,001 - 3,750 Hours of Work | 85% of Tile Layer's Rate |
| 3,751 - 4,500 Hours of Work | 95% of Tile Layer's Rate |

## Section 3.
## WELFARE, PENSION, ANNUITY FRINGE BENEFIT FUNDS

(A)   Welfare, Pension and Annuity Funds have been established, approved and operated jointly by the Union and the Associations.

(B)   These Funds are for the benefit of the Tile Layers, and are to be used for the established purposes only.

(C)   Contributions to the Welfare Fund, and the Annuity Fund shall be paid on the basis of Tile Layer hours paid for.

(D)   Contributions to all other Funds shall be paid on the basis of hours worked by the Tile Layer. The Employer shall deduct from wages 3.25 % of gross salary for each hour paid or any additional sums per hour thereafter specified by the Union. The amount so deducted shall be remitted to the Union as dues check-off. The sums transmitted shall be accompanied by a statement, in a form specified by the Union, reporting the name of each person

12

w_ __e dues are being paid and the number of hours each employee has been paid. The Employer and the Union further a acknowledge that the Employer has agreed to make such deductions provided that at the time of such deductions, the Employers have received written authorizations executed by the employee. The Employer and the Union further acknowledge that the Trustees have agreed to make such deductions provided that at the time of such deductions there is in possession of the Trustees proper written authorization executed by the employee. The Employer and the Union further acknowledge that the Union has agreed to indemnify and hold harmless the Trustees from any and all claims, actions and proceedings arising out of said payment.

(E)   Elected full time officers of the Union and employees of the Union may participate in the Pension, Welfare, Annuity Funds and the International Union of Bricklayers and Allied Crafts Pension Fund (I.U. Pension Fund) provided contributions are paid to these funds on their behalf in the same manner as other covered employees.

(F)   Employers shall provide for the coverage of Tile Layers in their employ with disability insurance in accordance with the requirements of the law of the State in which they are employed.

(G)   Payments by Employers to the Pension, Welfare, Annuity, Promotion and I.U. Pension Fund shall be accompanied by reporting forms furnished to the Employer by the Trustees of the respective Funds, containing such data as the Trustees may from time to time determine in their discretion to be necessary. Employers must file monthly fringe benefit contribution remittance reports whether or not employees are performing Tile Layers work during any particular period. Payments to the Pension, Welfare, Annuity and Promotion Funds shall be remitted to the funds or such other representative as the Trustees

13

may select. Payme    to the I.U. Pension Fund shall be remitted to the     /Pension Fund, or such other representative as the I.U. Pension Fund may select.

(H)   The books and records of the Employer shall be made available at all reasonable times for inspection and audit by, but not limited to, the accountant, outside independent auditors or other representatives of the Trustees of Pension, Welfare and Annuity Funds. The Employer shall be required to disclose upon such audits all payrolls and payroll ledgers including office payrolls, yard payrolls, New York payrolls, New Jersey payrolls, Connecticut payrolls, computer payroll printouts, W-2 forms, Quarterly Federal Payroll Tax Returns (Form 941), Quarterly State Payroll Tax Returns (Forms WRS-2 and WRS-30), annual Federal and State Tax Returns, Cash Disbursements, Journals, Purchase Journals, New York State Employment Records, Insurance Company Reports, Employer Remittance Reports, Payroll and Supporting Checks, Ledgers, Vouchers, 1099 Forms, evidence of Unemployment Disability Insurance Premiums, Certification of Workers Compensation Coverage, checks in support hereof and any other documentation concering payrolls. In addition, the aforementioned books and records of any Affiliate, Subsidiary, Alter Ego, Joint Venture or other related company of the Employer shall also be made available at all reasonable times for inspection and audit by, but not limited to, the Accountants, Outside Independent Auditors or other representatives of the Trustees of the Funds.

(I)   The Employer shall retain, for a minimum period of six (6) years, payroll and related records necessary for the conduct of a proper audit in order that a designated representative of the Trustees may make periodic review to confirm that contributions, owed pursuant to this Agreement are paid in full. In the event, after the Trustees have made a request, the Employer fails to produce its books and records necessary for a proper audit, the

14

T    .es of the Pension, Welfare, Annuity and Promotion Funds in their sole discretion, may determine that the Employer's monthly hours subject to contributions for each month of the requested audit period are the highest number of Tile Layer hours for any month during the twelve (12) preceding months audited, or during the last twelve (12) months for which reports were filed, whichever monthly number of hours is greater. Such determination by the Trustees shall constitute presumptive evidence of delinquency. Prior to making such determination, the Trustees shall mail a final seven (7) day written notice to the Employer advising him that such determination shall be made if the Employer does not schedule a prompt audit. Nothing herein shall mean that the Funds relinquish their right to commence legal proceedings to compel an examination of the Employer's books and records for audit.

(J)   If the Employer or a creditor of the Employer seeks the protection and/or intervention of the Bankruptcy Court under Chapters 7 or 11 of the United States Bankruptcy Code, the Trustees or their representatives shall have the right to conduct a quarterly audit of the Employer's books and records to confirm that contributions owed pursuant to this Agreement are paid in full. Nothing herein shall mean that the Funds relinquish their right to commence legal proceedings to compel an examination of the Employer's books and records nor shall this section limit the Trustees rights as creditors under the United States Bankruptcy Code.

(K)   When auditors ar sent to audit the books and records of the Employer and a definite appointment is scheduled and the auditor cannot start at the appointed time and date and must return, or when complete payroll records requested herein are not furnished, then the Employer shall be penalized and pay the sum of two hundred fifty dollars ($250.00) per auditor, to cover the expense of the auditor.

15

(L) It shall be a ~~lation~~ of this Agreement for any Employer to fail to ~~...sh~~ proper payroll records when requested for the purpose of completing an audit. The Union shall have the right to remove all its members from the offending Employer provided that three (3) days notice of intention to remove Tile Layers from a job is given to the Employer by the Union by certified mail. If such ~~members who are removed remain on the jobsite during~~ regular working hours, they shall be paid for lost time.

(M) The President, Vice President, Secretary-Treasurer, individual partner, employee of the partnership, officer, stockholder, proprietor or employee of the corporation, company, joint venture or proprietorship of the Employer acknowledges that he or she is vested with the authority and control over the submission of reports and/or payment of contributions to the Funds and acknowledges that he or she shall be personally and individually obligated to submit the required reports and/or pay the required contributions to the Funds for all work performed by Tile Layers.

(N) In the event the Employer does not make timely payment of contributions to Pension, Welfare, Annuity or Promotion Funds required herein, it is agreed that the Employer shall be liable for the following liquidated damages: An additional payment of five percent (5%) of the amount owing, and, if the Employer is a corporation, interest at the per annum rate of ten percent (10%) of the amount owing or at the maximum legal rate, whichever is greater. If the Employer is not a corporation, interest shall be at the maximum legal rate. Furthermore, if an audit is required of the Employer's books and records and a deficiency in contributions is determined, which is not paid within seven (7) days after reasonable notice, the Employer agrees to pay as additional liquidated damages five percent

16

o~~....~~e amount owing. If thereafter, in the sole discretion of the Trustees, the Employer's account is referred to legal counsel for collection, the Employer agrees to pay as additional liquidated damages five percent (5%) of the amount owing as attorney's fees. If litigation is instituted by service of a summons and complaint, or participation in any insolvency proceeding of the Employer is required, the Employer agrees to pay as additional liquidated damages five-hundred ($500.00) to each of the Pension, Welfare, Annuity and Promotion Funds, or five percent (5%) of the amount owing, whichever amount shall be greater. The Employer acknowledges and understands that the above liquidated damages are cumulative and are required to protect the fiscal integrity of the Pension, Welfare, Annuity and Promotion Funds. Where collection of payment is made pursuant to a judgment against the Employer, the Employer recognizes the Trustees' rights to receive liquidated damages, interest, costs and attorney's fees provided for pursuant to the civil enforcement provisions of the Employee Retirement Income Security Act, as amended.

(O) Any Employer who is found upon regular or special audit ordered by the Trustees of the Pension, Welfare, Annuity, Promotion Fund and/or I.U. Pension Fund to be more than three (3) months delinquent in excess of $1,000.00 may be charged the full cost of such audit.

(P) Where payment is made or an audit is conducted pursuant to a judgment or court order, the Employer recognizes the right of the Trustees of the Pension, Welfare, Annuity and Promotion Funds to have the court enter an order permanently enjoining the Employer and its agents, representatives, directors, officers, stockholders, successors and assigns, for the remaining term of this Agreement from failing, refusing or neglecting to submit the required

17

employer remittance ...orts and/or to pay the required contributions to the l... ...s, and requiring the Employer to cooperate in an audit in accordance with the provisions of this Agreement. In consideration of this Agreement the Employer represents and warrants that it will not raise any defense, counterclaim or offset to the Trustees' application for this order.

(Q) The Employer recognizes that when payment of contributions to the Pension, Welfare, Annuity and Promotion Funds pursuant to this Agreement is made by check or other negotiable instrument which is returned uncollected, the Pension, Welfare, Annuity and Promotion Funds incur additional cost and expense. The Employer hereby agrees that in the event any payment to the Pension, Welfare, Annuity and Promotion Funds by check or other negotiable instrument results in the check or negotiable instrument begin returned without payment after being duly presented, the Employer shall be liable for additional damages in the amount of one hundred dollars ($100.00) to cover such additional costs, charges and expenses. Nothing herein is intended, nor shall it be interpreted, to mean that the Pension, Welfare, Annuity and Promotion Funds or Union waive any other liquidated damages required to be paid pursuant to this Agreement in the event Employer contributions to the Pension, Welfare, Annuity and Promotion Funds are not timely paid in full.

(R) Any Employer who is delinquent in paying its contributions to the Pension, Welfare, Annuity and Promotion Funds shall pay nine percent (9%) on all late payments or such amount of interest as the U.S. Department of Labor or the Internal Revenue Service may require Trustees of Employee Benefit Funds to collect for late payments of contributions, whichever amount is greater.

18

( ...f Tile Layers are withdrawn from any job in order to c....ect contributions to the Pension, Welfare, Annuity and Promotion and I.U. Pension Funds, the Tile Layers who are affected by such stoppage of work shall be paid for lost time, provided that three (3) days notice of the intention to remove Tile Layers from a job is given to the Employer by the Union by certified mail.

(T) Any Employer who is found upon regular or special audit ordered by the Trustees of the Pension, Welfare, Annuity, Promotion and/or I.U. Pension Fund to be substantially delinquent may be charged the full cost of such audit.

(U) The Employer hereby agrees to be bound by and to the Agreements and Declarations of Trusts of the Pension, Welfare, Annuity and Promotion Funds, as though it had actually signed the individual documents and further agrees to be bound by all actions taken by the Funds pursuant to said Agreements and Declaration of Trusts, as amended, and their respective Plans, as amended, and by all By-Laws, rules and resolutions adopted to regulate each of the Funds.

## Section 4.
## International Union of Bricklayers and Allied Crafts Pension Fund

(A) The Employer acknowledges that the Union has elected to participate in the I.U. Pension Fund.

(B) The Employer hereby agrees to be bound and to the Agreements and Declarations of Trusts for the I.U. Pension Fund as though he had actually signed the individual documents and further agrees to be bound by all actions taken by the Trustees of this fund pursuant to said Agreements and Declarations of Trusts.

(C) The Employer hereby irrevocably designates as its representatives on the I.U. Pension Fund Board of Trustees

19

such Trustees as are n͏ ͏erving, or who will in the future serve, as Employer Tru͏ ͏s, together with their successors.

(D)   For the purpose of this Section, each hour paid for, including hours attributable to show-up time, and all other hours for which pay is received by the employee in accordance with this Agreement, shall be counted as hours for which contributions are payable to the I.U. Pension Fund.

(E)   Contributions shall be paid on behalf of all covered employees starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to contribution to journeymen, apprentices, helpers, trainees and probationary employees.

(F)   All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees shall have the authority to have an independent Certified Public Accountant audit the time books, payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the I.U. Pension Fund. Any Employer found, as a result of an audit ordered by the Trustees of one of the I.U. Pension Fund, to have been substantially inaccurate in reporting shall be charged the full costs of such audit.

(G)   If the Employer fails to make any contribution specified in this Section, within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary, including the withdrawal of manpower, to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs for collection of payments due together with attorney's fees and such liquidated damages as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any

20

gri͏ ͏ce or arbitration procedure or any "no strike" clause wh͏ ͏nay be provided for or set forth elsewhere in this Agreement.

## ARTICLE IV
### Holidays

**Section 1.**

| | |
|---|---|
| NEW YEARS DAY | VETERANS DAY |
| WASHINGTON'S BIRTHDAY | THANKSGIVING DAY |
| GOOD FRIDAY | (& THE DAY AFTER) |
| MEMORIAL DAY | CHRISTMAS DAY |
| INDEPENDENCE DAY | LABOR DAY |
| COLUMBUS DAY | |

And any other holiday celebrated on Monday, and any holiday observed in this jurisdiction by International Union of Bricklayers and Allied Crafts ("International Union").

**Section 2.**

No work within the trade and geographic jurisdiction of the Tile Layers Union shall be performed on Labor Day.

**Section 3.**

When Tile Layers covered by this Trade Agreement are working in locations outside of the jurisdiction of the Union, for Employers signatory to this Agreement, they must observe holidays in the locality.

## ARTICLE V
### Foremen

**Section 1.**

There shall be a foreman on all jobs within the jurisdiction of the Union. The foreman shall be a Tile Layer.

21

(A) On jobs where ~~~~e (5) or more Tile Layers are employed the foreman ~~~~l receive an amount at least ten (10) dollars ($10.00) per day above the daily wage of a Tile Layer.

(B) On jobs where more than ten (10) Tile Layers are employed, the foreman shall not handle the tools and shall receive an amount at least ten dollars ($10.00) per day above the daily wage of a Tile Layer.

(C) Any Tile Layer who has invested in, retained stocks or has any financial interest in any tile contracting firm under no circumstances shall be installed as foreman on any operation or installation of tile work.

## ARTICLE VI
### Shop Stewards

**Section 1.**

A Shop Steward shall be present on all jobs having two (2) or more Tile Layers. He shall be appointed by the Union and shall not be discriminated against for the legitimate performance of his duties.

**SECTION 2.**

The Shop Steward shall enforce the conditions of this Agreement and methods of employment herein established. It is his duty to see that no work is performed between the hours of 12 noon and 12:30 P.M. and that no Tile Layer continues to work after 3:30 P.M. or quits before 3:30 P.M., except as provided for by this Agreement. The Shop Steward shall notify the foreman when lockers are inadequate to protect the Tile Layers' clothes and tools.

**Section 3.**

The Shop Steward shall perform his duties with the least possible inconvenience to his Employer. He is to work as a

22

Til~~~~ ~~er and is not to use his position as an excuse to avoid the performance of his duties as a Tile Layer.

## ARTICLE VII
### Cutting of Tiles

**Section 1.**

Cutting of tile by machinery and tools shall be the work of the Tile Layers. The cutting of tile shall be done on the job site by Tile Layers unless specifically cut by the tile manufacturer.

**Section 2.**

(A) The Employer shall supply cutting machines for all tiles measuring more than six inches (6") on any side and all quarry tiles and other rough tiles.

(B) There shall be no limitation as to the use of power machines or tools used by the Tile Layers on the job site.

## ARTICLE VIII
### Apprentices

**Section 1.**

The parties are subject to and bound by "Standards of Apprenticeship for Greater New York Tile Layers Joint Apprenticeship Committee," which shall apply to all Apprentices employed under this Agreement. The "Standards of Apprenticeship for Greater New York Tile Layers Joint Apprenticeship Committee" are incorporated in this Agreement by reference as if fully set forth herein.

## ARTICLE IX
### Preparations

**Section 1.**

All preparations for tile walls, ceilings and floors must be properly prepared with sand and cement, plumb and true and scored. The portland cement float coat must be

23

properly prepared, plu    .nd true and shall be the exclusive work of the Tile Layers. The Union shall have the right to bring to the attention of the Employer any and all preparations that may be considered detrimental to proper and durable installation of work. It is understood that precautions to insure and guarantee the proper and durable installation of work are to conform with accepted practice in the industry. It is understood that preparations for adhesive installations are to be plumb and true and are to conform with accepted practice in the industry. Subsurface is to be dry, firm and clean for proper bond with adhesive. Rooms and any other work shall be cleaned to the proper level for the installation of the tile. Tubs shall also be cleaned of debris for the proper installation of the tile.

### Section 2.

Both parties signing this Agreement do not recognize that any particular grade of tile should call for any special grade of installation, but all installations regardless of quality or kind of tile, should be made in a first class manner, provided Tile Layers are supplied with proper working equipment such as soaking tubs, mortar boards, scaffolds wherever required, straight edges, floating strips, mixing boxes, sufficient light and heat to insure proper installation of tile work and such materials as are specified by the Architect for the job in question, and providing the principles of the trade as to proper installation and durability are adhered to.

Existing elevators shall be made available to Tile Layers where the building is over seven (7) stories in height.

### ARTICLE X
### Notice of Execution of Contract

### Section 1.

The Employer must within fifteen (15) days of entering into a contract requiring the performance of labor covered by this Agreement give written notice of such contract to

24

th    .ion and must give further written notice five (5) days before the commencement of the performance of any work.

### Section 2.

The Employer shall mail the required initial aforesaid notice to the Secretary of the Union stating:

(A)  The name of the party with whom the contract was made.

(B)  The place where the contract is to be performed.

(C)  The approximate time when the Employer will commence performance of work under such contract.

(D)  Whether this is to be a mortar job and the appropriate number of working days by the Tile Layers required to carry out such a contract.

(E)  The Secretary of the Union shall promptly acknowledge to the Employer the receipt of such communication.

### Section 3.

The required second aforesaid notice shall state the approximate number of Tile Layers to be employed on said job.

### Section 4.

No Tile Layer shall perform any work for any Employer who fails to give all notices as provided for in this Article, prior to the commencement of any work.

### ARTICLE XI
### Assignment of Contract

### Section 1.

No Employer, having a contract requiring the performance in connection therewith of labor within the classification set forth in this Agreement shall sublet and/or assign to any other person or entity the performance of

25

such contracts includ    ...e portland cement float coat or any other portion of the contract so far as the labor is required to be performed thereunder.

## ARTICLE XII
## Employment

**Section 1.**

(A)  It is agreed that on all jobs the Employer shall elect (exclusive of any now-working foreman) the first two (2) Tile Layers required and the Union shall designate, the next two (2) Tile Layers. Thereafter, if more Tile Layers are required, the distribution shall be one from the Employer and one Tile Layer referred by the Union, making the total number of days work equal as the job progresses. Both parties agree that the Employer shall have the right to determine the number of mechanics to be employed on any job. Both parties further agree it is the right of any Employer to discharge any Tile Layer that in his opinion is unsatisfactory.

(B)  The above is interpreted to mean that, when any job is fifty percent completed, Tile Layers referred through the Union shall have an equal number of days with the Tile Layers selected by the Employer; and if not, the Union shall have the right to stop the job in questions until such time as the Employer makes arrangements to the Union's satisfaction, to complete the job with an equal number of days for both sides.

(C)  This interpretation does not apply to one-man jobs. To settle any dispute or difference of opinion as to a one-man job, the Employer, when sending notice of execution of contract, as provided for herein, shall state on such notice that such job will only require one Tile Layer to complete the work. This will give the Business Agent time to visit the job before the work is started, and, if the Business Agent

26

rees with the Employer, the Business Agent shall so a__ .se the Employer, and if they cannot agree, the matter is to be referred to the Grievance Arbitration Board.

(D)  On thin set and mastic jobs the Employer shall select the first Tile Layer required exclusive of non-working foremen and the Union shall select the next Tile Layer. The Employer shall select the third Tile Layer and the Union shall select the fourth Tile Layer on such jobs. The selection of all additional Tile Layers required thereafter shall alternate on a one for one basis between the Employer and the Union.

(E)  If the Employer's principal place of business is located outside the geographic jurisdiction of the Union, the Employer shall select one (1) foreman on each job within the geographic jurisdiction of the Union and the Union shall select all other foremen and all Tile Layers.

**Section 2.**

Employers shall be at liberty to employ and discharge whomsoever they see fit and Tile Layers shall be at liberty to work for whomsoever they shall see fit, subject to the decision of the Grievance Arbitration Board when workmen or Employers are on charges.

**Section 3.**

In the event the Union fails to refer necessary men within three (3) working days after notice in writing by an Employer to the Union and to the Grievance Arbitration Board, the Employer may employ Tile Layers from any other source.

## ARTICLE XIII
## Contract or Piece Work

**Section 1.**

No Employer and Tile Layer shall bargain or contract with each other to lay a designated number of feet of tile for

27

the day's work nor sh   hey bargain or contract that a
Tile Layer do a certain   .e of work in a designated time.
This bargaining or contracting shall be looked upon as piece
work, which is not countenanced by the parties bound by
this Agreement.

## ARTICLE XIV
### Strikes and Lockouts

### Section 1.
Except for a breach of this Agreement by the Employer,
or as herein otherwise provided for, the Union shall not
order any strike, slowdown, picketing stoppage of work or
boycott, against the Employer, no members of the Union
shall leave the work of the Employer and no Employer shall
lock out any members of the Union working under the
jurisdiction of this Agreement, prior to filing a complaint,
dispute or grievance, or pending the resolution thereof, as
provided in Article XV hereof.

### Section 2.
The Union may call or sanction a strike for (A) the
Employer's refusal to submit a matter to the Grievance
Arbitration Board as defined in Article XV herein, pursuant
to the Arbitration Article of this Agreement, (B) the
Employer's failure to comply with any decision of the
Grievance Arbitration Board established hereunder within
five (5) working days after such decision, (C) the Employer's
failure to resolve a claim, dispute or demand arising out
of the Employer's fringe benefit contribution and audit
obligations set forth in Article III of the Agreement, (D) The
Employer's failure to post and maintain a bond as provided
by Article XXIII of this Agreement, and (E) any any other
reason provided for in this Agreement.

28

### Se   n 3.
\   n the Union, upon investigation, finds that the Tile
Layers on any job are being paid less than the rate of wages
prescribed in this Agreement, they shall, provided that three
(3) days notice of the intention to remove the Tile Layers
from a job is given to the Employer by Certified mail, be
entitled to withdraw the Tile Layers from such job without
first submitting the complaint to arbitration. Thereafter, the
Union shall consider the complaint as provided for in Article XV of this Agreement.
No damages of any kind of nature shall be awarded or
allowed against the Union, or any officer or member thereof
by reason of the withdrawal of members of the Union from
a job for which a complaint has been filed as aforesaid.

## ARTICLE XV
### Arbitration

### Section 1.
There shall be a Joint Arbitration Board consisting of
four (4) members of the Union and four (4) members of
the Association. The Board shall be empowered to hear
and determine all charges and complaints arising out of the
violation of any terms, covenants or conditions contained
in this Agreement except claims, disputes and demands
arising out of the Employer's fringe benefit contribution and
audit obligations set forth in Article III of this Agreement.

### Section 2.
(A) When a charge is made against a member of the
Association, written notice of such charge or complaint shall
be filed with the Association and mailed by Certified Mail,
Return Receipt Requested, to such member. Where a
charge or complaint is filed against the Union, written notice

29

of such charge must ........ailed by Certified Mail, Return Receipt Requested, to the Secretary of the Union.

(B)  No hearing shall be held on any charge or complaint until 48 hours have elapsed after receipt of such written charge.

(C)  A hearing on such complaint or charge shall be held no later than one calendar week after receipt of such written charge or complaint. Should the Joint Arbitration Board fail to reach a decision or deadlock within three (3) weeks of the submission of the charge or complaint, the matter shall be submitted in writing by either party to the American Arbitration Association for hearing and decision before an Impartial Arbitrator selected from the Labor Panel of the American Arbitration Association. The decision of the Impartial Arbitrator shall be final and binding upon all parties. Costs shall be borne equally by the parties.

(D)  During the term of this Agreement any extension thereof, the Impartial Arbitrator shall have authority and jurisdiction only to interpret or apply the terms and conditions of this Agreement and shall be prohibited from changing any term or condition thereof.

**Section 3.**

(A)  All determinations by the Joint Arbitration Board shall be sustained by majority vote.

(B)  It a charge is sustained against the Union, the penalty will be determined solely by the Union Trail Board and if a charge is sustained against the Employer the penalty will be determined solely by the Association members of the Joint Arbitration Board.

**Section 4.**

An Employer against whom charges have been sustained may, within ten (10) days after receiving written notice of such decision, appeal such decision or penalty to the

E.....ive Officer of the Tile Contractors Association of America provided, however, such Employer has filed in person or by Registered Mail his intention to appeal with the Chairman of the Joint Arbitration Board and with the Secretary of the Joint Arbitration Board.

**Section 5.**

Any member of the Association or Union against whom a charge has been sustained for violating Articles III, V or XIII, and who fails to comply with a decision of the Joint Arbitration Board, shall immediately be deprived of all privileges and benefits of this Agreement as of the expiration of the appeal period as stated above.

**Section 6.**

Any Union or Association member of the Joint Arbitration Board directly involved in any case brought before the Joint Arbitration Board shall withdraw from the Joint Arbitration Board until the case is settled and an alternate shall fill the temporary vacancy.

## ARTICLE XVI
### Clothing and Tools

**Section 1.**

The Employer shall reimburse Tile Layers and Apprentices for the loss of tools due to fire or the forcible entry to the locker area and/or tool house. All disputes regarding loss of clothing and/or tools by a Tile Layer or Apprentice, where the Tile Layer or Apprentice is not reimbursed by the Employer shall be considered by the Joint Arbitration Board.

## ARTICLE XVII
### Apprenticeship Program

**Section 1.**

There shall be a Joint Apprenticeship and Training Committee consisting of three (3) members designated by The Greater New York Tile Contractors Association, Inc. and three (3) members designated by the Union to administer the apprenticeship training program.

## ARTICLE XVIII
### International Masonry Institute

**Section 1.**

(A)  The masonry industry in the United States and Canada has great and definable needs in the fields of apprenticeship and training, advertising and promotion, research and development, and labor/management relations which must be met if the industry is to grow and prosper. The parties to this Agreement belive that the International Masonry Institute (IMI) is the most effective and efficient instrument for meeting these needs because it offers the greatest possibility of integrating activities in these program areas in an effective manner and coordinating them through a single regional/international system.

(B)  In order to properly finance IMI programs, the ultimate objective is to provide, through collective bargaining, contributions equal to three percent of the basic wage, however, this figure is a goal that can only be reached in stages over a period of time.

(C)  As contributions from this geographical area increase, IMI will be able to devote a portion of those monies to advertising and promotion, research and development, apprenticeship and training and labor/management relations programs directed specifically to this area.

32

In this Agreement, the parties intend to take a step to the overall objective by establishing a realistic level of support of IMI. With these principals in mind, the parties agree as follows;

The contribution to the IMI shall be in an amount equal to $.15 of the hourly base wage rate for each hour, or portion thereof, worked.

## ARTICLE XIX
### Employer Contributions to the Funds

**Section 1.**

Contributions to the Pension, Welfare, Annuity, and Promotion Funds are due and payable seven (7) days from the end of the week during which they were earned. Upon failing to make payment within (7) days from the end of the week during which they were earned, the Union shall thereupon cease all work of such Employer until full payment is made. Such action shall take place notwithstanding any other provisions of this Agreement.

## ARTICLE XX
### Promotion Fund

**Section 1.**

Each employer shall pay $.05 for each straight time hour of work to the Greater New York Tile Industry Fund to promote the Tile Industry, to encourage and increase the use of tile by Architects, owners, general contractors, and the building industry in general and to foster the common interest and welfare of Employers and Employees engaged in the Tile Industry. The Industry Fund shall be administered by a Board of Trustees designated by the Association. The Board of Trustees shall have the authority to adopt such rules and regulations as may be necessary to the proper

33

supervision and administration of the said Fund. Such rules and regulations shall b         ding on each Employer. Of the sum of $.05 paid to the Fund, $.01 shall be allocated and paid over to the National Tile Contractors' Promotional Fund and $.04 shall be used for such other purposes, local or otherwise, as the Board of Trustees may decide upon, consistent with the objectives for which the Fund has been established. Tile Layers Local Union No. 52 shall have the privilege of appointing a representative to attend meetings of the Board of Trustees at the invitation of the Board.

## ARTICLE XXI
### Employer Principals

**Section 1.**

No proprietor or partner of a firm, partnership or corporation who is the Employer herein, nor any person who is a stockholder, officer or director of a corporation or is in any way directly or indirectly (such as through a spouse or family member) financially interested in the Employers business enterprise, or exercises either directly or indirectly any degree of ownership, management or control over the Employers, shall be permitted to work as a Tile Setter on any job. Any employee who is or becomes an Employer must take out a withdrawal card of membership from the Union and his membership shall cease, excepting any benefits that may have accrued to such employee. Job must be more than 10 team dada.

## ARTICLE XXII
### Validity

**Section 1.**

It is further agreed by and between the parties hereto that if any Federal or State Court shall at any time decide that

34

lause or clauses of this Agreement is or are void or it. _ s, such decisions shall not invalidate the other portions of this Agreement, but such clause or clauses shall be stricken out and the remaining portion of this Agreement shall be considered binding between the parties hereto. Nothing contained in this Agreement shall be construed to prevent any one or more individual Tile Layers from pursuing whatever civil or criminal remedies that they may have under the law for the collection of their wages, or any part thereof.

Any provisions of this Agreement hereinabove mentioned which provide for Union security or employment in a manner or to an extent prohibited by any law or the determination of any Governmental Board or Agency, shall be and hereby are of no force or effect during the term of any such prohibition. It is understood and agreed, however, that if any of the provisions of this Agreement which are hereby declared to be of no force or effect because of restrictions imposed by law is or are determined either by Act of Congress or other legislative enactment or by a decision of the Court of highest recourse to be legal or permissible, then any such provision of this Agreement shall immediately become and remain effective during the remainder of the term of this Agreement. The Union reserves the right to re-negotiate any of the provisions of this Agreement which may be of no force or effect.

## ARTICLE XXIII
### Union By-Laws

**Section 1.**

It is understood that nothing in this Agreement shall interfere with the right of Tile Layers and the Union in its sole discretion to abide by all the laws and rules of the

35.

International Union and the orders of the Executive Board or with the rights of the Employer to obey any rules and regulations of the Tile Contractors Association of America, Incorporated provided that such rules do not conflict with applicable law or modify the provisions of Article XIII.

## ARTICLE XXIV
### Renewal

**Section 1.**

Both parties to this Agreement shall be held subject to all provisions herein contained while the Agreement continues in force. Notice of any contemplated changes by either side shall be given in writing by the party contemplating such change or changes at least three (3) months prior to the expiration of this Agreement, and unless such notice is received within the time herein specified, this Agreement shall be considered binding until a new Agreement is signed.

**Section 2.**

All notices, requests, demands and other communications which are required to be or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when delivered in person or after dispatch to certified mail, postage prepaid, return receipt requested, to the party to whom the same is so given or made, at the addresses set forth below, or at such other address as any party may specify by notice to all parties given as aforesaid.

## ARTICLE XXV
### Bonds

**Section 1.**

Each Employer shall post and maintain a bond, letter of credit or cash equivalent to insure payment of

36

ibutions to the Fringe Benefit Funds. The Bond shall be provided upon execution of the Agreement. The Union may, in its absolute discretion, require an additional increase in the amount of the bond, letter of credit or cash equivalent posted by any Employer. Bonds shall be in the following amounts, based on the average number of Tile Layers employed in the previous year:

| Number of Members of Bargaining Union Employed | Amount of Bond of Cash Equivalent |
|---|---|
| 0 - 1 | $ 2,500.00 |
| 2 - 4 | $10,000.00 |
| 5 or more | $20,000.00 |

## ARTICLE XXVI
### Retroactivity

**Section 1.**

It is mutually agreed that all wages, fringe benefit contributions, terms and conditions provided for in this Agreement shall be retroactive to April 29, 1991.

## ARTICLE XXVII
### Term of Agreement

**Section 1.**

This Agreement shall be effective for the period May 5, 1997 to May 4, 2000.

## ARTICLE XXVIII
### Complete Arrangement

**Section 1.**

There are no representations, agreements, arrangements or understandings, oral or written, between the parties

37

relating to the subject matter of this Agreement which are not fully expressed　　is Agreement.

### Section 2.

This Agreement supersedes all prior agreements and understandings between the parties and constitutes the entire agreement of the parties with respect to the subject matter hereof.

### Section 3.

No provision of this Agreement shall be modified, amended or terminated, except by a writing specifically referring to this Agreement and signed by all of the parties hereto.

### Section 4.

This Agreement constitutes the entire agreement between both parties and concludes all collective bargaining negotiations for the full term hereof and any automatic extensions and renewals thereof. It is agreed that all matters desired by any of the parties have been presented, discussed and incorporated herein or rejected.

### ARTICLE XXIX
### Benefit

### Section 1.

This Agreement shall be binding upon and shall insure to the benefit fo each party hereto, its successors and assigns, and any successor thereto resulting from a merger, consolidation or other reorganization or restructuring.

38

Starting time will be at 7:00 A.M., 8:00 A.M. or 9:00 A.M., as required by job conditions.

**7.** The Joint Arbitration Board will consist of two representatives of the Association and two representatives of the Union.

**8.** Bonds will not be required for members of the Southern New Jersey Building Contractors Association.

**9.** The required Contractor Notice to the Union of a contract award may be oral rather than in writing.

R-3

**RIDER TO TIL[...]ETTERS AGREEMENTS OF LOCAL 7, NEW YORK and NEW JERSEY, BAC**

**Effective May 5, 1997 and May 4, 2000**

For work in Dutchess, Orange, Sullivan and Ulster Counties, the following provisions shall apply:

**1.** The wage rates and fringe benefits contributions shall be as follows:

|  | 5/4/97 | 11/1/97 | 5/1/98 | 11/1/98 |
|---|---|---|---|---|
| **WAGES** | $18.64 | $18.66 | $18.91 | $19.26 |
| Dues C/O | $ 1.02 | $ 1.04 | $ 1.05 | $ 1.08 |
| **BENEFITS** | | | | |
| Pension | $ 2.25 | $ 2.25 | $ 2.25 | $ 2.25 |
| I.P.F. | $ .75 | $ .75 | $ .75 | $ .75 |
| Annuity | $ 4.51 | $ 4.84 | $ 5.09 | $ 5.44 |
| Welfare | $ 5.18 | $ 5.28 | $ 5.28 | $ 5.38 |
| Promotion | $ .05 | $ .05 | $ .05 | $ .05 |
| I.M.I | $ .15 | $ .20 | $ .20 | $ .25 |
| **TOTAL** | $31.53 | $32.03 | $32.53 | $33.38 |

|  | 5/1/99 | 11/1/99 |
|---|---|---|
| **WAGES** | $19.76 | $20.76 |
| Dues C/O | $ 1.11 | $ 1.16 |
| **BENEFITS** | | |
| Pension | $ 2.25 | $ 2.25 |
| I.P.F. | $ .75 | $ .75 |
| Annuity | $ 5.84 | $ 6.34 |
| Welfare | $ 5.48 | $ 5.48 |
| Promotion | $ .05 | $ .05 |
| I.M.I | $ .25 | $ .25 |
| **TOTAL** | $34.38 | $35.88 |

R-4B

Starting time will be at 7:00 A.M., 8:00 A.M. [...] 9:00 A.M., as required by job conditions.

**7.** The Joint Arbitration Board will consist of tw[...] representatives of the Association and two representative[...] of the Union.

**8.** Bonds will not be required for members of th[...] Southern New Jersey Building Contractors Association[...]

**9.** The required Contractor Notice to the Union of [...] contract award may be oral rather than in writing.

R-3

**RIDER TO TILE ... TTERS AGREEMENTS OF
LOCAL 7, NEW ... K and NEW JERSEY, BAC**

**Effective May 5, 1997 and May 4, 2000**

For work in Dutchess, Orange, Sullivan and Ulster Counties, the following provisions shall apply:

**1.** The wage rates and fringe benefits contributions shall be as follows:

|  | 5/4/97 | 11/1/97 | 5/1/98 | 11/1/98 |
|---|---|---|---|---|
| **WAGES** | $18.64 | $18.66 | $18.91 | $19.26 |
| Dues C/O | $ 1.02 | $ 1.04 | $ 1.05 | $ 1.08 |
| **BENEFITS** | | | | |
| Pension | $ 2.25 | $ 2.25 | $ 2.25 | $ 2.25 |
| I.P.F. | $ .75 | $ .75 | $ .75 | $ .75 |
| Annuity | $ 4.51 | $ 4.84 | $ 5.09 | $ 5.44 |
| Welfare | $ 5.18 | $ 5.28 | $ 5.28 | $ 5.38 |
| Promotion | $ .05 | $ .05 | $ .05 | $ .05 |
| I.M.I | $ .15 | $ .20 | $ .20 | $ .25 |
| **TOTAL** | **$31.53** | **$32.03** | **$32.53** | **$33.38** |

|  | 5/1/99 | 11/1/99 |
|---|---|---|
| **WAGES** | $19.76 | $20.76 |
| Dues C/O | $ 1.11 | $ 1.16 |
| **BENEFITS** | | |
| Pension | $ 2.25 | $ 2.25 |
| I.P.F. | $ .75 | $ .75 |
| Annuity | $ 5.84 | $ 6.34 |
| Welfare | $ 5.48 | $ 5.48 |
| Promotion | $ .05 | $ .05 |
| I.M.I | $ .25 | $ .25 |
| **TOTAL** | **$34.38** | **$35.88** |

R-4B

The holidays shall be:
New Year's Day
Memorial Day
Independence Day
Labor Day
Thanksgiving Day
Christmas Day

**3.** Eight (8) hours will constitute a regular day's work.

R-5B

# AGREEMENT

### Between

*Tile Layers Subordinate Union*

*of New York & New Jersey*

*of the*

*International Union of*

*Bricklayers and Allied Crafts*

*and*

*Employer*

## Local 7

**From May 5, 1997 to May 4, 2000**



# 313



**TITAN** STONE, TILE & MASONRY, INC.

GRANITE • MARBLE • LIMESTONE • BRICK • CERAMIC
PRE-FABRICATED SYSTEMS • CONVENTIONAL SET SYSTEMS
RESTORATIONS • MAINTENANCE

JEFFREY FARINA

70 WORTHINGTON AVE., BLDG. C
HARRISON, NJ 07029-1912

973 (201) 484-3000
FAX (201) 484-6635

AUG 1 8 1998

### ARTICLE XXVII
### Effectuating Clause

Signed by both parties as of the 18th day of April, 1997. The person signing on behalf of the Employer hereby acknowledges by his signature receipt of copies of the Agreements and Declarations of Trust of the Tile Layers Union Pension Fund, Insurance Fund, Welfare Fund and Annuity Fund, also agrees to be personally bound by and to assume all obligations to the Employer provided for in this Trade Agreement and he warrants and represents that he has authority to bind the Employer and the principals or members thereof.

Employer: *TITAN-STONE-TILE & MASONRY FAB*

Name & Title (Print): *Joseph L Farina  Pres.*

Signature: *Joseph Farina - President*

Corporate Address: *70 SUPOR BLvD*

*HARRISON, N.J. 07405*

Telephone Number: *973-484-3000*

Fed. I.D. #: *22-318-7299*

EXHIBIT B

NJ 9997

# AGREEMENT BETWEEN

## BUILDING CONTRACTORS ASSOCIATION OF NEW JERSEY

## OTHER SIGNATORY EMPLOYERS

### -and-

## LOCAL UNION NOS. 4 & 5
## OF THE
## INTERNATIONAL UNION OF
## BRICKLAYERS AND ALLIED CRAFTWORKERS

*November 1, 1999 through October 31, 2002*

NJ9997

# Table of Contents

| | ARTICLE NO. | PAGE NO. |
|---|---|---|
| Apprentices | VII | 13 |
| Duration/Termination/Amendment | II | 1 |
| Foremen | VIII | 14 |
| General Understanding | XXI | 30 |
| Grievance Procedure | XV | 26 |
| Hiring Preference | V | 12 |
| Hours Work, Overtime, Shifts, Holidays | XII | 21 |
| Jointly Trusteed Funds | XI | 15 |
| More Favorable Conditions | XX | 30 |
| No-Strike/No-Lockout | XVIII | 29 |
| Parties | I | 1 |
| Payment of Wages & Fringe Benefits | XIII | 23 |
| Preservation of Work | XVII | 29 |
| Scope of Work | III | 1 |
| Separability and Savings Provision | XIX | 30 |
| Stewards | VI | 13 |
| Subcontracting | XVI | 28 |
| Traveling Contractors | IX | 14 |
| Union Recognition, Union Security Access | IV | 12 |
| Wages, BACPAC, and Local Dues Checkoff | X | 15 |
| Working Conditions | XIV | 23 |

NJ9997

# AGREEMENT BETWEEN
## BUILDING CONTRACTORS ASSOCIATION OF NEW JERSEY
## OTHER SIGNATORY EMPLOYERS
### -and-
## LOCAL UNION NOS. 4 & 5
## OF THE INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED
## CRAFTWORKERS

### ARTICLE I
### PARTIES

This Agreement is entered into this *first day of November 1999,* by and between the Building Contractors Association of New Jersey, (hereinafter referred to as the Association), for and on behalf of its members as set forth in Schedule "A" attached hereto and other contractors who are signatory hereto or who may become signatory hereto (hereinafter referred to as the Employer), and the INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL UNION NOS. 4 & 5 (hereinafter referred to as the Union).

The Association agrees to furnish to the Union a list of all members of the Association denoting those members bound to the terms of this Agreement, the honorary members, independent members, and any other classes or groups of members.

### ARTICLE II
### DURATION - TERMINATION - AMENDMENT

This Agreement shall be effective commencing *November 1st, 1999* and shall continue in full force and effect up to and including *October 31, 2002,* and shall be automatically continued for each successive period of this Collective Bargaining Agreement unless written notice of decision to negotiate a new Agreement in whole or in part, is given in writing by either party to the other not later than sixty (60) days nor more than ninety (90) days prior to the expiration date or any anniversary date thereafter. If the parties fail to reach an agreement in such negotiations, the issues in dispute shall be submitted to the International Masonry Institute's Dispute Settlement Plan for such steps as are deemed appropriate in accordance with the procedures of the Plan. The parties may at any time mutually agree to change or amend any part of this Agreement and such changes or modifications shall not affect the continuing nature of this Agreement.

### ARTICLE III
### SCOPE OF WORK

A.     This Agreement shall cover new construction, maintenance, repair and renovation in the State of New Jersey.

1

NJ 9997

B.   The Employers bound hereby recognize the Union's claim to all work falling within the jurisdiction of the Union, as defined in Branches of the Trade, Code 1 of the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers which is incorporated herein by reference.

C.   The installation of Brick and all other masonry units such as blocks, etc., with or without mortar, anywhere on the project shall be the work of Bricklayers & Allied Craftworkers of International Union, Local Nos. 4 & 5.

D.   Temporary heat, applicable to all branches of the trade, to protect any Masonry work performed and shall include all masonry materials all year, especially in the winter months (November 15th through March 15th).

## Brick Masonry

A.   Bricklaying masonry shall consist of, but not limited to, the following work procedures and installation of the following materials: The laying of bricks made from any material in, under or upon any structure or form of work where bricks are used, whether in the ground, or over its surface, or beneath water, in commercial buildings, rolling mills, iron works, blasts or smelter furnaces, lime or brick kilns, in mines or fortifications and in all underground work, such as sewers, telegraphy, electric and telephone conduits; including the installation of substitutes for brick such as all carbon materials, Karbate, Impervite or mixtures, all acid resistant materials, all terra cotta and porcelain materials, except where the foregoing materials are manufactured to substitute for tile as provided for under the category of Section 8, C of the Codes of the International Union of Bricklayers and Allied Craftworkers. All cutting of joints, pointing, cleaning and cutting brick walls, fireproofing, block, arching terra cotta cutting and setting, the laying and cutting of all tile, plaster, mineral wool, cork, blocks and glass masonry or any substitutes for the above material, the laying of all pipe sewers or water mains and the filling of all joints on the same when such sewers or conduits are of any vitreous material, burnt clay or cement, or any substitute material used for the above purpose, the installation of all brackets and fasteners is the work of the mason exclusively, the cutting and rubbing and grinding of all kinds of bricks and the setting of all cut-stone trimmings on brick buildings, is bricklayer's work. The preparation and erection of plastic castables or any refractory materials is bricklayer's work.

B.   Cleaning, grouting, pointing and other work necessary to achieve and complete the work under the foregoing categories, all waterproofing and black mastic waterproofing, silicone and/or substitutes sandwiched between masonry units in the interior of the wall.

C.   All terra cotta called unit tile in sizes over 6" x 12" regardless of method of installation; all quarry tile over 9"x 9" x 1 1/4" in size, split brick or quarry tile or similar material if bedded and jointed with one operation. The bedding, jointing and pointing of the above materials shall be the work of the craft installing same.

2

NJ 9994

D. All burnt clay extruded cellular products regardless of trade name or method of installation when used as a veneer on structures; all clay products known as terra cotta tile, unit tile, ceramic veneer and machine-made terra cotta and like materials in sizes larger than 6" x 12", regardless of the method of installation. Where the preponderance of material to be installed is of the above size and when material of lesser sizes is to be used in connection therewith, the bricklayers shall install all such materials. Brick paving comes under bricklayers' trade classifications. The parties acknowledge the Union's claim to screeding of sub base regardless of type of material used.

E. Grouting of all Masonry Units, all Leveling Plates for steel columns, all machinery and Precast Panels shall apply to all branches of the trade.

## Stone Masonry

A. Stone Masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The laying of all rip rap, rubble work with or without mortar, setting all cut stone, marble, slate or stone work (meaning as to stone, any work manufactured from such foreign or domestic products as are specified and used in the interior or on the exterior of buildings by architects, and customarily called "stone" in the trade.) Cutting all shoddies, broken ashlar or random ashlar that is roughly dressed upon the beds and joints, and range ashlar not over 10 inches in height; the dressing of all jambs, corners and ringstones that are roughly dressed upon the beds, joints or reveals and the cutting of a draft upon same for plumbing purposes only; and the cleaning, cutting of joints and pointing of stone work.

B. This is to apply to all work in buildings, sewers, bridges, railroads, bulkheads, breakwaters, jetties, playgrounds, parks, landscaping and curbing or other public works and to all kinds of stone, particularly to the product of the locality where the work is being done. Stonemasons shall have the right to use all tools which they consider necessary in the performance of their work.

C. Cleaning, grouting, pointing and other necessary work to achieve and complete the work under the foregoing categories.

## Artificial Masonry

A. Artificial Masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The cutting, setting and pointing of cement blocks and all artificial stone or marble, either interior or exterior, when set by the usual custom of the stone mason and marble setter. All cement that is used for backing up external walls, the building of party walls, columns, girders, beams, floors, stairs and arches and all material substituted for the clay or natural stone products, shall be handled by employees in the bargaining unit for which the highest rate of wages shall be demanded.

3

NJ 9997

B.  All artificial masonry, the cutting, setting and pointing of all concrete prefabricated slabs, regardless of dimension size, shall be the work of members of this organization, for which the regular wage scale in the jurisdiction where the work is performed shall be paid.

C.  Cutting all shoddies, broken ashlar or random ashlar that is roughly dressed upon the beds and joints, and range ashlar not over ten inches in height, the dressing of all jams, corners and ringstones, joints, or reveals and the cutting of a draft upon same for plumbing purposes only, and the cleaning, cutting of joints and pointing of stonework.

D.  This is to apply to all work on buildings, sewers, bridges, railroads or other public works, and to all kinds of stone, particularly to the products of the locality where the work is being done and the same shall be considered stone masonry.

E.  Bricklayers and stone masons shall have the right to use all tools which they consider necessary in the performance of their work.

F.  All cement that is used for parging up external walls and block units, installing reinforcing rods and door blocks, and all grouting.

G.  The building of party walls, columns, girders, beams, floors, stairs and arches. Gypstell products and cement of precast slabs on roofs or wherever used in building construction of alterations, and all material substituted for the clay or natural stone products. All wall ties and brackets used to anchor brick, block, stone or any type of masonry whether screwed or nailed is the work of the mason, as per the 1962 agreement between the B. & A.C. and Ironworkers herein incorporated by reference.

H.  The laying out and supervising of work for or by the use of any or all of the above materials shall be done by the employees covered hereunder.

### Cement Masons Agreement

A.  Cement masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The laying out, screeding and finishing of all cement, concrete, brown stone composition, mastic and gypsum materials, also for fireproofing, waterproofing, cement and composition base and vault lights.

B.  The cutting of all cement and concrete for patching and finishing; the bush hammering of all concrete when cast in place; the operation of cement gun, the nozzle and the finishing of all material applied by the guns, and the operation of the cement floor finishing machines. The cement mason shall have the right to use all tools necessary to complete his work.

C.  The operation of the Lazar Screed Machine shall be performed solely by the Cement Masons.

4

NJ9997.

D.   Concrete constructions, such as buildings, bridges, elevators, smokestacks, curbs, gutters, sidewalks, street paving, alleys and roofs; laying out, setting joists, strips or screed rods for work hereinafter specified; laying and finishing of cement, wearing surfaces of basements, floor yards, driveways, areas and other surfaces where cement finish is to be laid; and where strips have to be set, or material ruled down, or surfaces finished; screening of concrete or fine stuff, asphalt or other preparations that are to be troweled, floated, darbied or bull floated; troweling, floating or finishing of concrete or fire retarding material or waterproofing compound or mixtures; construction of glass vaults or sidewalks, lights, where same is set in cement; excepting the carpenter work, but including pointing, facing and finishing of the surfaces after forms are removed; leveling of all fine materials for facing same; running of all cement base; cutting; patching and finishing of concrete fireproofing on walls, beams, girders and columns; cutting facing and finishing with cement of all concrete surfaces such as arches, beams, girders, walls, pile caps, piers and columns, whether done with trowel, float, gun and nozzle, bushhammer, rubbing or other process; applying cement mortar for damp-proofing, waterproofing for sanitary purposes where not over four (4) feet high whenever cementing with the floor is done in one operation; cutting of all concrete when cement finish is applied; setting of carpet pins and sockets in cement and composition brass or other metallic or wood strips when inserted in floor during the laying of same; rodding and spreading of all concrete and spreading and finishing of all top material; setting of all strips and stakes and grade; pointing, caulking and patching around all steel or metal window frames that touch concrete; handling of the vibrator machine. Washing and treating of all cement surfaces, handling of all machines, trowel machines, riding trowel machines, apparatus or equipment of any kind in connection with or to perform any of the above functions shall be the work of the cement finisher. Any signatory contractor who subcontracts sidewalks and curbs shall, in good faith, inform the subcontractor that said work is within the jurisdiction of the    Bricklayers & Allied Craftworkers,   Local Unions No. 4 & 5.

E.   The pouring of all concrete shall require a mason.

F.   When concrete bucket is used in conjunction with a crane, all safety precautions shall be exercised.

G.   The aligning of all bolts and the setting of all plates shall be performed by the employees covered hereunder.

H.   When flat concrete arches are poured with a crane, a hopper must be used in conjunction with a concrete bucket.

I.   On all high rise buildings an exterior scaffold for the cement masons shall be erected complete with guard rails.

J.   There shall be no cutting of cement masons crews before pull up is completed.

5

NJ 9997

K.  When masons work overtime at the direction of the employer or foreman, they shall receive at least one hour's pay at the applicable overtime rate. Fractions of an hour to be considered a full hour.

L.  Overtime shall only be with the prior permission of the union and shall be equitably shared by the employees working on the job.

M.  Employees who may be required to work overtime beyond 6:00 p.m. shall be permitted to take an unpaid one-half hour meal period on the job between 6:00 p.m. and 7:00 p.m. The employer may split a crew for the dinner period.

N.  Employees discharged or laid off shall be notified and paid off one hour before such discharge or layoff. If not complied with, another hour shall be paid. The one hour notice of layoff does not apply when overtime is worked.

O.  No cement worker working alone shall use a straight edge of more than six feet in length. Where a straight edge is longer than six feet, two men shall be used on a straight edge which is between six and eleven feet in length, one additional man shall be used for every additional four feet or fraction thereof of straight edge. On power straight edges or roller-type straight edges, two men shall be utilized up to fourteen feet and one additional man shall be used for each five feet or fraction thereof.

P.  The casting and pouring of pre-cast slabs when done on the job site shall be the work of a cement mason.

Q.  Cement masons are to complete, joint and strike up their work, whether this work is done with cement or caulking compound on any other masonry material.

R.  The cement masons shall supervise the placing or pouring of all concrete. In the event there is a journeyman already working at the job site who is recognized by the Local Union as a competent cement mason, he may be assigned to such work, otherwise a cement mason shall be hired.

S.  When concrete floors are to be hand troweled, the Employer shall provide knee boards such as the type used by cement finishers to handle trowel concrete floors, such knee boards shall measure approximately 12" wide and 30" long or fraction thereof, and shall have handles.

T.  The following work shall be allotted to the cement masons only: The setting of all screeds and forms to determine the proper grade of concrete when held in place by stakes and/or spreaders shall be done by cement finishers. A screed is a strip of wood, metal, etc., used as a guide for leveling or grading a concrete floor, slab or sidewalk.

U.  Any bulkhead that is one single board in height, and that has no key attached or which is not

6

NJ 9997

notched or fitted shall be set and braced or staked by cement finishers, providing same is used as a screed. The term bulkhead shall mean a form or screed erected for the purpose of separating pours of concrete.

V. The grinding, patching and curing of all floors, the snapping of wall ties, and patching of same and setting of expansion joints.

W. Steps, Landings, Platforms, etc. The setting of forms for steps, landings, platforms, coping, caps and curbs, except where underforms or centers are required, and the placing of all fine materials for facing same, shall be done by cement masons.

X. Curing and dustproofing of all floors are to be done by cement masons. All epoxy, acid and latex work will be an additional $.50 per hour above scale.

Y. The cement mason shall have the right to use all tools necessary to complete his work. There shall be no restriction as to the use of machinery or tools.

Z. When troweling floors with machine, changing of blades, cleaning and maintaining machine to be done by mason.

AA. No concrete trucks, pumping machine or any other machines are to do any mixing inside any structure without proper ventilation.

BB. Special Tools: The employer agrees to furnish the following tools for use by his employees: Respirators, goggles, boots, bull floats, brooms, brushes, power chisels, trowel machines, bushhammers, straight edges, rubber floats, rubbing stones, cover tools, special base tools and special edgers. Gloves furnished when using epoxies, acid, latex floor patching or any irritant.

CC. All wages, waiting time and general working conditions that apply to bricklayers shall also apply to the cement mason.

## Plastering

A. Level 5 Gypsum Board Finishing is the work of Plasterers.

Level 5 finishing as specified by the Association of the Wall and Ceiling Industries International (AWCI), Ceiling and Interior Systems Construction Association (CISCSA), Gypsum Association (GA), and Painting and Decorating Contractors of America (PDCA), in their "Levels of Gypsum Board Finish Recommended Specification."

Levels Description: All joints and interior angles shall have tape embedded in joint compound and three separate coats of joint compound applied over all joints, angles, fastener

7

NJ 9997

heads, and accessories. A thin skim board of joint compound, or a material manufactured especially for this purpose shall be applied to the entire surface. The surface shall be smooth and free of tool marks and ridges. Note: It is recommended that the prepared surface be coated with a primer/sealer prior to the application of finish paint. (See painting specification in this regard.)

The level of finish is recommended where gloss, semi-gloss, enamel or non-textured flat paints are specified or where severe lighting conditions occur.

This highest quality finish is the most effective method to provide a uniform surface and minimize the possibility of joint photographing and of fasteners showing through the final decoration.

The work jurisdiction of the plasterer under level 5: Gypsum board finishing shall be that which has heretofore been performed under this Agreement and is further set forth in constitution of the International Bricklayers and Allied Craftworkers of the United States and Canada. The parties agree to be bound by decisions rendered by the "Green Book" Decision of Record rendered by the Hearings Panel (March 1, 1978) under the plan for the settlement of jurisdictional disputes in the construction industry.

B.    All cement plastering, stone texture, stucco work, and pebble dask work, either exterior or interior, shall be done by plastering employees under this contract.

C.    All plastering, including plastering alterations and repairs, and all cement, caehstone, acoustic or any plastic substitute or artificial or imitative composition for plain surfaces or for moldings, cornices, pilasters panels, capitals, columns, bases, keystones, brackets or centers when applied on any exterior or surface in the usual method of either plastering or stuck work shall be the work of plastering employees.

D.    All ornaments including centers, brackets, trusses and keystone shall be placed in position and pointed by plastering employees who are on the job. Cast ornamentation shall be made in a Union shop. No employee shall work on any operation where the stickling of ornamentation has been sublet.

E.    All moldings, covers, arrises, chamfers and bullnoses shall run in place wherever possible with a regular mould on proper running strips. When moldings or cornices are to be ornamented proper beds shall be run to secure same.

F.    All capitals and bases shall be run on the job if practical to do so.

G.    All templates to be used by the plasterer shall be placed in position by the plasterer.

H.    All plastering shall consist of not less than three coats as scratch, brown and finish. Before

8

NJ9997

the brown coat is applied, the scratch shall be hard and set. The brown coat shall be made true with a straight edge rod in all upright and ceiling angles: the walls and ceilings shall be properly darbied and floated to an even surface and the angles cut out. The finish coat shall be properly gauged and troweled to the required surface and all angles featheredged true. All interior or exterior plastering shall be left straight and true with rod and darby; rod and darby to be furnished by the contractor. The taping and pointing of sheetrock, compo-board, plaster-board, etc., shall be the work of the plasterer.

I.   When Sprayo-Flake or similarly applied acoustics are used the applied acoustic will take the place of the finish coat and will be applied by plastering employees.

J.   The operation of all mechanical plastering or troweling machines, pertaining to plaster and all of its substitutes, shall be the work of the plasterer.

K.   All safety precautions, goggles, shields, and masks, shall be supplied by the contractor for the health and welfare of the plastering employees operating these machines.

L.   Plastering on concrete, fireproofing, brickwork or plaster boards shall be two coat work-brown and finish.

M.   The finish coat may be omitted on cellar ceilings provided the brown coat is floated to an even surface. All EIF systems and all related work.

N.   Finishing of walls and ceilings shall not be done until the screeds, cornices or covers with which they intersect are in place.

O.   Employees shall not install metal corner beads, nor shall they work on any operation where corner beads have been used to form arrises on beams or arches or corners except door or window heads or other continuous openings not over twelve (12) feet in height.

P.   On a scaffold area of one hundred and fifty (150) square feet or over, the mortar board shall be raised 30" from the scaffold on a properly constructed stand. On a scaffold area of less than 150 square feet, the mortar board shall be raised at least 12" from the scaffold on a properly constructed stand. No mortar board shall be raised on blocking, and no mortar board or gauging board shall be more than 4'6" square.

Q.   Where beams are sixteen (16) inches or over in depth, the scaffold shall be dropped to a suitable height where the plasterers may execute their work in a proper manner.

R.   Any material applied on walls by the plasterers shall not be higher than 6'6" from the floor. Where only the walls have to be plastered, a scaffold 4 planks wide and 6' from the ceiling shall be erected on which the mortar board shall be placed and raised 12" above the scaffold. Positively no hopping planks to be permitted.

9

NJ9997.

S.   There shall be a foreman plasterer on all plastering jobs. Plastering foremen shall meet the requirements for foremen as specified herein, and shall be paid as specified herein.

T.   Plastering foremen shall see that no gauging is made up later than thirty (30) minutes before 12 o'clock and thirty (30) minutes before quitting time.

U.   Plastering work, when sublet, shall be given to a subcontractor who employs employees covered under this contract.

V.   Plastering contractors shall furnish all the materials required for their work including all screed rods, cornice, rods, darbies and feather edges. No subcontractor shall contract for labor only.

W.   Synthetic Plastering Systems: The styrofoam and any other materials which is part of the system that are installed by screws, glue, masonry materials, and including Mechanical System.

## Firebrick

The matters set forth in this section are applicable solely to firebrick work.

A.   On all firebrick jobs, when working with regular firebrick and lay, the bricklayers will be permitted an additional fifteen (15) minutes to wash up or twenty-five (25) minutes when working with a carbon, acid proofing, high temperature clay or any other material out of the ordinary such as colored cements, asphalts, tars, plastics, etc. Solvent for washing up and cleaning of tools will be provided for by the employer.

A bricklayer working with carbon or acid proofing materials shall be given a minimum of five (5) minutes wash-up prior to lunch time.

B.   All scaffolding inside of furnace shall be solid nailed scaffold. Contractors to furnish safety equipment and have same on job site.

Provisions for adequate scaffolding shall be made so that the lead man does not have to climb over the wall to work on the opposite side of the wall. Adequate scaffolding shall mean standard metal tubular scaffolding or wooden scaffolding consisting of a platform of not less than 2" x 10" planks in width, and scaffolding shall remain in place until all paving has been completed.

C.   Clay shall be mixed at the furthermost location of the enclosure where refractory brick is being laid. The location to be selected as to both its physical separation from the work area and to its feasibility for performing the mixing function. In coke oven work a separate enclosure is required. All care shall be exercised to reduce dust.

10

NJ 9997

D.   When bricklayers are employed laying firebrick, the contractor shall pay for the sharpening of their tools required for the work, and all tools shall be sharpened to the satisfaction of the bricklayer. The contractor shall furnish all chisels over twelve (12) inches in length and all saws when required.

E.   On all jobs where conditions are such that a safety man is required by the owner, he shall be mutually agreed upon by the parties. For the safety of the bricklayers, said safety man must be a union bricklayer.

F.   All hot work shall be paid at the rate of double time. Fringe benefits shall be based on hours paid.

One hundred degree (100) Fahrenheit or over shall constitute hot work. When bricklayers are employed on excessive hot work, the contractor shall provide proper counter fatigue aids which shall meet the standards prescribed by the State Medical Board, shall provide proper gloves and protective materials to safeguard bricklayers when they are handling hot work, shall supply wooden shoes or facsimile when working on heated surfaces and contractors shall be responsible for tools, shoes, and clothes of bricklayers which they burn in performance of their duties on said work. Bricklayers must spell each other on all hot work.

Contractor will also be responsible for clothes, tools and/or shoes that are destroyed or damaged on jobs due to exception conditions and materials.

G.   When electrical grinding stones or carborundums are used, bricklayers shall leave that part of the job until the operation is completed. In an enclosed area, suction device to be used to remove dust while bricklayers grind. The employer and union shall arrange to spell bricklayers at ten minute intervals when they are actually performing grinding work.

H.   On stoves and furnaces, or anywhere else where danger of gas exists, approved gas detecting devices will be required.

I.   On all firebrick or acid proofing jobs, the employer shall furnish all bricklayers with gloves.

J.   All general working conditions which apply to the bricklayer shall also apply to all branches of the trade.

K.   In addition, all other assignments mutually agreed upon between the Employer and the Union on any other building products or systems related to the scope and type of work covered by this Agreement which may be developed in the future that are determined by these parties to fall within the work jurisdiction of this Agreement.

L.   In the event of territorial jurisdiction or work assignment dispute with any other BAC Local Union, the matter shall be referred to the International Union for binding resolution.

11

NJ9997

## ARTICLE IV
## UNION RECOGNITION, UNION SECURITY, ACCESS

A.     The Employer hereby recognizes and acknowledges that the Union is the exclusive representative of all its employees in the classifications of work falling within the jurisdiction of the Union, as defined in Article III of this Agreement, and in the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers, for the purpose of collective bargaining as provided for in the Labor Management Relations Act of 1947, as amended.

B.     No later than eight (8) days following the effective date of this Agreement, all present employees must, as a condition of continued employment, be or become members of the Union; all employees hired after the effective date of this Agreement shall be or become and remain members of the Union no later than eight (8) days following the first day of their employment in accordance with the provisions of Section 8 of the National Labor Relations Act, as amended. Failure of any employee to comply with the provisions of this subsection shall, upon request of the Union, result in termination of such employee, provided that the Union has given the employee four (4) days notice that his obligation to make payment has not been met and that his delinquency renders him liable to termination under this section. The Employer shall not be obligated to dismiss an employee for non-membership in the Union: (a) if he has reasonable grounds for believing that such membership was not available on the same terms and conditions generally applicable to other members; or (b) if he has reasonable grounds for believing that such membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.

C.     International Union Representatives and the Business Manager and/or other officers of the Union shall have access to the Employer's jobsites at reasonable times in compliance with any special rules and regulations adopted by the owner to ensure that the provisions of this Agreement are observed, provided however, that such representatives shall not unduly interfere with the job progress.

## ARTICLE V
## HIRING PREFERENCE

The employer agrees that when hiring any employee for any job in the territorial jurisdiction of the agreement he will employ a fair percentage in the territorial jurisdiction of Local No. 4 or Local No. 5 of New Jersey. The employer also agrees that when requesting manpower, they must call the Local Union Office by 4:30 p.m. of the previous day.

12

NJ 9997

## ARTICLE VI
## STEWARDS

A.   The Employer shall hire a steward for each branch of the trade appointed by the business manager of the Union on all jobs. The steward shall be a working employee and shall, when appropriate, be granted reasonable time to conduct union business. The steward shall not be laid off without reasonable cause, without first consulting the business manager.

B.   It is the steward's duty to look after the interest of both parties, see that the number of men desired by the employer is promptly reported to the business agent, take up all grievances on the job, and try to have the same adjusted. In the event that he cannot, he must report that fact to the business agent. He shall conduct himself in a proper manner at all times when on the projects and shall not be discriminated against, discharged, or laid off for the performance of his duties as such. The steward's employment can only be terminated by the employer after a review of complaint against him between the employer and the business agent.

C.   The first Bricklayers & Allied Craftworkers member shall notify the union at the start of each job.

## ARTICLE VII
## APPRENTICES

A.   In order to train sufficient skilled mechanics for the industry, the necessity for employment of apprentices and/or apprentice improvers is recognized and encouraged by the parties to this Agreement. Apprentices shall be given a minimum of 32 hours per week to perform the work of brick or block provided the work is available. The employer agrees to employ one apprentice for every five journeymen employed on a job site. It is agreed that the Employer shall abide by the National Apprenticeship Standards, developed for masonry craft training, incorporated herein by reference.

B.   All apprentices will be required to attend and successfully complete a pre-job school which shall take place over a period of approximately 12 weeks at a place and at such times as designated by the State Joint Apprenticeship Committee.

C.   After 12 weeks of pre-job training, apprentices shall be required to serve a probationary period of 30 days of employment at the trade during which period no fringe benefit contributions will be required. After satisfactory completion of this period, credit will be given for this time served as part of the three year apprenticeship term. During the probationary period, the termination or cancellation of the apprenticeship agreement may be made by the committee at the request of either party to the agreement. After probationary period, the agreement may be canceled at the request of the apprentice or committee. The committee may cancel the agreement for good cause such as unexcused absences from the job and related training classes if required, lack of progress or interest, and unsafe practices

13

NJ9997

common to the trade. Due notice shall be given to the apprentice with a reasonable opportunity for corrective action. Written notice shall be given to the apprentice and Bureau of Apprenticeship and Training of the final action taken.

D.     Apprentices shall be paid not less than the following percentages of the journeyman's basic wage rate.

| | |
|---|---|
| First six months or 500 hours: | 50% of Journeyman's Basic Wage Rate |
| Second six months or 500 hours: | 55% of Journeyman's Basic Wage Rate |
| Third six months or 500 hours: | 65% of Journeyman's Basic Wage Rate |
| Fourth six months or 500 hours: | 75% of Journeyman's Basic Wage Rate |
| Fifth six months or 500 hours: | 85% of Journeyman's Basic Wage Rate |
| Sixth six months or 500 hours: | 95% of Journeyman's Basic Wage Rate |

During the first year of apprenticeship, after the probationary period, fringe benefit contributions shall be required for the Welfare Fund at 50%. No other fringe benefit contributions shall be required for this period. Deductions for check off dues and BAC PAC should be made according to Schedule "B" attached hereto. Commencing with the second year of apprenticeship (third six-months), fringe benefit contributions and check off deductions shall be made according to Schedule "B" attached hereto.

E.     Apprentices may be required to attend related training classes during period of apprenticeship as directed by the Joint Apprenticeship.

### ARTICLE VIII
### FOREMEN

There shall be a separate foreman on all jobs for each branch of the trade. The employer will determine when the foreman shall not work with tools. Foremen shall be paid the prevailing regular weekly pay (40 hours), between the initial date of employment and the termination date of employment, holidays and inclement weather days included, provided, however, that all foremen must report to work everyday within the work week unless otherwise directed by the Employer. All overtime worked by foremen shall be compensated for at proper overtime rates.

### ARTICLE IX
### TRAVELING CONTRACTORS

When the Employer has any work specified in Article III of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by an agreement with another affiliate of the International Union of Bricklayers and Allied Craftworkers, the Employer agrees to abide by the full terms and conditions of the Agreement in effect in the jobsite area. Employees covered by this Agreement who are sent to projects outside of the area covered by this Agreement shall be paid at least the established minimum wage scale specified in Article X of this Agreement

14

NJ9997

but in no case less than the established minimum wage scale of the local Agreement covering the territory in which such work is being performed plus all contributions specified in the jobsite local Agreement. The Employer shall in all other matters be governed by the provisions established in the jobsite local Agreement. If employees are sent to work on a project in an area where there is no local Agreement covering the work specified in Article III of this Agreement, the full terms and conditions of this Agreement shall apply.

## ARTICLE X
## WAGES, BACPAC, AND LOCAL DUES CHECKOFF

A.    The hourly wage rates for all employees performing work covered under this Agreement shall be as listed on Schedule "B" attached hereto.

B.    The Union shall have the option of allocating a portion of all of the increases in wage rates for the periods beginning November 1, 1999 and all subsequent increases thereafter, among the various benefit funds specified in Article XI.

C.    The Employer shall deduct from the wages of each employee who has signed a check-off authorization conforming to federal law and transmit monthly to the Union (or to any agency designated by said Union for the collection of such money), the sum for each hour paid which the Union has specified, or specifies from time to time and so advises the Employer in writing, as the portion of each employee's Union dues to said Union, to its International Union, or to any other affiliate of the International Union, subject to check-off. The sums transmitted shall be accompanied by a statement, in a form specified by the Union, reporting the name of each person whose dues are being paid and the number of hours each employee has been paid. If the employee does not sign a dues check off authorization card, he shall report to the union hall to pay the weekly dues.

D.    The Employer agrees to deduct an amount from the pay of each employee, who is a union member and who executes a voluntary check-off authorization form for the Bricklayers and Allied Craftworkers Political Action Committee (BACPAC). Deductions shall be in the amount and at the intervals specified on the check-off authorization form. The Employer agrees to transmit BACPAC deductions to the Treasurer of BACPAC, and shall be accompanied by a list of the names of those employees for whom BACPAC deductions have been made and the amount deducted for each employee.

## ARTICLE XI
## JOINTLY TRUSTEED FUNDS

Section 1.
In addition to the wages and other payments herein provided for, the Employer agrees to pay specified contributions to the following designated funds.

15

NJ 9997

**A.  Bricklayers and Trowel Trades International Pension Fund**

1.    The contribution to the Bricklayers and Trowel Trades International Pension fund (IPF) shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2.    The payments required above shall be made to the Bricklayers and Trowel Trades International Pension Fund, which was established under an Agreement and Declaration of Trust, dated 1 July 1972.

**B.  Local Pension Fund**

1.    The contribution to the Local Pension Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2.    The payments required above shall be made to the territorial Local Pension Fund which was established under an Agreement and Declaration of Trust.  All Local Pension Funds remitted on behalf of an employee shall be forwarded in whole to the employee's Home Local Pension Fund.  The Home Local Funds shall credit any excess monies remitted for the Pension Fund to the employee's Annuity Fund.

**C.  Local Annuity Fund**

1.    The contribution to the Local Annuity Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2.    The payments required above shall be made to the territorial Local Annuity Fund which was established under an Agreement and Declaration of Trust.  All Local Annuity Funds remitted on behalf of an employee shall be forwarded in whole to the employee's Home Local Annuity Fund.  The Home Local Funds shall apply any excess monies remitted for the Annuity Fund to the employee's Pension Fund.

**D.  Bricklayers and Allied Craftworkers Statewide Welfare Fund**

1.    The contribution to the Bricklayers and Allied Craftworkers' Statewide Welfare Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2.    The payments required above shall be made to the Bricklayers and Allied Craftworkers' Statewide Welfare Fund which was established under an Agreement and Declaration of Trust, dated May 1, 1988.

**E.  Industry Advancement Fund**

The parties hereto do hereby establish an Industry Advancement Fund pursuant to the requirements of the Labor - Management Relations Act, the Internal Revenue Code and all

16

NJ 9997

applicable laws and the agreement of the parties for the purpose, in all lawful ways, of promoting the increase of commercial, institutional, public and industrial building construction throughout the State of New Jersey and the adjoining areas within the territorial jurisdiction of the unions by providing building owners, architects, engineers, builders, contractors, private and public funding institutions and agencies, government agencies and any others, directly or indirectly, with the building construction industry information, data and other information to communicate the advantages of sound, durable and economical construction that will provide a high degree of service, utilization and benefit to the public by the utilization of union affiliated contractors. The purpose of the Fund shall be to foster and promote the continued utilization and expansion of union construction, particularly utilizing union members of the Bricklayers & Allied Craftworkers union, in prospective projects throughout the State of New Jersey.

In order to carry out this agreement, the parties hereto shall execute such agreements of trust and other documents necessary in accordance with law, which documents shall include the following terms which are agreed to and incorporated into this contract:

1.    The Employer shall make the following contributions for each hour worked by each member of the Bricklayers & Allied Craftworkers union to the Industry Advancement Fund created hereby:

| | |
|---|---|
| Effective November 1, 1999 through December 31, 1999: | $.15 per hour |
| Effective January 1, 2000 through October 31, 2000: | $.20 per hour |
| Effective November 1, 2000 through October 31, 2001: | $.25 per hour |

The parties shall meet to discuss additional increases to the IMI and IAP prior to November 1, 2001. Said increases shall not exceed $.05.

2.    The Bricklayers & Allied Craftworkers' Health & Welfare Fund Office shall collect and distribute such funds.

3.    Effective January 1, 2000, the Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey agree to allocate $.01 of the Industry Advancement Fund contribution to the International Council of Employers of Bricklayers & Allied Craftworkers (I.C.E.) Said contribution shall be forward to I.C.E. by the Masonry Contractors of New Jersey. The remaining contribution shall be divided as follows:

| | |
|---|---|
| BCANJ: | 50% |
| Masonry Contractors of New Jersey: | 50% |

In such case as the parties opt to discontinue the $.01 allocation to I.C.E., said $.01 contribution shall be distributed equally between the BCANJ and the Masonry Contractors of New Jersey.

17

NJ9997

4.   The BCANJ and the Masonry Contractors of New Jersey shall utilize said funds in a manner consistent with the terms of the trust including the lease or purchase of materials, supplies and equipment, the lease of premises or purchase of premises, the employment and retention of professional counsel, the engagement of administrative and other employees, and all other appropriate expenses and expenditures which comply with the purposes of the trust and law. However, in all circumstances, it is the intention hereto that the said Fund shall be used to promote the following industry wide activities for the benefit of the contractors utilizing members of the Bricklayers & Allied Craftworkers union including accident prevention, education, research, public relations, industry relations, labor relations, market development, standardization of contracts and specifications and all other such appropriate activities.

5.   Although the Industry Advancement Fund is designated a "contribution" it is expressly understood and agreed that the said sum payable to said Industry Advancement Fund is not intended to be and is not a contribution to employees and no employee of Employer has any proprietary interest in said funds.

6.   The Industry Advancement Fund shall pay the Bricklayers & Allied Craftworkers' Health and Welfare fund 2% of all amounts collected as reimbursement for expenses incurred in connection with the collection services rendered. In addition the Bricklayers & Allied Craftworkers' Health & Welfare Fund shall not be responsible for collection of any delinquent amounts owed by any employer.

F.   **International Masonry Institute (IMI)**

1.   The masonry industry in the United States and Canada has great and definable needs in the fields of apprenticeship and training, advertising and promotion, research and development, and labor/management relations which must be met if the industry is to grow and prosper. The parties to this agreement believe that the International Masonry Institute is the most effective and efficient instrument for meeting these needs because it offers the greatest possibility of integrating activities in these program areas in an effective manner and coordinating them through a single regional/international system.

2.   In order to properly finance IMI programs, the ultimate objective is to provide, through collective bargaining, contributions from the total hourly wage and benefits package, as listed on Schedule "B" attached hereto.

3.   With IMI funding from New Jersey, IMI will be able to provide advertising and promotion, research and development, apprenticeship and training, and labor/management relations programs directed specifically to this area. With these principles in mind, the parties agree to contribute the amounts listed on Schedule "B"

18

NJ 9997

The payments required above shall be made to the International Masonry Institute, which was established under an Agreement and Declaration of Trust, 14 March 1981, as the successor trust to the predecessor International Masonry Institute (established under an Agreement and Declaration of Trust, 22 July 1970) and/or to the predecessor International Masonry Apprenticeship Trust (established under an Agreement and Declaration of Trust, 6 November 1974).

G.    **New Jersey State Apprentice Fund**

1.    The contribution to the New Jersey State Apprentice Fund shall be listed on Schedule "B"attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2.    The payments required above shall be made to established New Jersey State Fund office which was established under an Agreement and Declaration of Trust.

**Section 2.**
In order to facilitate the establishment of the same wage and fringe benefit structure within Local No. 5, it is agreed that no other funds other than the Welfare, Pension, International Pension, Annuity, Apprentice, IMI, IAP, Labor Management, BAC PAC and Defense Funds shall be contributed to as of November 1, 1999.

**Section 3.**
The Employer hereby agrees to be bound by and to the above stated Agreements and Declarations of Trust, as though he had actually signed the individual documents and further agrees to be bound by all actions taken by the Trustees of these funds pursuant to said Agreements and Declarations of Trust.

**Section 4.**
The Employer hereby irrevocably designates as its representative on the above stated Boards of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors.

**Section 5.**
For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and all other hours for which pay is received by the employee in accordance with this Agreement, shall be counted as hours for which contributions are payable to each fund designated in Section 1 of this Article.

**Section 6.**
Contributions shall be paid on behalf of all covered employees starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, journeymen, apprentices, helpers, trainees and probationary employees.

TELEPHONE: 732-225-2265 / FAX: 732-225-3105
Raritan Center - Raritan Plaza II - Fieldcrest Avenue - Edison, NJ 08837
19

**BULLETIN**

**BCANJ**
Building Contractors
Association
Of New Jersey

BUILDING CHAPTER,
ASSOCIATED GENERAL
OF AMERICA

NJ9997

**Section 7.**

All contributions shall be made at such time and in such a manner as the Trustees require; and the Trustees shall have the authority to have an Independent Certified Public Accountant audit the time books, payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the funds designated in Section 1 of this Article. Any Employer found, as a result of an audit ordered by the Trustees of one of the fringe benefit funds, to have been substantially inaccurate in reporting shall be charged in full costs of such audit.

**Section 8.**

If the Employer fails to make any contribution specified in this Article, within twenty (20) days after the date required by the Trustees, the Union shall take whatever steps are necessary, including the withdrawal of manpower, to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs for collection of payments due together with attorney's fees and such liquidated damages as may be assessed by the Trustees. In the event a job is stopped due to delinquent fringe benefit payments by the employer, craftworkers shall be compensated a day's wages for each day the delinquency continues, not to exceed five days. The Employer's liability for payment under this article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided for or set forth elsewhere in this Agreement.

**Section 9.**

Management's appointments to the aforementioned Jointly Trusteed Funds are to be made equally by the Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey. The Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey shall only have the right to the appointment of trustees if and when the existing Trust Funds of the predecessor local unions of the International Union of Bricklayers and Allied Craftworkers, Local Unions No. 4 and 5 are merged into statewide benefits funds. Neither the Building Contractors Association of New Jersey or the Masonry Contractors of New Jersey shall have the right or authority to appoint trustees to any trust fund of a predecessor local union unless and until a statewide merger of the Trust Funds occur, except if trustees are currently appointed by either the Building Contractors Association of New Jersey or the Masonry Contractors of New Jersey, that authority shall remain.

**Section 10.**

The Labor/Management Fund established under an Agreement and Declaration of Trust, shall be used to enhance the economic development and competitiveness of the unionized masonry industry, to assure the effective enforcement of prevailing wage laws and to provide for stable labor-management relations. The parties to this agreement shall appoint trustees to this fund in the same manner in which appointments are made to the Statewide Welfare Fund.

**Section 11.**

The parties agree to establish a Committee to explore the concept and funding mechanism for a Market Recovery Program.



**BCANJ**

Building Contractors
Association
Of New Jersey

Raritan Center - Raritan Plaza II - Fieldcrest Avenue - Edison, NJ 08837
TELEPHONE: 732-225-2265 / FAX: 732-225-3105

MASONRY
CONTRACTORS
ASSOCIATED GENERAL
CONTRACTORS
OF AMERICA
WASHINGTON, D C

**BULLETIN**

NJ9997

## ARTICLE XII
## HOURS WORK, OVERTIME, SHIFTS, AND HOLIDAYS

A.   The standard work day shall consist of eight (8) hours of work with flexible starting and quitting times between the hours of 7:00 a.m. and 4:30 p.m. with a 30-minute unpaid lunch hour occurring in the middle of the shift. The standard work week shall consist of five standard work days commencing on Monday and ending on Friday, inclusive. The normal starting and quitting times may be changed by mutual consent of the Employer and the Union.

B.   All time worked before and after the established eight (8) hour day, Monday through Friday, and all time worked on Saturday shall be paid at the rate of time and one-half. All hours worked on Sundays and holidays shall be paid at the double time rate. If a craftworker works through any portion of their lunch they shall be paid one hour.

If any of the following trades: Carpenters, Laborers, Ironworkers or Operating Engineers Locals, with whom the BCANJ negotiates, receive a more beneficial overtime rate, the Bricklayers will be paid the higher overtime rate.

C.   A make-up day may be worked on Saturday providing it is mutually agreed to by the union and the employer and provided that the following conditions are satisfied:

1.   A make-up day on Saturday can be utilized provided 24 or more hours are worked during the course of the calendar work week, Monday through Friday.

2.   It is not mandatory for an employee to work on a make-up day and it is at their choice and discretion. No negative actions or retribution shall be taken by the employer against any employee who chooses not to work a make-up day.

3.   The sole reason for the loss of hours during the calendar work week must be weather conditions to qualify for a make-up day.

4.   Any time worked before the established starting time or after the established quitting time on a make-up day shall be paid at the applicable overtime rate. Any hours worked on a Saturday make-up day that exceed 40 hours shall be paid at the applicable overtime rate.

5.   If employees are unable to work a make-up day, the local union shall be given the preference to supply the remainder of the employees needed for that day.

6.   There shall be no addition to the previously established crew size for the make-up day.





NJ9997

Any employer who violates the above provisions shall be prohibited from utilizing the make-up day for the duration of this Collective Bargaining Agreement. The employer has the right to file an appeal with the Joint Arbitration Board defined in Article XV of this Collective Bargaining Agreement. Said appeal shall be heard within five (5) days from the date filed. During the appeal process the employer shall be prohibited from utilizing the make-up day provision.

D.    The parties to this Agreement recognize the desirability and in some cases absolute necessity of coordinating the shifts to be worked with the other trades involved on the project and the customer's work schedule.  If shift work is necessary and it is mutually agreed to by the union and the employer, the following schedule shall prevail:

When a two shift schedule (including a day shift) is established, the first or day shift shall be established on an eight (8) hour basis. The second shift shall be established on an eight (8) hour basis and paid the base rate plus 15%.

When a three shift schedule is established, and mutually agreed to by the Employer and the Union, the following conditions shall prevail. The day shift shall be established on an eight (8) hour basis, the second shift shall be established on a seven and one-half (7 ½) hour basis, and the third shift shall be established on a seven (7) hour basis. The first shift shall receive the base or regular hourly rate. The second shift shall receive the base hourly rate plus 15%. The third shift shall receive the base hourly rate plus 20%.

When there is no day shift and a second shift or third shift is established and mutually agreed to by the Employer and the Union, the following conditions shall prevail. The second shift shall be established on an eight (8) hour basis. The third shift shall be established on an eight (8) hour basis. The second shift shall receive the base hourly rate plus 15%. The third shift shall receive the base hourly rate plus 20%.

The percentage premium, when added to the base rate, shall be termed the regular hourly rate. Shift hours for the second and third shifts shall be such as to conform to the day shift and in no case shall an employee work on more than one shift within a 24 hour period. When an irregular shift must be established, the percentage premium shall be 15% above the base rate.

All time worked before and after a regularly established shift shall be paid at the applicable overtime rate. When a portion of a regular established shift works into Saturday, Sunday or a Holiday, that time worked shall be paid at the established shift rate.

E.    The Employer agrees to recognize the following holidays: New Year's Day, President's Day, Memorial Day, Fourth of July, Labor Day, Presidential Election Day, Veterans' Day, Thanksgiving Day, and Christmas Day. Holidays falling on a Sunday shall be observed the following Monday. The above holidays are subject to renegotiation based upon agreements established with other trades.

NT9997

## ARTICLE XIII
## PAYMENT OF WAGES & FRINGE BENEFITS

All employees working under this Agreement shall be paid in cash or by check weekly on Thursday, or another day if mutually agreed between the business agent and the employer, before quitting time and within 72 hours after the closing of the pay for the week. When employees are unable to work on pay day due to inclement weather, the employee shall be paid before 12 noon in absence of reasonable cause for delay. An employee being laid off shall be given his final paycheck in full for all hours of employment one hour before layoff. When working overtime, the one hour notice of layoff does not apply. In the event an employer issues a paycheck and there are insufficient funds in the employer's account, the employer, on the next working day, will bring either cash or cashiers checks to the jobsite to cover the paychecks and all penalties. Failure to do so will result in immediate withdrawal of all craftworkers from the job. Employees will be compensated by the employer for all lost time until the matter is resolved. If a second violation occurs, all payrolls shall be in either the form of cash or cashiers checks. Fringe benefits will be paid on a weekly basis, except that Association Members may pay monthly. Monthly payments shall be due to the fund(s) on or before the fifteenth day of the month immediately following the month during which the contributions were earned. Should an Association Member become delinquent, they may be required by the trustees of the benefits funds to remit weekly payments.

## ARTICLE XIV
## WORKING CONDITIONS

A.   Overhead Protection: If any work is being performed overhead, all Employees must be protected on all outside scaffolds by two inch (2") planks, a covering shall be supplied over all stairwells, hatches, shafts, etc., no more than two (2) stories overhead and two (2) stories below in shafts.

B.   Hard hats are to be supplied by each employer. Failure to wear hard hats is cause for dismissal.

C.   Lines: All contractors must furnish the men with lines. The lines must not be raised more than one (1) course at a time. No bricklayer shall spread mortar before the line has been raised. However, a trig brick can be raised one (1) course before raising the line. Lines on a double unit wall shall be used on both sides of a wall eight inches (8") or over in thickness and on all units of masonry over four (4) feet in length.

D.   Portable Sanitation Units: Suitable portable sanitation units shall be erected on all jobs which shall be kept in sanitary condition. Portable sanitation units shall be built in accordance with State or Municipal health laws.

E.   Cutting Tools: Where employees are employed on cutting masonry, the employer shall have all cutting tools sharpened.



**BULLETIN**

**BCANJ**
Building Contractors
Association
Of New Jersey

NJ9997

F.   Where machines are used for the cutting of masonry units, a wet saw shall be used. A dry saw may also be used provided that the proper safety protection is furnished. It is agreed that in order to protect the health and safety of employees the dry cutting of masonry units by means of hand-held, gas powered or electrical, portable "chop saws" and skill saws, and the dry grinding of masonry materials shall be done in a designated area away from craftworkers if at all possible. It is the responsibility of the employee to adhere to the established restrictions for said designated areas. Dry cutting shall be permissible provided applicable water attachments are used. In all cases, employees shall be provided with proper respirators as part of a complete respiratory protection program which shall include proper selection, fit testing and air monitoring, and eye protection in accordance with OSHA standards. It is the employee's responsibility to utilize proper protection. The employee operating the machine shall be allowed ten (10) minutes to clean up at 12:00 noon and quitting time.

G.   Cutting and Mechanical Devices: Where air guns or other mechanical devices are used for the purpose of cutting chases, opening, etc., in brick work, such gun or device shall not exceed fifteen (15) lbs. weight. When such device exceeds fifteen (15) lbs., the employer may use a laborer to assist the bricklayer in handling the gun, but there shall always be one bricklayer on each gun in use. All cutting, when done by hammer and chisel, shall be done exclusively by the bricklayer. Where a bull and sledge hammer is used, there shall be a composite crew of bricklayers and laborers. (The bricklayer foreman shall have complete authority over all men employed in this phase of work.) All cutting out of brick work, pointing, washing down, caulking cement and lime waterproofing washing of brick, or slabs, used in floor arches shall be done by bricklayers, and where scaffolding is used in the above work wire rope shall be used.

H.   Pointing: All pointing and joining of brick work shall be done by journeymen who built same, if possible.

I.   Cement Block: Bricklayers and stone masons to set all cement blocks and all masonry units.

J.   Cork Block: All cork block (Styrofoam Sheets), and substitutes thereof, shall be laid by bricklayers.

K.   Caulking: All pointing and caulking of windows with cement or composition to be done by bricklayers, by either gun, trowel or any other method.

L.   Stone Work: All renovation, cleaning, and pointing of stone to be done by this union.

M.   The setting, aligning and erection of all precast slabs and the setting and leveling of all bearing plates for structural steel or machinery shall be done by the members of the above local union.

N.   Composite crew on all precast panels. Setting of all other masonry panels shall be the work of BAC Members.

BCANJ
Building Contractors
Association
Of New Jersey
Raritan Center - Raritan Plaza II - Fieldcrest Avenue - Edison, NJ 08837
TELEPHONE: 732-225-2265 / FAX: 732-225-3105
BULLETIN

NJ 9997

O.    All brick or block panels shall be erected by union bricklayers.

P.    Waterproofing: All transparent waterproofing applied to brick or stone work with brush or spray to be done by bricklayers.

Q.    There are to be two men on all blocks weighing 40 lbs. or more.

R.    Scaffolding: No block 6" or over in size shall be built more than six (6) courses in scaffold height. Where blocks of 100 lbs. or over are used, a pony scaffold is to be erected when the wall is three (3) feet high, for the easier laying of these blocks to the next scaffold height.

S.    Water: Water containers and sanitary drinking cups shall be provided on all jobs to be furnished by all contractors at all times.

T.    Shanty and Stoves: Where there are not more than ten (10) men employed on a job, a shanty house shall be erected exclusively for the bricklayer, and it shall contain not less than eighty (80) square feet of floor space. Where there are more than ten (10) men and not more than twenty (20) men, the shanty house shall contain not less than one hundred and fifty (150) square feet of floor space. Where there are more than twenty (20) men and not more than thirty (30) men it shall contain not less than two hundred (200) square feet of floor space but where there are more than thirty (30) men employed the same proportion shall apply. Where there is a shanty and no elevator located in the building it shall not be above the ground floor unless elevator is provided except on alterations where it will be placed to suit the convenience of the contractor.

U.    Ample provision shall be made to protect all bricklayers levels on all outside scaffolds.

V.    It shall be deemed unsafe to run any brick work up more than 6 courses or 16" whichever is less without backing up in cavity walls or any masonry walls which does not utilize a brick header course.

W.    Contractors shall provide a two foot clear, planked working area beyond the building wall when bricklayers or stone masons are working off new footing on or below grade.

X.    There shall be a clothing allowance of fifty cents (.50) per hour minimum on all fire brick work paid by contractor.

Y.    There will be one coffee break in the morning not to exceed ten (10) minutes. There shall be an afternoon coffee break not to exceed five (5) minutes at the place of work.

Z.    All mortar tubs will be raised to at least sixteen inches, not to exceed thirty inches.

AA.   All rubber gloves and goggles to be furnished by the contractor for all washing down.





**BULLETIN**

25

**BCANJ**

Building Contractors
Association
Of New Jersey

Raritan Center - Raritan Plaza II - Fieldcrest Avenue - Edison, NJ 08837
TELEPHONE: 732-225-2265 / FAX: 732-225-3105

NJ 9997

BB.   All work on high stacks, the contractor will pay a premium wage of 22% above the wage scale.

CC.   All scaffolds will be kept at least four (4) inches below the wall.

DD.   If an employee works past the full hour and must stop because of inclement weather conditions, he shall be paid for the full hour, but is not to leave the job until expiration of said hour. No employee shall start work on the half hour.

EE.   If an employee reports to work and is not started but requested to stay on the job by the contractor, the employee shall be paid for all time prior to starting or until informed that no work shall be performed.

FF.   In the event that due to failure or breakdown of machinery or equipment a work stoppage occurs between starting time and 12 noon, men shall be paid until noon. Employees must, however, remain on the job until noon. In the event that due to failure or breakdown of machinery or equipment a work stoppage occurs between 12:30 p.m. and 3:30 or 4:30 p.m., employees shall be paid until 3:30 or 4:30 p.m. Employees must remain on the job until 3:30 or 4:30 p.m.

GG.   When a job does not start at the regular starting time, it will be the duty of the Foreman to notify the Shop Steward, personally, two hours after the designated start regarding the work conditions. It is clearly understood and agreed the employer will not send anyone to work on a job working during inclement weather unless all of the men regularly employed on that job who showed up for work at starting time are started first. Nothing herein contained shall be construed to deny the saw men, lay-out men and steward regularly employed on the job from working at anytime at their respective job assignments if they are needed.

**ARTICLE XV**
**GRIEVANCE PROCEDURE**

A.   The parties to this Agreement shall establish a Joint Arbitration Board consisting of two representatives of the Building Contractors Association of New Jersey, two representatives of the Mason Contractors of New Jersey and four representatives selected by the Local Union, to resolve disputes over the interpretation and application of this Agreement. The boards shall meet at least once a month, or on call, to settle complaints, abuses or grievances. It is further agreed that should occasion require any alterations or amendments to this Agreement, the party desiring such alterations or amendments shall submit same in writing to the Board. The Employer and union representatives at a session shall have an equal number of votes on all matters coming before the Joint Arbitration Board, regardless of the number of Employer or Union representatives present at a session.

B.   It is specifically agreed that any controversy arising out of this Agreement involving the





BCANJ
Building Contractors
Association
Of New Jersey

BULLETIN

26

TELEPHONE: 732-225-2265 / FAX: 732-225-3105
Raritan Center - Raritan Plaza II - Fieldcrest Avenue - Edison, NJ 08837

NJ9997

interpretation of its terms and conditions, shall be settled in accordance with the grievance procedure set forth in this Article. No grievance shall be recognized unless it is called to the attention of the Employer by the union or to the attention of the Union by the Employer within five (5) days after the alleged violation is committed or discovered.

C.    Grievances shall be handled in the following manner:

    1.    The grievance shall be referred to the jobsite union steward and to an employer representative for adjustment.

    2.    If the grievance cannot be settled pursuant to paragraph 1 of this Section, the grievance shall be referred on the following day to the Business Manager of the Union and the Employer.

    3.    If the grievance cannot be settled pursuant to paragraph 2 of this Section within three (3) working days excluding weekends and holidays, the grievance shall be submitted within 48 hours to the Joint Arbitration Board for consideration and settlement.

    4.    If the Joint Arbitration Board cannot reach a satisfactory settlement within five (5) working day, not including weekends and holidays, following a referral of the grievance to the Board, it shall immediately select an impartial arbitrator to review with the Board all evidence submitted relating to the dispute and then cast the deciding vote. If the Arbitration Board cannot agree on an impartial arbitrator, then the matter shall be submitted to the American Arbitration Association for a decision. All expenses of the Impartial party shall be borne equally by the Employer and the Union. The decision reached by the Joint Arbitration Board with the assistance of the impartial arbitrator shall be final and binding upon all parties.

D.    When a settlement has been reached at any step of this Grievance Procedure, such a settlement shall be final and binding on all parties, provided, however, that in order to encourage the resolution of disputes and grievances at Steps 1 and 2 of Section C of this Article, the parties agree that such settlements shall not be precedent-setting.

E.    The time limits specified in any step of the Grievance Procedure may be extended by mutual agreement of the parties initiated by the written request of one party to the other, at the appropriate step of the Grievance Procedure. However, failure to process a grievance , or failure to respond within the time limits provided above, without a written request for an extension of time, shall be deemed a waiver of such grievance without prejudice and shall create no precedent in the processing of and/or resolution of like or similar grievances or disputes.

## JURISDICTIONAL DISPUTES

A.    In order to avoid jurisdictional disputes which have such a demoralizing effect upon the





Building Contractors
Association
Of New Jersey

Raritan Center - Raritan Plaza II - Fieldcrest Avenue - Edison, NJ 08837
TELEPHONE: 732-225-2265 / FAX: 732-225-3105

WASHINGTON, D.C.
OF AMERICA
CONTRACTORS
ASSOCIATED GENERAL
BUILDING CHAPTER

NJ9997

progress of the construction work, it is agreed that only B.A.C. Members will be employed on work which is recognized as coming under the jurisdiction of the International Union of Bricklayers and Allied Craftworkers as:

1.    Granted by the A.F.L. - C.I.O.

2.    Determined by a Joint Board consisting of four representatives from the Local Unions, two representatives from the Building Contractors Association of New Jersey and two representatives from the Mason Contractors of New Jersey.

3.    As established by practice of Employers within the area designated herein whenever (1) or (2) above are not applicable;

4.    It is the intent of the parties that wherever a job decision shall be deemed to be strongly indicative of the area practice, the Bricklayers & Allied Craftworkers Local Unions will advise all personnel affected to make future assignments accordingly.

5.    It is further the intent of the parties hereto that wherever possible, and whenever the contractor can reasonably foresee a jurisdictional dispute, the contractor will call a pre-job conference with the Local concerned and the contractors agree that when no agreement is reached, at the request of the Union, the contractor will join in the submission of the matter to the Joint Board. In the meantime, the work shall proceed by the craft in possession of the work.

B.    The Employer and the Unions agree to be governed by the terms and conditions of the Agreement, effective May 1, 1995, as amended, creating the Joint Board for the settlement of any jurisdictional dispute; and the decisions of the Joint Board will be followed in good faith.

## ARTICLE XVI
## SUBCONTRACTING

A.    The Employer agrees not to sublet, assign or transfer any work covered by this Agreement to be performed at the site of a construction project to any person, firm or corporation, except where the subcontractor subscribes and agrees in writing to be bound by the full terms of this Agreement and complies with all of the terms and conditions of this Agreement.

B.    All charges of violation of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedures for the handling of disputes and the final and binding arbitration of disputes.



BUILDING CHAPTER,
ASSOCIATED GENERAL
CONTRACTORS
OF AMERICA
WASHINGTON, D.C.




Building Contractors
Association
Of New Jersey

# BCNJ

NJ 9997

## ARTICLE XVII
### PRESERVATION OF WORK (Anti-Double Breasting)

A.  In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement at the site of a construction project, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer (including its officers, directors, owners, partners or stockholders) exercises either directly or indirectly (such as through family members) any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work.

B.  All charges of violations of Section A of this Article shall be considered as a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes, as provided in Article XV of this Agreement. As a remedy for violations of this Section, the arbitrator (or arbitration body) provided for in Article XV is empowered, at the request of the Union, to require an Employer to (1) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as result of the violations, and (2) pay into the affected joint trust funds established under this Agreement any delinquent contributions to such funds which have resulted from the violations, including such interest as may be prescribed by the trustees or by law. Provision for this remedy herein does not make such remedy the exclusive remedy available to the Union for violation of this Section; nor does it make the same or other remedies unavailable to the Union for violations of other sections or articles of this Agreement.

C.  If, as a result of violation of this Article, it is necessary for the Union and/or the trustees of the joint trust funds to institute court action to enforce an award rendered in accordance with Section B above, or to defend an action which seeks to vacate such award, the Employer shall pay any accountants' and attorneys' fees incurred by the Union and/or the fund trustees, plus costs of the litigation, which have resulted from the bringing of such court action.

## ARTICLE XVIII
### NO-STRIKE/NO-LOCKOUT

It is understood and mutually agreed that there shall be no strikes or lockouts over a dispute concerning this Agreement during its term until the grievance procedures described in Article XIV have been exhausted and then only in the event a party fails or refuses to abide by a final decision. This Article shall not apply in those cases where an Employer fails or refuses to make available or pay in part any payments required under this Agreement including all wages, local union fringe benefits or other contributions that have been established through bona fide collective bargaining.

29





Building Contractors
Association
Of New Jersey

Raritan Center - Raritan Plaza II - Fieldcrest Avenue - Edison, NJ 08837
TELEPHONE: 732-225-2265 / FAX: 732-225-3105

NJ9997

## ARTICLE XIX
### SEPARABILITY AND SAVINGS PROVISION

It is the intent of the parties hereto to abide by all applicable Federal and State statutes and rules and regulations made pursuant thereto. If any provision of this Agreement is held invalid by any court or governmental agency having jurisdiction, or if compliance with or enforcement of any provision of this Agreement is restrained by such tribunal pending a final determination as to its validity, then such provision or provisions shall continue in effect only to the extent permitted and all other provisions of this Agreement shall remain in force and effect.

In the event that any provision of this Agreement is held invalid, or enforcement of or compliance with any provision is restrained, the Union and the Employer shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement, incorporating the substance of such provision to the extent allowable under the law, to be in effect during the period of invalidity or restraint.

## ARTICLE XX
### MORE FAVORABLE CONDITIONS

The Union hereby agrees that if it affords any conditions of a more favorable means to any other employer with whom it has a collective bargaining agreement who performs the same or similar work, that said more favorable condition shall automatically be incorporated in this Agreement and be afforded all members of the Association covered hereunder.

## ARTICLE XXI
### GENERAL UNDERSTANDING

The Union agrees to cooperate with the Employer in meeting conditions peculiar to the job in which it may be engaged. It will at all times meet and confer with the Employer, and similarly, the Employer will at all times meet with the Union respecting any questions or misunderstandings that may arise under the performance of this Agreement.

This Agreement constitutes the entire agreement between the parties, and any local or area practices or working rules which may be in conflict with the provisions contained in this Agreement shall be subordinated to this Agreement.

The Employer agrees that if it has not previously done so, it will, upon the Union's submission of evidence of majority status among its employees in the bargaining unit described herein, voluntarily recognize the Union as the exclusive representative as defined in Section 9(a) of the National Labor Relations Act, as amended, of all employees within that bargaining unit on all present and future jobsites within the jurisdiction of the Union. The Employer expressly agrees that it will not condition its recognition upon the results of an election conducted under the rules and regulations of the National Labor Relations Board.



BCANJ

Building Contractors
Association
Of New Jersey

Raritan Center - Raritan Plaza II - Fieldcrest Avenue - Edison, NJ 08837
TELEPHONE: 732-225-2265 / FAX: 732-225-3105

BULLETIN

30

NJ 9997

**IN WITNESS WHEREOF,** we the authorized officers of the Building Contractors Association of New Jersey, the Masonry Contractors of New Jersey and the Bricklayers & Allied Craftworkers, Local Unions No. 4 & 5 have hereunto set our hands and seals this 31st day of October, 1999.

*Authorized Management Representatives*

Joseph Natoli, BCANJ

Robert Epifano, BCANJ

Ralph Pastore, BCANJ

Jack Macedo, BCANJ

Jack Kotsis, BCANJ

Joseph Speranza, MC of NJ

Michael Schmerbeck, MC of NJ

Michael Peterson, BCA/AC

*Authorized Union Representatives*

Gerald Della Salla, Local No. 4

John Capo, Local No. 4

Daniel Guerrera, Local No. 4

Sal Renna, Local No. 4

Joseph DiRenzo, Local No. 5

Gerard Scarano, Local No. 5

Michael Perrone, Local No. 5

Richard Tolson, Local No. 5

31

NJ 9997

NEW JERSEY

# Bricklayers & Allied Craftworkers

### LOCAL UNION #4

B.A.C.
4

143 Washington Street
Morristown, New Jersey 07960



April 25, 2000

Donald Hart
International Union of BAC
815 Fifteenth Street N.W.
Washington, D.C. 20005

Dear Brother Don,

As I indicated to you in my letter of November 26, 1999 I would forward to you a full
copy of the Collective Bargaining Agreement. The copy is enclosed. This also is our
Residential Agreement for all prevailing wage projects.

Please confirm in writing that the agreement was filed with the proper regulatory
agencies.

Fraternally yours,

Gerald Della Salla
Business Manager

Cc: Michael Maness

Gerald Della Salla
Business Manager
John Capo
Secretary-Treasurer

Office # 973-631-9644
Fax # 973-631-9646
Referral # 1 800 421-5624

N J9997

# MEMORANDUM OF UNDERSTANDING

It is hereby agreed by and between the Building Contractors Association of New Jersey, Masonry Contractors of New Jersey and all affiliated local associations and the International Union of Bricklayers and Allied Craftworkers Locals No. 4 & 5 that the local union's collective bargaining agreement between said parties, which expires on October 31, 1999, shall hereby continue in full force and effect except as modified herein:

I.    **THREE-YEAR AGREEMENT**

    A.    There shall be a total wage/fringe package increase of $1.15 effective November 1, 1999.  In addition, there shall be a $.05 per hour increase to the IMI.

    B.    There shall be a $.05 per hour increase to the IAP effective January 1, 2000.

    C.    There shall be a total wage/fringe package increase of $1.20 effective November 1, 2000.  In addition, there shall be a $.05 per hour increase to the IAP.

    D.    There shall be a total wage/fringe package increase of $1.20 effective November 1, 2001.  In addition, the parties shall meet to discuss additional increases to the IMI and IAP prior to November 1, 2001.  Said increases shall not exceed $.05.

    E.    The Agreement shall expire on October 31, 2002.

II.    **FRINGE BENEFITS**

    A.    It is agreed that fringe benefit contributions between Locals No. 4 & 5 shall be fully reciprocal. Language will be developed and mutually agreed to by both Management and Labor regarding the provisions for Reciprocity of Fringe Benefits.

    B.    In order to facilitate the establishment of the same wage and fringe benefit structure within Local No. 5, it is agreed that no other funds other than the Welfare, Pension, International Pension, Annuity, Apprentice, IMI, IAP, Labor Management, BAC PAC and Defense Funds shall be contributed to as of November 1, 1999.

    C.    The parties agree to establish a Committee to explore the concept and funding mechanism for a Market Recovery Program.

NT 9997

Memorandum of Understanding
Bricklayers & Allied Craftworkers, Local Unions No. 4 & 5

## III. WORK JURISDICTION

A. The parties acknowledge the Union's claim to Brick Paving Work. Accordingly, the contract shall be revised to acknowledge the Union's claim of screeding of sub base, regardless of type of material used, shall be the work of the Bricklayers & Allied Craftworkers, Locals Unions No. 4 & 5.

B. Any signatory contractor who subcontracts sidewalks and curbs shall, in good faith, inform the subcontractor that said work is within the jurisdiction of the Bricklayers & Allied Craftworkers, Local Unions No. 4 & 5.

## IV. SAFETY

A. It is agreed that in order to protect the health and safety of employees the dry cutting of masonry units by means of hand-held, gas powered or electrical, portable "chop saws" and skill saws, and the dry grinding of masonry materials shall be done in a designated area away from craftworkers if at all possible. It is the responsibility of the employee to adhere to the established restrictions for said designated areas. Dry cutting shall be permissible provided applicable water attachments are used. In all cases, employees shall be provided with proper respirators as part of a complete respiratory protection program which shall include proper selection, fit testing and air monitoring, and eye protection in accordance with OSHA standards. It is the employee's responsibility to utilize proper protection.

## V. APPRENTICES

A. Apprentices shall be given a minimum of 32 hours per week to perform the work of brick or block provided the work is available.

B. The employer agrees to employ one apprentice for every five journeymen employed on a job site.

## VI. OVERTIME

A. It shall be clarified in the contract that if craftworkers work through any portion of their lunch they shall be paid one hour.

Page 2 of 4

NJ9997

Memorandum of Understanding
Bricklayers & Allied Craftworkers, Local Unions No. 4 & 5

## VII.  WORKING CONDITIONS

A.  If an employee reports to work and is not started but requested to stay on the job by the contractor, the employee shall be paid for all time prior to starting or until informed that no work shall be performed.

B.  The contract shall be clarified to read that in the event of failure or breakdown of equipment or machinery a work stoppage occurs between the starting time and 12 Noon, craftworkers shall be paid until 12 Noon.

## VIII.  PAYMENT OF WAGES

A.  In the event an employer issues a paycheck and there are insufficient funds in the employer's account, the employer, on the next working day, will bring either cash or cashiers checks to the jobsite to cover the paychecks and all penalties.  Failure to do so will result in immediate withdrawal of all craftworkers from the job.  Employees will be compensated by the employer for all lost time until the matter is resolved.  If a second violation occurs, all payrolls shall be in either the form of cash or cashiers checks.

## IX.  FRINGE BENEFIT FUNDS DELINQUENCIES

A.  In the event a job is stopped due to delinquent fringe benefit payments by the employer, craftworkers shall be compensated a day's wages for each day the delinquency continues, not to exceed five days.

NJ 9997

**Memorandum of Understanding**
**Bricklayers & Allied Craftworkers, Local Unions No. 4 & 5**

**IN WITNESS WHEREOF,** we the authorized officers of the Building Contractors Association of New Jersey, the Masonry Contractors of New Jersey and the Bricklayers & Allied Craftworkers, Local Unions No. 4 & 5 have hereunto set our hands and seals this 31st day of October, 1999.

*Authorized Management Representatives*

Joseph Natoli, BCANJ

Robert Epifano, BCANJ

Ralph Pastore, BCANJ

Jack Macedo, BCANJ

Jack Kocsis, BCANJ

Joseph Speranza, MC of NJ

Michael Schmerbeck, MC of NJ

Michael Peterson, BCA/AC

*Authorized Union Representatives*

Gerald Della Salla, Local No. 4

John Capo, Local No. 4

Daniel Guerrera, Local No. 4

Sal Renna, Local No. 4

*To: Josh*
*From: Bill Tomko*

*Steve B.*

**(SIGNATURE PAGE)**

*79*

# B.A.C. LOCAL #4 NEW JERSEY
## THE UNDERSIGNED EMPLOYER AGREES TO BE BOUND
## BY ALL TERMS OF THE BARGAINING AGREEMENT.

NAME OF FIRM _Titan Stone Tile & Masonry_

ADDRESS _70 Supor Blvd_

_Harrison N.J._ ZIP CODE _07063_

TELEPHONE # _(973) 484-3000_ FAX # _(973) 484-6135_

EMPLOYER'S FEDERAL I.D. NUMBER _223187299_

NEW JERSEY EMPLOYMENT I.D. NUMBER _821963-00_

INSURANCE CARRIER FOR WORKMEN'S COMP _PIA Co. 438-7500_

### SIGNATURE OF PARTIES

_Jeff Farina_
OFFICER OR OWNER OF FIRM

_10-16-01_
DATE

_Sec/Tres_
TITLE

_Jeff Farina_
PRINT NAME

BUSINESS MANAGERS SIGNATURE
LOCAL #4 NEW JERSEY

_10/16/01_
DATE

FIELD REP. SIGNATURE

_10-16-01_
DATE

EXHIBIT C

COLLECTIVE BARGAINING AGREEMENT

BETWEEN

BAC LOCAL NO. 1, FLORIDA

OF THE INTERNATIONAL UNION OF BRICKLAYERS
AND ALLIED CRAFTSMAN

AND

SIGNATORY CONTRACTORS

## WITNESSETH:

Wheras, it is the desire of the parties to this Agreement to stabilize employment in the building and construction trades industry, fix wage rates and working conditions, eliminate strikes, boycotts, lockouts and prevent stoppage of work and, therefore, in consideration of this mutual promises hereinafter set forth, each part agrees as follows:

The Agreement shall be in force and effect from *April 1 1999* up to and including midnight *March 31 2001*.

## ARTICLE I.

### Geographical Jurisdiction

The territorial jurisdiction of B.A.C. Local Union No 1, Florida shall be all counties in Florida and Glynn, Camden counties in Ga.

### Trade Jurisdiction

The trade jurisdiction of the Union shall include all work performed in the trade so Brick Masonry, Stone Masonry, Artificial Masonry, Cement masonry, marble Masonry, Plastering, marble, Mosaic, Terrazzo Work, Tile Layer's Work, Cement or Concrete blocklaying and Pointing, Caulking, Grouting and Cleaning of the material used in this work, together with any and al material, natural or artificial, rough or cultured; whether quarried, manufactured or any substitute or replacement thereof regardless of the method or manner of installation. Also: Precast Erectors, Pool Specialist and Roof Deck Applicators and all allied craftsmen designed by the International Union of Bricklayers & Allied Craftsmen and Fiberglass Mechanics.

A.    The caulking of window frames encased in masonry on brick, stone or cement structure including all grinding and cutting out on such work.

B.    All cork installation and substitute therefore, where cementitous or other plastic materials are used, when such cork is installed in floors, wall, partitions, roofs and ceiling, including cutting of closures to fill out corners.

## ARTICLE II

A.    For the purpose of determining the responsibility and liability of the Employer under the terms of this Agreement, the work "Employer" as used throughout this Agreement is hereby defined to mean the firm described below, whether a sole proprietorship, joint venture or corporation; in addition, the word "Employer" shall at all times be defined to include any and all other business entities doing business in whole or

2.

in part in the trade and territorial jurisdiction of the Unions, including but not limited to a sole proprietorship, a partnership, a corporation, a joint venture, an assign, a successor, a subsidiary, a parent corporation, a merger, a lessee or a lessor, operated by one of more of the members, stockholders or officers of the firm described below, or in which one or more of the members stockholder or officers of such entity operates their firm described below. For the purpose of this definition, a person will be deemed to "operate" a business entity if he is its managing or principal officer or member, or if he is in charge of it labor relations in whole or in part.

B.    The Employer agrees that neither he nor any of his subcontractors on the jobsite, will contract or subcontract work coming under the trade or territorial jurisdiction of the International Union of Bricklayers and Allied Craftsmen, to be done at the site of construction, alterations or repairs of a building, structure or other work, except to a person, firm or corporation bound to this agreement.

C.    The provisions of this Article shall be enforceable by judicial means only.

D.    When the Employer has any work specified in Article I of this Agreement to be performed outside the area covered by this Agreement and within the area covered by an agreement with other affiliate of the International Unions of Bricklayers and Allied Craftsmen, the Employer agrees to abide by the full terms and conditions of the Agreement in effect in the jobsite area. Employees covered by this Agreement who are sent to projects outside of the area covered by this Agreement shall be paid at least the established minimum wage scale specified in Article XVIII of this Agreements, but in no case less than the established minimum wage scale of the local Agreement covering the territory in which such work is being performed plus all contributions specified in jobsite local Agreement. The Employer shall in all other matters be governed by the provisions established in the jobsite local Agreement. If employees are sent to work on a project in an area where there is no local Agreement covering the work specified in Article I of this Agreement, the full terms and conditions of this Agreement shall apply.

<u>ARTICLE III</u>

<u>Violation of Statue</u>

Section 1.    Neither the Union nor the Employer shall make a demand upon the other requiring either party to violate the Florida Statutes regulating employment.

3.

Section 2.    It is further agreed by and between the parties hereto that if any clause of this Agreement is determined to be void or illegal, such decision shall not invalidate the other portions of this Agreement but any such clause declared void or illegal by a Federal or Sate Court shall be stricken out and the remaining portions of this Agreements shall be considered binding between the parties hereto.

Section 3.    The parties agree that this Agreement shall not be opened for negotiations based upon any unresolved issue, or for wages, or for any fringe benefits not provided in this Agreement.

Section 4.    The Union may withdraw men without notice from any Employer not paying the wages or fringe benefits required by this Agreement.

## ARTICLE IV

### Grievance/Disputes

All questions, differences and/or disputes relating to the application of interpretations of this Agreement arising during the term of this Agreement between the Union and the Employer shall be resolved in the following manner.

### Grievance Committee

Section 1.    There shall be a committee composed of six members, three from the Union and three designated by the Employer who are signatory to a collective bargaining agreement. Meetings may be called by either party to this agreement by submitting written notice to the other party within seven working days of the grievable occurrence. Written notice shall set forth the specific items to be discussed by the committee.

Section 2.    Each party must designate its representative members and notify same within two working days from receipt of the notice. The committee shall meet within five working days of receipt of the demand for a grievance hearing. No questions of jurisdiction will be considered.

Section 3.    Four members, two from each side shall constitute a quorum. A decision shall require a majority vote and shall be binding on both side, unless either party notified the other within five working days of its intent to appeal the matter to an impartial arbitrator.

4.

## ARTICLE V

Arbitration

A.    The party appealing shall request a panel of arbitrators from the Federal Mediation and Conciliation Service and shall strike first from the list of names submitted.

B.    All costs incurred in the arbitration, other than attorney's fees, shall be borne equally.

C.    The arbitrator shall not have any authority to amend or modify or otherwise alter this Agreement.

D.    The time limits provided in this Article shall be considered as of the essence in this contract, but may be waived by mutual and written consent of the parties.

## ARTICLE VI

Working Conditions

Section 1.    When additional Journeymen are required, the Employer , before recruiting employees may apply to the Union, allowing two (2) working days in which to refer craftsmen for employment.

A.    The Union agrees to maintain and out-of-work list from which to refer job applicants.

B.    Referrals shall be on a non-discriminatory basis without regard to any unlawful requirements.

Section 2.    The Employer may request and the Union will refer.

A.    Any individual who has been employed by the Employer within the trade and geographical jurisdiction of the Agreement within the preceding twelve (12) months: and

B.    Any individual the Employer deems to have a special skill and who has worked in the trade and geographical jurisdiction of the Agreement within the preceding twelve (12) months.

5.

Section 3.    An Employer who does not maintain a regular place of business in the jurisdiction of the Union shall give seniority to employees based on residency. Only one non-resident maybe employed for each three employees who reside in said jurisdiction.

A.    Signatory Employers who maintain a regular place of business in the jurisdiction of the Union may, when traveling within the jurisdiction, employ a ratio of two to one provided that the second employee shall be the shop steward from the Union's jurisdiction.

B.    The Union agrees that there shall be no limitation of the amount of work an employee shall perform. No Employer or his representative shall require or permit their employees to engage in any of the following practices: Lumping of work or piecework.

C.    It shall be a violation of this Agreement for an Employer and employee to bargain to perform a certain amount of work, in a certain amount of time, for a certain amount of compensation.

D.    All parties agree that no person shall interfere with employees during working time. The Joint Apprenticeship Coordinator, Field Representative, representatives and assistants shall have access to all jobs, but shall first advise the Employer's representative of his presence on the job.

Section 4.    Stewards shall be selected by the Union's Business Agent or his assistants, and shall be the second employee on the job. Stewards shall not be restricted in the performance of their duties. However, Stewards shall not use more than the time actually required to perform these duties. Stewards shall remain on the job and not be discharged or laid off, while other employees working under the jurisdiction of the Union are on the job, so long as the Steward has previously performed such work.

A.    If the Steward is unable to promptly resolve a problem on the job, he shall contact the President as soon as possible. He Shall Not have the authority to order a work stoppage or interruption in the work process.

B.    A Steward may, however, be discharged for "good cause" after notice in writing is sent to the Union no less than two (2) full working days prior to such intended discharge. "Good Cause" shall be limited to acts of dishonesty, use of illegal drugs, intoxication and incompetency and must be proven by the Employer.

6.

C.    The Shop Steward shall be on the job for all overtime, including Saturday, Sunday and holidays. If the Steward is not available, he shall appoint a temporary Steward for the time in question.

## ARTICLE VII

### Start of Work

Section 1.    If no personnel elevator or hoist is on a job of over 5 stories in height, a locked room, gang box or shanty shall be provided on the 5th and 10th floors of the building and employees shall leave these areas at their regular starting time.

A.    Each journeyman and apprentice shall furnish his own hand tools necessary to perform the work of his trade. Power tools, rods, feather edges, straight edges, bull floats and any tool over four (4) feet in length shall be furnished by the Employer.

B.    The Operation of all mechanical and all power tools or equipment used in this installation of work under the jurisdiction of this Agreement shall be performed by journeymen or by apprentices under the direction of a journeyman. All saw cuts on the job, breaking of units and raking of joints in any brickwork stonework or artificial masonry, all cleaning of masonry by any means, all patch work and finishing of masonry work shall be done by mechanics or apprentices of the trade.

Section 2.    All mortar boards shall be raised not less than for:

A.    Masons        16" Sixteen inches above walking level
       Plasterers     30" Thirty inches above walking level
       Tile Setters   30" Thirty inches above walking level

B.    Sanitary toilets shall be furnished on every third floor and not more than 300 feet from work area.

C.    Clean and fresh ice water and paper cups shall be on all floors or job locations within reasonable distance of work sites.

D.    Should work be stopped for causes beyond the control of the Employer, no claims for lost or lapsed time shall be made by the Union for the time of the unavoidable cessation of work.

7.

E.. Employees shall not be removed from the payroll (time account) while waiting for materials, a place designated to work in or scaffolds prepared to work on.

Section 3. Employees will not be obligated to perform work if unsafe conditions exits.

A. The maintenance of safe working conditions is the Employer's responsibility. Stewards shall at all times be considered Employees of the Employer and working under the Employer's direction and control. Stewards shall not perform any safety inspections on behalf of the Union. If any Employee, including the Steward is requested by the Employer to perform any safety inspections or test, or to take or suggest any corrective action or repairs to an unsafe conditions, the Employee shall do so solely as an Employee and agent of the Employer and not on behalf of the Union. The Union, it's officers and agent, shall have no duty to assure the work place safe. However, if after being informed of the Employer's safety regulations and warned once that the employee is in violation, the Employer may take whatever disciplinary action he deems necessary, including discharge. It is agreed that all employees shall furnish their own hard hats and proper work shoes and clothing. All other required safety equipment shall be furnished by the Employer.

B. Employees injured on the job during the first four hours of work shall be paid four hours wages for the day of the accident or employees injured on the job during the second four hours of work shall be paid eight hours wages for the day of the accident if his treating physician advises that he could not or should not return to work that day. In addition, the Employer may require an injured employee to be examined by a physician designated by the Employer. The physician's fee shall be paid by the Employer including any travel expenses and lost wages incurred by the employee.

C. An employee injured on the job shall be reinstated to his former job when released to do so by the attending physician, provided the Employer is still employing workmen covered under this Agreement on the jobsite where the injury occurred.

D. All injuries should be reported immediately to the Employer representative and the Job Steward.

E. Only medical questionnaires approved by both parties to this Agreement and under guideline established and permitted under the Americans With Disabilities Act, shall be used.

8.

## ARTICLE VIII

.Section 1.    It is understood and agreed that there shall be no stoppage of work ordered by this Union nor shall the members of this Union be allowed to engage in such stoppage, provided however, that the terms and conditions of this Agreement shall be followed, unless otherwise provided in this agreement.

A.    Members shall retain their right not to cross any lawful primary picket line at the job site.

Section 2.    In the event of a dispute involving a violation of this Agreement it shall be resolved under the process of "Grievances & Arbitration" except that the Union reserves the right to withdraw its members, after serving written notice, from any Employer delinquent in the payment of fringe benefit contributions.

A.    Payment of wages shall be made weekly and during working hours, and shall not be later than three (3) days after the close of the Employer's weekly payroll period.

B.    If the Employer's payroll checks have been denied for payment of any reason other than a fault of the bank, the Employer shall be required to make all payrolls in cash until the Union is satisfied the problem will not re-occur. All payroll checks shall be drawn on a local Bank within the jurisdiction of this Collective Bargaining Agreement.

Section 3.    When a lay-off is expected, the Foreman shall notify the men who are to be laid off at least (30) minutes before quitting time. Lay-off shall be payoff.

Section 4.    If any employee shall quit or fail to return to work he shall receive his wages the following pay day and shall not be entitled to waiting time or show-up time.

Section 5.    When any employee is discharged or laid-off for violation of established safety regulation, for drinking alcoholic beverages or for consuming illegal drugs, he shall be paid the following pay day. He shall not be entitled to waiting time.

Section 6.    When any employee does not receive pay at the time due, he shall be entitled to pay for waiting at Regular Straight Time Rate of Pay.

9.

Section 7.    The Employer reserves the right to require and receive, when any employee quits or is discharged or laid-off, and before making any payment due, any and all of the employer's property in the possession of the employee.

Section 8.    Each payroll envelope or voucher shall clearly show the following: Name of employee, classification and social security number, hours worked and rate of pay, total amount due, all amounts deducted for Federal Old Age Benefit Tax and Withholding Tax, net amount paid and week-ending date.  Include pay, month, and year, Employer's name and address- this shall be a payroll record for the employee.

Section 9.    Federal Prevailing Wage- If the published wage rate for any project is lower than the wages required by this Agreement, the prevailing published wage rate shall supersede this Agreement.

Section 10.    Targeted projects, so designated by the Union, shall prevail.  The Union shall timely notify all signatory contractors of targeted projects.

Section 11.    Parking or bus shuttle system shall be provided when practical and feasible.  Only toll charges by employees in order to travel to the job where no toll-free travel exists shall be paid by the Employer upon presentation of toll payment receipt.

## ARTICLE IX

### Hours, Wages and Holidays

Both Parties hereto mutually agree:

Section 1.    Any eight and one-half continuous hours between seven o'clock A.M. (7:00 A.M.) and five thirty P.M. (5:30 P.M.) within one-half hour (1/2) midway for lunch break, Monday thru Friday shall constitute a days work.  A ten minute mid morning and afternoon refreshment break shall be allowed in the work area.

Section 2.    Clean-up Time:

All employees shall be allowed ten (10) minutes before quitting time to clean their tools and change their clothes, after which they shall be permitted to leave the job.

## ARTICLE X

SHIFT WORK (Heavy industrial, stack and slipform, water treatment plants and such other type projects.)

10.

Section 1.    Where proper notice has been given to the Union through the Business Manager, shift work shall be allowed for a period of not less than five (5) consecutive working days as follows: First shift, normally 8:00 A.M. until 4:30 P.M. at regular pay. Second shift, normally 4:30 P.M. until 12:30 A.M. at 15% above scale, 7 ½ hours worked for 8 hours pay. Any additional work shall be paid at double the applicable rate. Third shift, normally 12:30 A.M. until 8:00 A.M. at 25% above scale, 7 ½ hours worked for 8 hours pay, any additional work shall be paid at double the applicable rate for industrial work only.

Section 2.    Other Applicable Shiftwork -  If the Employer desires, shiftwork may be established for work during week days.  If two 8 hours shifts are established, the first shift shall be paid 8 hours straight time.  The second shift shall be paid .50 cents per hour over scale; if a third 8 hour shift is established by the employer, the employee shall work 7 hours and be paid 8 hours straight time.  All hours in excess of shifts established, shall be a double the straight time rate for commercial work only.

## ARTICLE XI

### Special Shifts

When maintenance or remodeling work cannot be performed during the regular work hours because of the fact that establishments cannot suspend business operations during the day, a special single shift may be established starting when the premises are available Monday through Friday, and Employees on this shift work eight consecutive hours, including meal break and one-half hour midway, for which they will receive eight hours, pay for seven and one-half hours worked.  No special shifts shall be established without written notifications to the Union. All hours in excess of 8 hours shall be paid at double time.

## ARTICLE XII

### Hazard Pay

Pertains to local areas only.
Please refer to addendum.

11.

## ARTICLE XIII

Overtime

Section 1.    Except where otherwise provided for in this Agreement, if an employee works before or after his straight time working hours, or in excess of any shift work, or on Saturday, he shall be paid time and one-half the straight time rate applicable to the work he is doing.  Work on Sunday or holidays shall be paid double (2x) the straight rate time.

A.    No overtime shall be worked unless the Employer, foreman or steward has first made a request for permission to work overtime and had received approval of the President or Field Representative of the Union.

B.    If overtime is to be worked, the employees who worked on the job during the regular straight time hours shall work the overtime.

## ARTICLE XIV

Holidays

Section 1.    The following shall be recognized as holidays:  New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Veteran's Day, Friday after Thanksgiving Day and Christmas Day.  If the holiday falls on a Sunday, the holiday will be observed on Monday.

## ARTICLE XV

Apprentices

Section 1.    Apprentices shall be paid at the following percentage of the appropriate journeyman rate:

| | |
|---|---|
| 1st. 6 months period | 65 per cent, plus fringes |
| 2nd. 6 months period | 70 per cent, plus fringes |
| 3rd. 6 months period | 80 per cent, plus fringes |
| 4th 6 months period | 85 per cent, plus fringes |
| 5th. 6 months period | 90 per cent, plus fringes |
| 6th. 6 months period | 95 per cent, plus fringes |

12.

A.   Except as provided in this Agreement the employment of Apprentices shall be governed by the standards fixed by the Joint Apprenticeship Council.

.B.   No Employer shall employ an Apprentice unless he has employed an average of two Journeymen for one year immediately prior to his employment of the Apprentice.

C.   No Employer shall employ more than one (1) Apprentice to every three (3) Journeymen employed on the same construction site.

D.   The President of the Union may in his discretion allow more favorable terms for the employment of Apprentices if the Employer requests it and if it is in the best interest of the Apprentice.

E.   Apprentices shall not during the term of their Apprenticeship be employed as, nor work in the capacity of foreman, leadman or placed in charge of any Journeyman or apprentices.  Apprentices with less than 18 months of on-the-job training, must work with and under the direction of a Journeyman of the same trade.

.F.   All Apprentices must enter into a written Agreement to remain with a Signatory Employer during the term of his Apprenticeship and for two (2) years thereafter, unless released by his Employer, in which case the Union has the right to reassign him.  Failure of the Apprentice to abide by these terms will result in repayment to the J.A.C. for his training and Scholarship Agreement.

G.   Apprentices must be permitted to work with the tools of the trade, a minimum of six hours each day.

<div align="center">ARTICLE XVI</div>

Student Apprentices

All parties to this Agreement recognize the problem of young people seeking employment during the annual summer vacation period and the need for the construction industry to endeavor to help by employing these young persons when there is a need and they possess the capacity to do the work assigned.  Being neither indentured apprentices nor journeymen trowel tradesmen a special category is hereby authorized to employ such individual without being considered in violation of this Agreement, provided the following conditions are followed:  (a) There is no indentured trowel trades apprentices available for employment at the time; (b) Such employee is compensated at no less than the first period trowel trades apprentice; (c) Such employee shall only do work usually done by journeymen or apprentice trowel tradesmen.  This is limited to only school vacation period No fringe benefit payments shall be required.

<div align="center">13.</div>

## ARTICLE XVII

### Finisher and Helpers

Section 1.     In addition to work assignments set forth in the Collective Bargaining Agreement, the Employer agrees to assign to employees represented by the Union all additional work assignments necessary to complete the entire installation of tile marble, terrazzo, stone and mosaic projects.

Section 2.     The wage rates to cover these employees working on the additional work assignments shall be:

Helpers and Finishers:
July 1, 1999 $.25 increase........$12.78
Jan. 1, 2000  $.55 increase.......$13.33

14.

## ARTICLE XVIII

### Wage and Fringe Benefits

Pertaining to Local Areas in attached addendum.

WAGES

| | | |
|---|---|---|
| July 1,1999 | $.25 increase...................$16.95 | |
| Jan. 1,2000 | $.55 increase...................$17.50 | |

FRINGES

| Jan.1,2000 | H&W | LOCAL PENSION | INDUSTRY FUND |
|---|---|---|---|
| | $1.65 | $1.00 | $.05 |

| | JAT | IPF | |
|---|---|---|---|
| IMI | | | |
| | $.10 | $.60 | $.10 |

| | |
|---|---|
| July 1,2000 | $.50 increase will inform contractor on breakdown. |
| Jan 1,2001 | $.50 increase will inform contractor on breakdown. |

14a

## ARTICLE XIX FRINGE BENEFIT FUNDS

Section 1.    Commencing with the effective date of this agreement, the employer hereby agrees to contribute the amount set forth in the attached addendum, for each hour worked by employees within geographic jurisdiction of the Agreement to the Florida Trowel Trades Pension Trust Fund, Florida Trowel Trades Health & Welfare Trust Fund and the Apprenticeship and Training Fund in the location of the work.

Section 2.    Each of the Trust Funds set forth above are established pursuant to Agreements and Declarations of Trust which, among other provisions, include the following:

That the Trustees shall have equal representation between labor and management;
That the contributions shall be for the exclusive benefit of employees covered by this Agreement, elected or appointed officers or employees of the Union or the employer, not covered by other Union joint Trust Funds, their dependents and beneficiaries and such other eligible person as the Trustee may elect to include;
That Trust Agreements shall in all ways conform to the requirements of the Employee Retirement Income Security Act and the Labor-Management Relation Act.

All employers who are party to or otherwise bound by this Agreement acknowledge, accept and agree to be bound by the Agreements and Declarations of Trust of the various Trust Funds as set forth within this Agreement. All employees acknowledge, accept and appoint the current employer Trustees of the various Trust Funds to act on their behalf and to accept future Trustees who are appointed or elected in accordance with the Trust documents. All employees further acknowledge that they are bound by the terms, provisions and conditions of all rules, regulations, resolutions and amendments pertaining to any Trust Fund, as promulgated by the Trustees in accordance with the Trust Agreements, whether currently existing of promulgated during the term of this agreement.

NOTE: The balance of this article remains unchanged.

Section 3.    Bricklayers and Trowel Trades International Pension Fund. Except as otherwise provided in this Agreement for Local pension and retirement benefits, the only agreement between the Employer (s) and Union parties to this Agreement regarding pension or retirement for employees covered by this Agreement is as follows:

1. (a) Commencing _April 1, 1997_, and for the duration of the Agreement, and any renewals or extensions thereof, the Employer agrees to make payments to the Bricklayers and Trowel Trades International Pension Fund (National Pension Fund) for each employed covered by this Agreement, as follows:

15.

(b).    For each hour or portion thereof, for which an employee receives pay, the Employer shall make a contribution of _____ to the above named national Pension Fund.

(c).    For the purpose of this Article, each hour paid for, including hours attributable to show up time, and other hours for which pay is received by the employed in accordance with this Agreement, shall be counted as hours for which contributions are payable.

(d).    Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This included but is not limited to apprentices helper, trainees, improvers and a probationary employee.

(e).    The payments to the National Pension Fund required above shall be made to the Bricklayers and Trowel Trades International Pension Fund, which was established under Agreement and Declaration of Trust, as though he had actually signed the same.

2.    The Employer hereby irrevocable designates as its representative on the Board of Trustees such Trustees as are now serving, or their successors. The Employer further agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust.

3.    All contributions shall be made at such time and in such manner as the Trustees require. The Trustees shall have the authority to have an independent Public Accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the National Pension Fund.

4.    If any Employer fails to make contributions to the National Pension Fund within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs for the collection of payments due together with attorney's fees and such liquidated damages as maybe assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in the Agreement.

5.    The Pension Plan adopted by the Trustees of said National Pension Fund shall at all times conform with the requirements of the internal Revenue Code so as to enable to the Employer at all times to treat contributions to the National Pension Fund as a deduction for income tax purposes.

16.

Section 4.   Contributions required to be paid hereunder shall be made <u>monthly</u> by sending a check for the amount due accompanied by a reporting form to the appropriate Trust Fund or such other agent designated by the Trustees of the various Trust Funds. After receipt of the contributions, all monies collected, expect those amounts representing check-off payments, shall be paid over to the appropriate joint Trust Fund. Monies contributed for check-off shall be appropriately distributed to the various Unions as directed in Article XXII.

The reporting forms shall, among other data required to be furnished by the employer, include the name of the employees, Social Security numbers, the area in which they worked and the number of hours paid to them by the employer. If an employer does not have employees to contribute on, he shall report that information weekly by marking the appropriate box on the reporting form.

## ARTICLE XX  PROVISIONS APPLICABLE TO FRINGE BENEFITS

Section 1.   The employer agrees to promptly make payments of all fringe benefit contributions to the various Trust Funds on a monthly basis.  Contributions shall be considered delinquent if the employers' contributions are received by the Trust Funds more than fifteen (15) days after the close of the month for which the contributions are owed;  if this contributions show a pattern of late payments over a period of more that three (3) months;  or if the employer's contributions are not made on all hours worked by covered employees or are not made on all covered employees;  or if the Employer fails to makes timely filing of reporting forms required by the Trustees.

Section 2.   The employer agrees that if he is delinquent in the payment of any of the contributions required in Article XVIII of this Agreement, the Trustees of any of the aforementioned Trust Funds may direct the Trust Funds attorney to contact the delinquent employer to enforce the provisions of this Agreement or to institute suit in any court of competent jurisdiction to enforce the Employer's obligations to the Trust Funds.

Section 3.   The Board of Trustees of any joint Trust Fund upon their own initiative or upon a written complaint or upon any employer becoming delinquent may direct an impartial public accountant or qualified member of his firm or staff to audit the employer's payroll records.  The employer shall fully cooperate and permit the audit to be conducted upon his premised at any reasonable time during business hours.  The employer shall make available to the auditor, for his examination, all books and records necessary to determine the correctness of the employer's contributions under this or any prior agreement.

17.

In the event the auditor determines that the employer has violated the provision of this Agreement in his method of computation of contributions, or if adequate records are not made available to allow the audit to make his determination in that regard, compensation by the applicable hourly rate of pay and a quotient from that calculation shall be multiplied by the applicable fringe benefit contribution rate requires to be paid under this Agreement.

In the event the audit reveals that the employer has underpaid or failed to pay any fringe benefits required to be paid under this Agreement, except for clerical errors in a minor amount, or failed to submit to auditing, all cost incurred by the Trustees, including audit charges and reasonable attorney's fees shall be paid by the Employer.

Section 4.    The employer agrees that in the event of any delinquency on his part, he shall pay all attorneys' fees, audit fees and costs incurred by the Trustees on account of his delinquency, in addition to all delinquent sums. Furthermore, in the event of a delinquency, the employer shall be liable for the payment of late payment service fees in the sum of 10% of the delinquent contributions, interest and liquidated damages as permitted by law.

Section 5.    In the event that any employer is delinquent in paying of fringe benefit contributions to the various Trust Funds as defined in Section 1 of this Article, the Trustees shall levy a late payment service fee in the sum of 10% of the amount of the delinquent contributions The Trustees of the various Trust Funds may establish such uniform practices, policies or rules as they deem appropriate with respect to late service fees, so that the fee will be charged in a manner calculated to help defray cost of collection, compensate for loss of investment earnings and administrative inconvenience caused by the delinquency and to deter delinquency so that the fee will not be charged for minor or inadvertent delinquencies, or in an unfair or inequitable manner.

The escrow agent shall be empowered to deposit the monies in an interest-bearing account and at any time to deduct from each employer's account and to pay to the appropriate Trust Fund whatever may be needed to make up fringe benefit contribution shortage or delinquencies on the part of the Employer. Interest earned by such an account shall be used to pay the escrow agent's costs and charges for administering this bond account. When the employer's account reaches the sun of _____, the hourly contribution shall cease and the monies so collected shall be treated as cash bond under Section 6 above.

Section 6.    The employer agrees that if delinquency in payment of fringe benefits has caused, in whole or in part, an employee to lose or fail to gain eligibility under the Health and Welfare Fund and the said employee has personally incurred any medical or hospital expenses or costs for himself of his dependents, the employer shall be liable for and shall pay such expenses and costs in addition to any delinquent amounts.

18.

Section 7.    It is specifically understood and agreed between the parties hereto that the employer shall comply with the terms of the Agreements and Declarations of Trust referred to herein as a condition for the continued employment of employees working under the terms of this Agreement.  In the event the Employer fails to make payment as required under the terms of this Agreement, the Union shall have the right, without liability, to order the withdrawal of employees from the job without notice.

Section 8.    The parties to this Agreement agree that it is desirable for the Boards of Trustees of the Trust Fund referred to in this Agreement to have the discretionary authority to make good faith determinations regarding payment of benefits and interpretations of the terms of the written documents involved in the operation of the Trust Funds.  The parties further agree that it would be more costly and burdensome for the operation of the Trust Funds to make those determinations subject to de novo review by the Courts.  Therefore, the parties specifically agree that the Boards of Trustees of the Trust Funds referred to in this Agreement have been delegated the full power and authority, in their sole discretion, to determine eligibility for benefits, to construe and interpret the terms of all written documents, including the Trust Agreements, the Plan Documents and the Summary Plan Documents, and to otherwise make decisions regarding the administration and operation of the Trust Funds.

## ARTICLE XXI

The Union in its sole discretion shall have the authority to reapportion fringe benefit contributions as needed.

## ARTICLE XXII

The Employer agrees to take from the wages of all employees who have executed proper written authorization such sums as designated by the Union as a working assessment, at the same time as the Employer pays his fringe benefit contributions.  Upon receipt of the monies the escrow agent shall promptly make the proper disbursement of such checked-off sums to the Union.

The Employer shall have no responsibility for any check-off monies after forwarding same to escrow agent.

19.

## ARTICLE XXIII

Section 1.    This Agreement shall be in force and effect from the date signed by the Employer to and including midnight *March 31, 2001* and thereafter for yearly periods unless the Employer or the Union notifies the other party, in writing, at least sixty (60) days prior to the stated expiration date or any succeeding annual anniversary, of its desire to amend or terminate this Agreement. In the event of such notice, the parties shall promptly commence negotiations looking toward the consummation of a new modified Agreement.

Section 2.    In the event that either party serves notice in the timely manner, pursuant to Section 1 of this Article, this contract shall continue in full force and effect until negotiation shall be terminated by either party.

20.

*IN WITNESS WHEREOF*, the parties hereto subscribe their names.

*BARGAINING RECOGNITION; CONDITIONS OF ACCEPTANCE*

It is mutually acknowledged and agreed by the Parties that said Union is the duly recognized and authorized representative of employees by the Employer performing work in the trade and territorial jurisdiction of the Union and has by law the right to represent them exclusively.

The Employer does hereby accept and adopt this Agreement in its entirety and agrees to be bound hereto for the terms expressed herein.

FOR EMPLOYEES FOR WHICH THE ASSOCIATIONS ARE RECOGNIZED COLLECTIVE BARGAINING AGENT:

TROWEL GUILD                    BAC LOCAL UNION NO. 1

## EMPLOYER ACCEPTANCE

Signed this _FRIDAY_ day of _MAY_ _14_, 19_99_

Firm Name _TITAN STONE, TILE + MASONRY Of Florida LLC_

Address _700 NW 27 AVE_

City _FT Lauderdale_, State _FLA_    Zip _33311-6639_

Phone/s _954 316 0572_

I.R.S. No. _65-0866051_    C.C. No. _926698 TMX_

Type of Business _____

Employer Agent/s _[signature]_    Title _VICE President_ 5-14-99

Union Agent/s _Bob Blanco_    Title _President_

GRANITE • MARBLE • LIMESTONE • BRICK
PRE-FABRICATED SYSTEMS • CONVENTIONAL SET SYSTEMS

Joseph Farina

TITAN
STONE, TILE &
MASONRY, INC.

70 Supor Blvd.
Building C
Harrison, NJ 07029-1918

Tel: (973) 484-3000
Fax: (973) 484-6636

EXHIBIT D



NEVADA
AGREEMENT

TILE, MARBLE,
STONE & TERRAZZO
FINISHERS

RECEIVED
SEP 2 4 08
CARPENTERS BA...... UNION 5...655

# NEVADA WORKING AGREEMENT

## ARTICLE I
## PARTIES

This Agreement is entered into this 3rd day of March, 2003 by and between Bricklayers and Allied Craftworkers Local Union No. 13 Nevada (hereinafter the "Union") and the Nevada Tile, Marble, Stone and Terrazzo Contractors Association (hereinafter the "Association"), on behalf of the Association members listed in Appendix B, those employers who subsequently join the Association and those independent employers who agree to become signatory to this Agreement.

## ARTICLE II
## DURATION-TERMINATION-AMENDMENT

This Agreement shall be effective commencing March, 2003 shall continue in full force up to and including February 28, 2006, and shall be automatically continued yearly thereafter unless written notice of intent to negotiate a new Agreement, in whole or in part, is given in writing by either party to the other not later than sixty (60) days prior to the expiration date or of any anniversary date thereafter. The parties may at any time mutually agree to change or amend any part of this Agreement, such changes or modifications shall not affect the continuing nature of this Agreement.

## ARTICLE III
## SCOPE OF WORK

Section A. This Agreement shall cover new construction, maintenance, repair and renovation work, except that this Agreement does not apply to any work covered by the "Work Recovery Agreement," within the following Nevada counties: Clark, Esmeralda, Lincoln and the Southern portion of Nye County south of the 38th parallel. In addition, before an Employer, signatory to this agreement, performs new construction, maintenance, repair or renovation work in any county in Nevada north of the 38 'h parallel, the Employer will negotiate in good faith with the Union concerning the terms and conditions of employment applicable to such work. No negotiations are required if the Employer chooses to perform such work in accordance with this Agreement.

Section B. This Agreement shall cover the work of Brick Masonry, Stone Masonry, Artificial Masonry, Marble Masonry, Marble, Mosaic and Terrazzo Work, Tile Layers' Work, Pointing-Cleaning-Caulking, Finishers' Work, and Special Categories falling within the jurisdiction of the Union, as defined in Code 1 to the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers, AFL-CIO, except that this Agreement does not apply to any work covered by the "Work Recovery Agreement" between the parties hereto. The foregoing shall include but not be limited to the work of masons, mechanics, setters (also known as layers), and finishers (including but not limited to , stone finishers, marble finishers, tile finishers, and terrazzo finishers) All work covered by this Agreement shall be assigned to employees represented by the Union. The cutting of materials at the site of construction may be assigned to finishers at the discretion of the Employer.

Initial _____    Union _____    Management _____

2

SFDOCS/204930/7/1 030304.000

Section C. In addition, this Agreement shall cover all other assignments mutually agreed upon between the Employer and the Union on any other building products or systems related to the scope and type of work covered by this Agreement that are determined by these parties to fall within the work jurisdiction of this Agreement.

Section D. Residential work shall be in accordance with the Work Recovery Agreement.

## ARTICLE IV
## MANAGEMENT RIGHTS

The Employer shall have the right to hire, fire, suspend, direct the work force, and manage its business in accordance with its best judgment, including but not limited to the right to exercise complete and exclusive control, management and operation of the Employer's equipment and personnel, the location and layout thereof and the determination of the nature and scope of the Employer's activities and methods pertaining thereto, the right to introduce new and to modify procedures, methods, processes, facilities and equipment and to make technological changes, the right reasonably to maintain order, safety, security and efficiency and to promulgate, publish and enforce such reasonable rules which in the discretion of management are necessary, the determination of the number of employees, the assignment of duties thereto, the right to direct the work force, including but not limited to scheduling, assigning, laying off, promoting and transferring of its employees.

## ARTICLE V
## UNION RECOGNITION

Section A. The Union claims, and the Employer, having satisfied itself thereof, acknowledges that a majority of the Employer's employees in classifications covered by this Agreement have authorized the Union to represent them in collective bargaining. On that basis, the Employer hereby recognizes the Union under Section 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a), as the exclusive bargaining agent of all of its full-time and regular part-time employees in classifications covered by this Agreement on all present and future job sites within the jurisdiction of the Union. The parties to this Agreement hereby express their intent to create a multi-employer bargaining unit, as to which the Union is the exclusive bargaining agent for the employees under Section 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a), composed of all Employers who are currently or at any time in the future become members of the Association.

Section B. There shall be open and nondiscriminatory employment on work covered by this Agreement.

Section C. On large scale projects exceeding twenty (20) crews, the Union or the Employer may request a pre job meeting prior to the commencement of any work to discuss such issues as manpower requests, safety issues, job requirements, special concerns, etc.

## ARTICLE VI
## HIRING PREFERENCE & DISPATCH PROCEDURES

Section A. The Union shall operate an exclusive hiring hall. When the Employer has a vacancy, the Employer shall first call the Union's Hiring Hall for referral of applicants. Should the Union be unable to refer the number of applicants requested by the Employer, the Employer can hire from any other source. The

Initial _____    Union _____    Management _____

3

SFDOCS/204930/7/1 030304.000

Employer may discharge any worker for any cause which the Union may deem sufficient, provided there shall be no discrimination on the part of the Employer against any worker for Union activity.

When an Employer hires workers from a source other than the Union's hiring hall, the Employer will promptly notify the Union in writing of the worker's name, home address and telephone number, and in addition, will send the worker to the Union's hiring hall to obtain a dispatch slip within 48 hours of hire.

Section B. When requested by the Employer, the Union shall provide via fax a copy of the out of work list. The list shall include name, skill level and phone number.

Section C. The Individual Employer, the Union's Employment Office will provide the Individual Employee dispatched to an Individual Employer, with a written dispatch slip containing complete and up-to-date information regarding the employee's skill level, the hours reported at that skill level and the immediately preceding skill level, and the Employer for whom the employee has worked during the previous twelve (12) months at that skill level and the immediately preceding skill level.

Section D. The Employer may reject any employee or applicant for employment referred by the Employment Office of the Union. Employees or applicants for employment who are rejected by an Employer shall be paid show-up pay in accordance with the following provisions:

1. Any worker reporting for work at the regular starting time and for whom no work is provided shall receive two (2) hours pay at the stipulated rate, as well as the expense payment, if any, due for the day for reporting when he has been notified before the end of the preceding day not to report, or when the employee is prevented from working for reasons beyond the control of the Employer, including but not limited to such factors as inclement weather, or breakdown causing discontinuance of a major unit of work of the project.

2. The Employer shall be relieved of the obligation to pay show-up pay to any employee or applicant who does not possess all of the following minimum qualifications: (a) the ability to communicate as necessary to perform the job safely and efficiently, and (b) proof of eligibility to work in accordance with the Immigration Reform and Control Act. In addition, Marble Masons, Bricklayers, Tile Layers, Journeypersons, Improvers and Finishers must report to the jobsite with all necessary hand tools.

Section E. Notwithstanding anything to the contrary in this Article, the Employer may request by name, in writing, and the Union shall dispatch, if available, any employee that has been previously employed by the Employer.

## ARTICLE VII
## CHECKS, PAY PERIOD, WAGES AND CONTRIBUTIONS

Section A. All employees working under this Agreement shall, be paid in cash or by check weekly by Friday. The Employer may mail employee's paycheck to their home address. Employees electing not to have paychecks mailed may pick their paychecks up at the Employer's local office or at the Employer's job site trailer, before quitting time each Friday. The Employer must provide a timecard for the employees to complete and sign weekly before receiving their paycheck. Alternative satisfactory time reporting methods may be used if approved by the Union. An employee being laid off or terminated shall be given his final paycheck in full for all hours of employment before quitting time.

Initial _____    Union _____    Management _____

4

Section B. The right to pay by check shall be denied any Employer whose checks fail to be honored.

### Section C.

1. The total hourly wage package for Bricklayer, P.C.C., Tile Setter, Marble Mason, Terrazzo Worker, Finisher, etc., working under this Agreement shall be as shown in Appendix A. The total hourly wage package for a Certified Welder working under this Agreement shall be two dollars and fifty cents ($2.50) above his/her normal hourly wage rate, only while doing welding work.

2. The total hourly wage package payable under this Agreement shall automatically be adjusted per Appendix A. The total hourly wage package payable under this Agreement shall be automatically adjusted per Appendix A. In the event of unanticipated or unforeseen benefit cost increases (e.g., Health & Welfare insurance premiums), either the Union or the Association may request that the parties meet to consider changes to Appendix A; provided, however, that neither party may take economic action in support of its position.

3. The setters, Marble Masons, Finisher, Bricklayers, etc., who do not presently qualify as Journeyperson Mechanics shall be classified as Apprentice Improvers at the pay scale in accordance with their actual abilities or qualifications as determined by the Employer in conjunction with the Union and will be based on a percentage of the Journeyperson rate. The Employer has the right to lay off any employee, provided the reason is without discrimination because of age, race, color, religion, sex or national origin.

Section D. The parties to this Agreement recognize that in order to protect and preserve certain segments of the masonry industry, special total hourly wage package rates and working conditions may be necessary. Therefore, upon notice to all signatories to this Agreement, the parties to this Agreement engaged in such segment of the industry mutually agree that special rates and conditions are necessary, they will negotiate said wages and conditions for those segments of the masonry industry and reduce their understanding to writing.

Section E. On a prevailing wage rate job, should the state or federal prevailing wage package be lower than the wage package established by this Agreement, the Employer shall have the right to pay the lower package. The Employer shall agree to fill out Prevailing Wage Forms at least one week prior to the due date, and submit them to the Labor Commissioner.

Section F. The Employer has the right to evaluate any employee's performance and to reject any employee, provided it is without discrimination.

Initial _____    Union _____    Management

SFRDOCS.3204927J.032004J.1000

---

5

### ARTICLE VIII
### TRAVEL-SUBSISTENCE

### Section A.

1. Employees covered by this Agreement shall be entitled to receive the following expense payments for travel on jobs located over fifty (50) miles from the City Hall of Las Vegas, Nevada.

|  |  |
|---|---|
| 0 - 50 Miles | Free Zone |
| 51 - 70 Miles | $ 21.00 per day |
| Over 71 Miles | $ 44.00 per day |

If requested by the Employer to stay the weekend, $ 55.00 per day, during the weekend only.

2. The expense payments established under Paragraph (1) will be paid to any employee who is required to report and does in fact report for work.

3. The expense payment is not subject to proration under any circumstance.

4. Mileage measured for the purpose of this section is defined as from the Las Vegas City Hall to where construction is being performed per AAA mileage.

5. The area within the city limits of Boulder City and Primm, Nevada shall be considered free zones.

6. Employees eligible for pay zone under section 1 above, shall also be paid driving time as follows:

| | |
|---|---|
| 0-50 miles .......... | 0 hours at straight time |
| 50-100 miles .......... | 1 hour at straight time For every portion of each additional 50 miles thereafter. .......... 1 hour at straight time |

### ARTICLE IX
### FOREMEN

### Section A.

1. Foremen shall be selected by and be the representative of the Employer, and shall be a Journeyperson Mechanic of the trade they supervise.

2. There shall be an employee designated as Foreman on all jobs employing four (4) persons. The Foreman will receive fifty cents ($.50) per hour above the Journeyperson wage rate.

3. A Foreman supervising five (5) or more persons will receive one dollar and twenty five cents ($1.25) per hour above the Journeyperson wage. The number of covered employees to be supervised by a working Foreman is subject to the Employer's discretion.

Initial _____    Union _____    Management

SFRDOCS.3204927J.032004J.1000

6

4. A Foreman supervising thirty (30) or more persons shall be known as a general foreman and receive three dollars ($3.00) per hour above the Journeyperson wage. The number of covered employees to be supervised by a working Foreman is subject to the Employer's discretion.

5. The Employer, upon approval of the Employee and the Union, may provide compensation to the Employee in a manner other than the hourly Foreman rate, provided that the compensation is of equal or greater value.

ARTICLE X
APPRENTICES

Section A. In order to train sufficient skilled mechanics for the industry, the parties to this Agreement recognize and encourage the necessity for employment of apprentices. It is understood and mutually agreed that the employment of apprentices shall be in accordance with the standards adopted by the Joint Apprenticeship and Training Committee which are incorporated herein by reference.

Section B. Apprentices shall be paid the following percentages of the Journeyperson basic hourly pay rate. (Periods to be based on 750 hours each).

Apprentice Wage Structure

Tilesetter/Marble Mason – Apprentices

| | |
|---|---|
| 1 st period-6 mos. -750 hours | 50% |
| 2nd period-6 mos.-750 hours | 60% |
| 3rd period-6 mos.-750 hours | 70% |
| 4th period-6 mos.-750 hours | 80% |
| 5th period-6 mos.-750 hours | 85% |
| 6th period-6 mos.-750 hours | 90% |

Bricklayer-Apprentices

| | |
|---|---|
| 1st period-6 mos. -750 hours | 50% |
| 2nd period-6 mos.-750 hours | 60%, |
| 3rd period-6 mos.-750 hours | 70% |
| 4th period-6 mos.-750 hours | 80% |
| 5th period-6 mos.-750 hours | 85% |
| 6th period-6 mos.-750 hours | 90% |

Finisher Tile/Marble

| | |
|---|---|
| 1st Period-300 hours | 60% |
| 2nd Period-300 hours | 70% |
| 3rd Period-300 hours | 80% |
| 4th Period-300 hours | 85% |
| 5th Period-300 hours | 90% |

Initial _____    Union _____    Management _____

7

Benefit contributions for apprentices shall be as detailed on Appendix A. The parties acknowledge that a formal apprentice program is a necessity in preserving the trade and the skills required to continue masonry projects.

Section C. If a Journeyperson Finisher is reclassified as a Tile Setter Apprentice, the employee shall start at a pay rate no less than that of a Journeyperson Finisher.

Section D. The J.A.T.C. shall develop and approve its own test for rating the skill level of an employee prior to hiring in order to determine the appropriate pay scale.

Section E. An Employer may not assign overtime work to an apprentice if the assignment would interfere with the apprentice's classroom attendance.

ARTICLE XI
CHECK-OFF AND LOCAL DUES

The Employer shall deduct from the basic hourly pay of each employee who has signed a check-off authorization conforming to applicable law, and transmit monthly to the Union (or to any agencies designated by the Union for the collection of such money), the sum for each hour paid which the Union has specified or specifies from time to time and so advises the Employer in writing, as the portion of each employee's Union dues to the Union, or to any other affiliate of the International Union, subject to check-off. The amount will be deducted upon receipt of dues authorization card. The sum so transmitted shall be accompanied by a statement, in a form specified by the Union, reporting the names of each person whose dues are being paid and the number of hours each employee has been paid. By 1/1/2001, check-off dues after forty (40) hours in a week will be reduced to one percent (1%).

Section A. All Check-Off Dues shall be paid on the 15th day of the month for all hours paid for employment during the previous month, and in such a manner as the Union requires. The Union shall have the authority to have an independent Certified Public Accountant audit the time books, payroll and wage records of the Employer for the purpose of determining the accuracy of Dues Check Off deductions and payments. If the Employer is found, as a result of an audit ordered by the Union, to have been more than six percent (6%) inaccurate in reporting, the Employer shall be charged the full costs of such audit, in addition to the applicable delinquent Dues Check Off funds and any attorney's fees required for such collection.

Delinquent Contributions. If an Employer fails to make contributions by the 15th day of the month for all hours paid for employment during the previous month, interest shall immediately accrue at the rate of 18% per annum and liquidated damages will be immediately assessed in accordance with the terms of the applicable Trust Agreements. If it becomes necessary for the Trustees to initiate legal action to collect delinquent benefit and fund contributions required by this Article, the Employer will be responsible for all attorney's fees incurred by the respective Trustees.

Initial _____    Union _____    Management _____

8

Section B. If the Employer fails to make any contributions specified in this Article within ten (10) days after the date required by the Union, the Union shall have the right to file a grievance under the expedited grievance and arbitration procedure provided hereby, without regard to any limitations periods set forth anywhere in this Agreement for the filing of grievances, or to commence litigation, to recover the delinquency. If the Union elects to proceed by filing a grievance, that grievance shall be commenced at the level of the Joint Labor Management Committee (as provided for elsewhere in this Agreement), which shall have seven (7) calendar days within which to attempt to resolve the dispute. The Employer which is alleged to be delinquent shall not sit on the Joint Labor Management Committee for the purpose of considering this dispute (i.e., its own case). If the Joint Labor Management Committee is able to resolve the dispute by majority vote within seven (7) calendar days, its resolution of the dispute shall be final and binding upon all parties. If the Joint Labor Management Committee is unable to resolve the dispute within seven (7) calendar days, the dispute will be referred to expedited arbitration before one of the arbitrators listed in Appendix B hereto. The Joint Labor Management Committee will randomly select names from Appendix B, will contact each arbitrator in the order selected, and the first such arbitrator who is available to serve as the arbitrator for the dispute, agrees to hold a hearing on the dispute within seven (7) calendar days after the close of the dispute is referred to him or her, and decide the dispute within seven (7) calendar days after the hearing or after the submission of any post-hearing briefs (where the parties agree to submit post-hearing briefs), whichever comes last. The Arbitrator's decision shall be final and binding upon all parties. Where the Union prevails either before the Arbitrator or before a court, the Employer shall be liable for all costs of collection of payments due together with attorney's fees, statutory costs, litigation expenses and arbitrator's fees. Pending the resolution of the dispute by the Joint Labor Management Committee, the Arbitrator or the Court (where the Union elects to proceed before the Court in the first instance), the no-strike clause set forth elsewhere in this Agreement shall apply. Where the Employer fails to comply fully within twenty-four (24) hours of the final and binding decision of the Joint Labor Management Committee, the Arbitrator, or the Court (where the Union elects to proceed before the Court in the first instance), however, the no-strike clause shall no longer apply and the Union shall have the right to take whatever steps are necessary, including the withdrawal of manpower, to secure compliance with this Agreement and/or the final and binding decision of the Joint Labor Management Committee, the Arbitrator, or the Court.

## ARTICLE XII
## JOINTLY TRUSTED FUNDS

Section A. Except as otherwise provided herein, in addition to the basic hourly pay contained in Article VII, Section C, the Employer agrees to pay the contributions specified in that section to the following designated funds:

### International Pension Fund

1. Bricklayers and Trowel Trades International Pension Fund

   (a) Pension Fund (IPF) shall be as listed in Appendix "A" for each hour or portion thereof for which a covered employee receives pay.

   (b) The payments required above shall be made to the Bricklayers and Trowel Trades International Pension Fund, which was established under an Agreement and Declaration of Trust dated 1 July 1972.

### Health and Welfare Trust

2. Bricklayers and Allied Craftworkers Local 13 Health & Welfare Trust

   (a) The contribution to the Bricklayers and Allied Craftworkers Local 13 Health & Welfare Trust shall be as listed in "Appendix A" for each hour or portion thereof for which a covered employee receives pay.

   (b) The payments required above shall be paid to the Bricklayers and Allied Craftworkers Local 13 Health & Welfare Trust, which was established under a Trust Agreement dated October 19, 2000.

### International Masonry Institute And Local IATC

3. International Masonry Institute

   (a) The contribution to the International Masonry Institute (IMI) shall be as listed in Appendix "A" for each hour or portion thereof for which a covered employee receives pay.

   (b) The payments required above shall be made to the International Masonry Institute, which was established under an Agreement and Declaration of Trust, 14 March 1991, as the successor trust to the predecessor International Masonry Institute (established under an Agreement and Declaration of Trust dated 22 July 1970) and the predecessor International Masonry Apprenticeship Trust (established under an Agreement and Declaration of Trust dated 6 November 1974).

   (c) The Union and the Association shall form a Joint Apprentice Training Committee ("JATC"), consisting of at least three (3) members from labor and three (3) members from management, with at least one (1) of the members from management being a brick masonry contractor. Each side shall have an, equal vote on all business conducted by the JATC.

   (d) Funds required for operation of the JATC will be collected and provided monthly by IMI. IMI will report collections and expenditures to the JATC in a format acceptable to the JATC, which the JATC shall develop in cooperation with IMI. Two-thirds (2/3) of all apprenticeship funds collected will be used in Southern Nevada, which the JATC shall develop in the direction of the JATC. If two-thirds (2/3) of all apprenticeship funds collected are not used in Southern Nevada, and/or if IMI fails to use the format developed by the JATC for reporting collections and expenditures, the JATC shall meet to consider and decide what appropriate action should be taken. Such action may include discontinuing contributions to IMI and redirecting the same contributions to a jointly trusted fund to be used by the JATC for apprenticeship training in Southern Nevada.

## 10

### Local Pension

The contribution to the Local Pension Fund shall be in accordance with Appendix "A" per hour to a tax deferred annuity plan by the Employer for each hour worked for all employees covered by this Agreement. The plan may allow for employee elective deferrals up to the legal limits. All administrative expenses will be absorbed by the participants from contributions made. There will be two Trustees, two from Management as approved by a two-thirds (2/3) majority vote, one vote per Employer (for Management side). Administrative expenses will be defined as costs necessary to administer the Pension Fund, and will not apply to costs incurred by the Employer or any outside sources. The Local Pension Fund shall take effect June 1, 1997.

### 5.    Craftworkers/Masonry Industry Compliance Trust

A fund known as the Craftworkers/Masonry Industry Compliance Trust has been established by an Agreement and Declaration of Trust dated February 12, 2002, which may be subsequently amended by the parties.

The Employers agree to abide by said Agreement and Declaration of Trust, to accept the appointed Board of Directors; and further, to make payments to the Fund in the amount designated in Appendix "A" of this Agreement. Participation by the Employers in said Trust shall be for the duration of this Agreement and any renewals or extensions thereof, or for the period workmen are employed under the terms of this Agreement. In the event the Trust ceases operations and is dissolved, payments to the Trust shall cease and then be applied to employees' wages.

### 6.    Contract Administration Fund

The Contract Administration Fund is a fund known as the Tile, Marble, Stone and Terrazzo Contractors Association, Inc. Contract Administration Fund. Contributions to the Contract Administration Fund shall be as listed in Appendix A.

### Section B.

The Employer agrees to be bound by and to the above stated Agreements and Declarations of Trust as though it had actually signed the individual document, to the extent required by law and as necessary to make benefit contributions, provide reporting, and all information and notices reasonably required for the operation of the funds and to be subject to provisions governing enforceability and means of enforcement of trust obligations and the consequences of nonpayment of such contributions. When due, and the Employer further agrees to be bound by all actions taken by the Trustees of these funds pursuant to said Agreements and Declarations of Trust; provided, however, that except as may be required by any annual Agreement of the parties, the Employer shall not be required to pay more in benefit contributions than is provided for by this Agreement. Notwithstanding actions that may be taken by the Trustees to increase such contributions, the parties acknowledge that the Employer has no control over the actions of the Trustees who were in office as of the signing of this Agreement, and over the administration of the several Agreements and Declarations of Trust. The Employer and the Union agree that said Agreements and Declarations of Trust are incorporated herein only to the extent necessary to implement this Agreement.

## 11

in accordance with the terms of the Plans' respective Agreements and Declarations of Trust, and waives any right to participate in their selection.

### Section C.

The Employer agrees that the Trustees on the Boards of Trustees may be selected

### Section D.

For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and all other hours for which pay is received by the employee in accordance with this Agreement, shall be counted as hours for which contributions are payable to each fund designated in Section A of this Article. Such payments shall be made only for all actual hours worked and shall not include employer payment for bonuses, subsistence, travel time, or premiums.

### Section E.

Except as otherwise provided herein, contributions shall be paid on behalf of all covered employees starting with the employees' first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, Journeypersons and apprentice employees.

### Section F.

All contributions shall be paid on the 15th day of the month for all hours paid for employment during the previous month, and in such a manner as the Trustees require. The Trustees shall have the authority to have an independent Certified Public Accountant audit the time books, payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the funds designated in Section A of this Article. If the Employer is found, as a result of an audit ordered by the Trustees of one of the fringe benefit funds, to have been six percent (6%) inaccurate in reporting, the Employer shall be charged the full costs of such audit, in addition to the applicable delinquent contribution, any attorneys' fees required for such collection and the liquidated damages established by the Board of Trustees.

### Section G.    Third Party Administrator.

The Union and the Association will select a third party administrator to collect and disburse all contributions required by this Article. Each Employer will receive a single remittance form for payment of all contributions required by this Article.

### Section H.    Delinquent Contributions.

If an Employer fails to make contributions by the 15th day of the month for the previous month, and in such a manner as the Trustees require, interest shall immediately accrue, at the rate of 14% per annum and liquidated damages will be immediately assessed in accordance with the terms of the applicable Trust Agreements. If it becomes necessary for the Trustees to initiate legal action to collect delinquent benefit and fund contributions required by this Article, the Employer will be responsible for all attorney's fees incurred by the respective Trustee. Initial

### Section I.

If the Employer fails to make any contributions specified in this Article within ten (10) days after the date required by the Union, the Union shall have the right to file a grievance under the grievance and arbitration procedure provided hereby, without regard to any limitations periods expressed anywhere in this Agreement for the filing of grievances, or to commence litigation, to recover the delinquency. If the Union elects to proceed by filing a grievance, that grievance shall be commenced at the level of the Joint Labor Management Committee (as provided for elsewhere in this Agreement), which shall have seven (7) calendar days within which to attempt to resolve the dispute. The Employer which is alleged to be delinquent shall not sit on the Joint Labor Management Committee for the purpose of considering this dispute (i.e., its own case). If the Joint Labor Management Committee is unable to resolve the dispute by majority vote within seven (7) calendar days, its resolution of the dispute shall be final and binding upon all parties. If the Joint Labor Management Committee will randomly select names from Appendix B, and contact each arbitrator in the order referred to expedited arbitration before one of the arbitrators listed in Appendix B hereto. The Joint Labor Management Committee will randomly select names from Appendix B, and contact each arbitrator in the order selected, and the first such arbitrator who is available to hear the dispute within seven (7) calendar days at the order

12

dispute is referred to him or her will be mutually agreed by all parties to serve as the Arbitrator for the dispute. The Arbitrator shall hold a hearing on the dispute within seven (7) calendar days after the dispute is referred to him or her, and shall decide the dispute within seven (7) calendar days after the close of the hearing or after the submission of any post-hearing briefs (where the parties agree to submit post-hearing briefs), whichever comes last. The Arbitrator's decision shall be final and binding upon all parties. Where the Union prevails either before the Arbitrator or before a court, the Employer shall be liable for all costs of collection of payments due together with attorneys' fees, statutory costs, litigation expenses and arbitrator's fees. Pending the resolution of the dispute by the Joint Labor Management Committee, the Arbitrator, or the Court (where the Union elects to proceed before the Court in the first instance), however, the no-strike clause set forth elsewhere in this Agreement shall apply. Where the Employer fails to comply fully within twenty-four (24) hours of the final and binding decision of the Joint Labor Management Committee, the Arbitrator, or the Court (where the Union elects to proceed before the Court in the first instance), however, the Union shall have the right to take whatever steps are necessary, including the withdrawal of manpower, to secure compliance with this Agreement and/or the final and binding decision of the Joint Labor Management Committee, the Arbitrator, or the Court. This provision shall be without prejudice to the rights of the fringe benefit trustees, who shall not be bound hereby.

Section J. Any Employer which has been habitually delinquent in paying trust fund contributions and/or dues check-off to the Union, to the BAC, to any of the appropriate Trust Funds, or to any Local of the BAC, shall post a bond in an amount equal to the Employer's highest two months of trust fund contributions and dues check-off in the immediately prior twelve (12) months, or in the alternative may deposit cash or a certified check in the same amount in an escrow account designated by the Union. In the event that such an Employer does not have a sufficient 'track record' of payments over the immediately prior twelve (12) months to permit the amount of the bond, cash deposit or certified check to be calculated in the manner described in the previous sentence, the amount of the bond, cash deposit or certified check shall be equal to one-half (½) of the estimated value of the trust fund contributions and dues check-off to be paid by the Employer in the immediately following twelve (12) months, based upon the work the Employer is currently performing and anticipates to be performing during that period. In such a case, the Employer will disclose all relevant information regarding its current and anticipated work to the Union, so that the Union may set the amount of the bond, cash deposit or certified check. Additionally, any Employer which has been habitually delinquent in paying trust fund contributions or dues check-off to the Union, to any of the appropriate Trust Funds, or to any local of the BAC, shall have a pre-job conference with the Union prior to commencing work on any project of more than $200,000 in value, and shall post a bond in an amount equal to one-half (½) of the estimated value of the trust fund contributions and dues check-off to be paid for the project, or deposit cash or a certified check in the same amount in an escrow account designated by the Union. For the purposes of this provision, 'habitually delinquent' shall mean three (3) or more months consecutive or not, of delinquencies within any twelve-month period.

ARTICLE XIII
GRIEVANCE PROCEDURE

Section A. It is specifically agreed that any controversy arising out of this Agreement involving the interpretation of its terms and conditions shall be settled in accordance with the grievance procedure set forth in this Article, except as to those controversies for which an alternative grievance procedure is provided elsewhere in this Agreement. No grievance shall be recognized unless it is called to the attention of the Employer by the Union or to the attention of the Union by the Employer within ten (10) working days after the alleged violation is committed or discovered. All grievances to be processed hereunder shall be in writing. The term working days shall be defined as Monday through Friday, inclusive.

13

Section B. Grievances shall be handled in the following manner:

1. The grievance shall be referred to the job-site Union Steward and to the Foreman for adjustment.

2. If the grievance cannot be settled pursuant to Paragraph (1) of this Section, the grievance shall be referred to the Business Manager or the Field Representative of the Union, and the Employer.

3. If the grievance cannot be settled pursuant to Paragraph (2) of this Section within thirty (30) days, excluding weekends and holidays, the grievance shall be submitted to the Joint Labor Management Committee for consideration and settlement.

If the Joint Labor Management Committee cannot reach a satisfactory settlement within thirty (30) working days, not including weekends and holidays, following a referral of the grievance to the Committee, the dispute shall, if the parties agree, be submitted to the International Masonry Institute's Dispute Settlement Plan for such steps as are deemed appropriate in accordance with the procedures of that Plan, or to one of the designated arbitrators listed on Appendix C. For the first dispute arising between the parties, if they are unable to agree on one of the designated arbitrators, the parties shall start at the top of the list and proceed downward until an available arbitrator is found. For subsequent disputes, the parties shall start with the next arbitrator on Appendix C. The arbitrator shall have no authority to add to or modify any of the terms or conditions of this Agreement, and the expenses of the arbitration shall be borne equally by the Employer and the Union.

Section C. When a settlement has been reached at any step of this Grievance Procedure, such settlement shall be final and binding on all parties, provided, however, that in order to encourage the resolution of disputes and grievances at Steps 1 and 2 of Section B of this Article, the parties agree that such settlements shall not be precedent-setting.

ARTICLE XIV
SUBCONTRACTING

Section A. The Employer agrees not to sublet, assign or transfer any work covered by this Agreement to be performed at the site of a construction project to any person, firm or corporation, except where the subcontractor subscribes and agrees in writing to be bound by the full terms of this Agreement and complies with all of the terms and conditions of this Agreement.

Section B. All charges of violation of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedure for the handling of disputes and the final and binding arbitration of disputes.

ARTICLE XV
PRESERVATION OF WORK
(ANTI-DOUBLE BREASTING)

Section A. In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them, and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement, at the site of a commercial, light commercial, or custom home construction project (excluding tract homes, residential work) under its own name or under the name of another, as a

Initial _____    Union _____    Management _____

14

corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer (including its officers, directors, owners, partners or stockholders) exercises either directly or indirectly any degree of management or control, the terms and conditions of this Agreement shall be applicable to all such work.

Section B. All charges of violations of Section A of this Article shall be considered as a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes, as provided in Article XIII of this Agreement. As a remedy for violations of this Section, the arbitrator (or arbitration body) provided for in Article XIII is empowered, at the request of the Union, to require an Employer to (1) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as a result of the violations, and (2) pay into the affected joint trust funds established under this Agreement any delinquent contributions to such funds which have resulted from the violations, including such interest as may be prescribed by the trustees or by law. Provision for this remedy herein does not make such remedy the exclusive remedy available to the Union for violation of this Section, nor does it make the same or other remedies unavailable to the Union for violations of other sections or articles of this Agreement.

Section C. If, as a result of violation of this Article, it is necessary for the Union and/or the Trustees of the joint Trust Funds to institute court action to enforce an award rendered in accordance with Section B above, or to defend in an action which seeks to vacate such award, the Employer shall pay any accountants' and attorneys' fees incurred by the Union and/or the Fund Trustees, plus costs of the litigation, which have resulted from the bringing of such court action.

## ARTICLE XVI
## STEWARDS, REPORTING PAY, WORK RULES, SAFETY

### Section A. Rules Applicable to All Covered Employees:

1. The Union may select, and the Employer shall approve, a working steward from among employees on all jobs upon which more than five (5) covered employees are working. (Either party has the right to object to the Steward that is selected.) Such working steward shall not be discharged for fulfilling his/her stewardship duties. Otherwise, the Employer's rights shall fall under Articles IV and VII of this Agreement. The Steward shall have a reasonable amount of time to perform his/her duties. The duties of the working steward shall not interfere with work productivity. The working Steward shall refer any disputes or grievances to its business manager or field representative of the Union. All disputes and grievances shall be processed in accordance with the grievance procedure Article XIII of the Agreement.

2. Any employee reporting for work at the regular starting time and for whom no work is provided, shall receive two (2) hours pay at the stipulated rate, as well as the expense payment, if any, due for the day, for reporting unless he has been notified before the end of the preceding shift not to report, except when (a) the employee is prevented from working for reasons beyond the control of the Employer, including but not limited to such factors as inclement weather, or breakdown causing discontinuance of a major unit of the project, or (b) employee does not possess his/her own hand tools, safety shoes and hard hat, required to do his work, excluding all power tools.

15

(a) Each Tile Layer shall furnish the following equipment:

Regular cutting board
Framing square
Side biters and large biters
Rubber mallet and beating block
Level, 2' 0" and 4' 0"
Chalk box and line
Claw hammer
12' steel tape
1/4" and 1/2" chisel (lipped)
Flat trowel
Wood float
1/4" notched trowel
3/8" or 1/2" notched trowel
3/16" V-notched trowel (mastic)
Gauging, margin or pointing trowel
Wire cutter (tin snips)
Staple gun or hammer
Hawk
Mortar Board and stand
Rubbing stone
Knee Pads
Hard hat

(b) Each Finisher shall furnish the following equipment:

1/4" Chisel or screwdriver
Regular rubber gloves
Margin or Pointing trowel
Hard hat
Knee Pads
50' Hose
Two 3-gallon buckets
Steel flat trowel, if required by employer
One hand mixer (such as "potato masher")
One floor and Wall Groutmaster (such as or equal to brand sold by American Olean)
One Hoe
One Slicker
Six 12-Quart Buckets
One Broom

Initial _____    Union _____    Management _____

SFRDOCS:20349037.1 035243.1000

SFRDOCS:20349037.1 035243.1000

(c) Each Brick Mason shall furnish the following equipment:

Hard Hat
Boots
Strikers
Hammer
2' Level
4' Level
Chalk Snap Line
Tape Measure
Pliers
Margin Trowel
Brick Trowel
Tuck Point
1/2" Chisel
3" Chisel
Razor Knife

(d) Each Marble Mason shall furnish the following equipment:

Hammers (brick, stonesledge, rawhide, dead blow, rubber mallet)
Chisels (pitching tools, carbide point, cold chisels)
Trowels (margin, tuck pointers, brick)
Tape Measure
Levels (2 foot, 4 foot)
Plumb Bob
Brush
Straight Edges
C-Clamps
Bar Clamps
Square
Razor Knife
Pencils
Line
Wire Cutters Plyers
Blow Ball
Suction Cups
Grout Bag
Plug Wood
Plaster Spoon
Putty Knife
Wood Wedges
Pry Bars
Caulking Gun
3 Three or Five Gallon Buckets
2 Plaster Buckets
Arising Stone or Sanding Block
Tin Strips

17

Chalk Line
Knee Pads
Hard Hat

3. Employees must be paid for going from one job to another during working hours and shall not use any of the lunch hour in making such a job transfer.

4. Tile Setters and Finishers shall be paid an additional one dollar ($1.00) per hour when working with Epoxy, and shall be provided proper safety equipment.

5. Employees shall not be required to work more than five (5) hours consecutively without a half-hour (1/2) meal break.

6. The Employer shall provide potable water if it is not available at the job site.

7. The Employer shall furnish, at the jobsite, all necessary power tools and proper extension cords to ensure quality and safety of equipment. An employee who intentionally, or as a result of gross negligence, loss or damages Employer-supplied equipment, shall be responsible to replace or pay for it. (As allowed by city, state, and federal law.)

8. The employee shall furnish his own hand tools, level and other tools of the trade excluding all power tools. All employees are required to furnish and wear on the job site safety work shoes and hard hats, in accordance with OSHA requirements.

9. The Employer shall not base pay or other compensation on a predetermined amount of work or output by the employee, and the Union shall not countenance any limitation on the productivity of the Employer's work force.

10. A duly accredited representative of the Union shall be given the right, by the Employer, to visit the jobsite for the purpose of talking with covered employees, including but not limited to, the investigating of complaints, grievances, etc., during work hours, but in a manner that does not unreasonably interfere with the work assigned to employees. All jobsite locations shall be provided upon request. Violation of this Article can result in a penalty, payable to the Apprenticeship and Training Committee, the penalty shall be up to $500.00 under the provisions of the grievance procedure.

11. The Employer will supply all respirators, and/or dust masks, or any OSHA required safety equipment as required.

12. The Union and/or the Employer will inform the Health & Welfare Trust of any members working for non-signatory employers. The Trust, upon reliable evidence and for good cause, may take any action consistent with the Trust Agreement and applicable law, including but not limited to, suspending the member's health and welfare benefits and/or canceling the member's bank of hours.

Section B. Rules Applicable to Bricklayers and Stone Masons:

1. No wall shall be built over five feet, four inches (5'4") in height from the floor or scaffold. No foot plank shall be built higher than the wall, excluding fences.

Initial ___   Union ___   Management ___

18

2. Mortar boards shall be blocked or set on stands at least sixteen (16) inches above scaffold or floor. This provision shall not apply to stem walls.

3. Employees on refractory jobs necessitating a change of clothing due to nature of the work shall be allowed fifteen (15) minutes to wash up, change clothing and clean tools.

Section C' Rules Applicable to The Setter, Bricklayer, and Marble Masons, etc. Journeyperson of Union

Status

Whenever a Journeyperson does work defective or below standards, due to no other cause by others, as determined by the Employer, it shall be the duty of the Union Business Representative to immediately investigate and, if the complaint is found to be justified, to order the employee to repair the work without further compensation from Employer, provided the Employer furnishes the materials to make such repairs.

## ARTICLE XVII
## HOURS OF WORK, OVERTIME SHIFTS, AND HOLIDAYS

Section A. Hours. The standard work day shall consist of eight (8) continuous hours of work between the hours of 5:30 a.m. and 4:30 p.m., with the requirement that all employees take a 30-minute unpaid lunch period occurring in the middle of the shift. There shall be no set time for coffee breaks. Some time in between starting the shift and lunch, a ten (10) minute break will be allowed at the employee's work station. Grievances with respect to this break shall be processed in accordance with Article XIII of this Agreement. The standard work week shall consist of five (5) standard work days commencing on Monday and ending on Friday, inclusive. The normal starting and quitting times may be changed by the Employer to work in accordance with job site requirements established by the general contractor and upon notice to the Union.

Section B. Overtime. All work in excess of forty (40) hours during the established work week shall be paid at the rate of one and one half (1-1/2) times the hourly base wage rate in effect.

1. Employees will be paid double time for hours worked on Union recognized Holidays.

2. Employees will be paid double time on Sundays. (If forty (40) straight time hours have been worked during that week. (In the event that a Holiday falls within this workweek, employees will be paid the double time rate on Sunday.) If forty (40) straight time hours have not been worked during that week, Employees will be paid at one and one-half (1-1/2) times the hourly wage rate for Sunday work.

3. Employees will be paid one and one half (1-1/2) times the hourly wage rate for all hours worked over eight (8) in a single day.

4. Work performed on Saturday will be paid at one and one-half (1-1/2) times the regular wage rate, in accordance with Article XVII, Section D.

There shall be no mandatory overtime.

Section C. Shifts. Notwithstanding the terms of Section B, the parties to this Agreement recognize the desirability and in some cases the absolute necessity of working shifts. The straight time work week shall start with the day shift on Monday and end at the conclusion of the second or third shift on the fifth day. In the event

Initial _____
Union _____
Management _____

19

the second or third shift extends into a Holiday, a Saturday or a Sunday, employees shall be paid at the regular shift rate.

1. The first shift shall be the regular day shift insofar as computing wage payments is concerned, and the first day day shift shall work a regular eight-hour shift, with a one half-hour unpaid lunch period midway through the shift.

2. If two work shifts are established, the second shift shall consist of eight (8) hours of continuous work, with a one half-hour unpaid lunch period midway through the shift. Employees working on the second shift shall receive eight hours times the basic straight time rate plus twenty five cents $ .25 for each of these eight hours.

3. If three work shifts are established, the third shift shall consist of seven hours of continuous work, plus one half-hour unpaid lunch period midway through the shift. Employees working on the third shift shall receive the basic straight time rate plus three dollars and twenty five cents $3.25 for each of those seven hours.

4. Time worked in excess of seven hours on the third shift shall be paid at the appropriate overtime rate.

Section D. In the event it is not possible to work Monday through Friday on the normal eight (8) hour per day workweek because of weather conditions, or a breakdown of a piece of major equipment on the jobsite, up to eight (8) hours of work on Saturday may be performed at straight time pay during normal working hours, provided that the total amount of straight time pay in the week cannot be more than forty (40) hours. In the event that an Employee misses a regularly scheduled work day, and the Employee agrees, that day can be made up by working Saturday at the straight time rate, upon written notice to the Union, however, the employee cannot be disciplined for refusing to work on Saturday for the straight time rate. If an Employer fails to make work available during the work week, work performed on Saturday will be paid at one and one-half (1-1/2) times the regular straight time rate.

Section E. Holidays. The Employer agrees to recognize the following holidays: New Year's Day, Memorial Day, Fourth of July, Labor Day, Veterans Day, Thanksgiving Day, Friday following Thanksgiving Day, and Christmas Day. Any holiday falling on a Sunday will be observed on the Monday following.

## ARTICLE XVIII
## NO-STRIKE/NO-LOCKOUT

Section A. It is understood and mutually agreed that there shall be no strikes or lockouts over a dispute concerning this Agreement during its term until the grievance procedures described in Article XIII have been exhausted, and then only in the event a party fails or refuses to abide by a final decision under Article XIII of this Agreement or as permitted by Article XII(B) or Article XII(G), provided that refusal by any employee to pass through a lawfully permitted picket line will not constitute a violation of this Agreement.

Section B. It is understood and mutually agreed that in the event the Union enters into an agreement which provides for terms or conditions of employment which are more favorable than those contained in this Agreement for specific projects, particular segments of the masonry market or certain geographic areas, those same terms and conditions of employment will be available to the Employer on the specified projects, particular segments of the masonry market or in those geographic areas covered. The only exceptions to this

Initial _____
Union _____
Management _____

20

provision are (1) those initial agreements that are signed with newly organized employers to provide a bridge between those rates which are initially established and those which prevail for signatory contractors in the masonry market in which the newly organized contractor is going to operate. Any instance in which a job is bid to be completed during a particular contract period, and the job is delayed for reasons beyond the contractor's control so that it falls into a later contract period, and the Union agrees (which will not be unreasonably withheld), the work will be performed under the wage rates in effect when the work was expected to be done. Should any question arise as to the meaning and application of this provision, either party may file with the other a written complaint. Such complaint will be initiated as stated in Article XIII of this Agreement (referred to Joint Labor Management Committee), and shall be processed in accordance with the procedure for the handling of grievances and the final and binding arbitration of disputes.

## ARTICLE XIX
## SEPARABILITY AND SAVINGS PROVISION

It is the intent of the parties hereto to abide by all applicable Federal and State statutes and rules and regulations made pursuant thereto. If any provision of this Agreement is held invalid by any court or governmental agency having jurisdiction, or if compliance with or enforcement of any provision of this Agreement is restrained by such tribunal pending a final determination as to its validity, then such provision or provisions shall continue in effect only to the extent permitted and all other provisions of this Agreement shall remain in force and effect. In the event that any provision of this Agreement is held invalid, or enforcement of or compliance with any provision is restrained, the Union and the Employer shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement, incorporating the substance of such provision to the extent allowable under the law, to be in effect during the period of invalidity or restraint.

## ARTICLE XX
## JOINT LABOR-MANAGEMENT COMMITTEE

The various individual contractors signatory to this Agreement and the Union shall establish a Joint Labor-Management Committee consisting of three (3) representatives selected by the signatory Employers as a group and three (3) representatives selected by the Union, to discuss matters of common concern and interest, to review conditions in the industry, to work for the betterment of the industry, to develop programs for additional work opportunities for parties covered by this Agreement, to perform other mutually beneficial activities and other activities permitted by law, and where necessary, to resolve disputes over the interpretation and application of this Agreement. The Board shall meet no less than once every other month and whenever necessary between such meetings. The Employer and Union representatives at a session shall have an equal number of votes on all matters coming before the Joint Labor Management Committee regardless of the number of Employer or Union representatives present at a session, a minimum of five (5) required to make a quorum. The Joint Labor Management Committee Members (for Management side) shall be approved by the Signatory Employers by a two-thirds (2/3) majority vote, one vote per Employer.

## ARTICLE XXI
## GENERAL UNDERSTANDING

Section A. The parties to this Agreement agree to cooperate in meeting conditions peculiar to a job or project on which the Employer maybe engaged. They will at all times meet and confer respecting any questions or misunderstandings that may arise under the performance of this Agreement.

Initial _____  Union _____  Management _____

21

parties.

Section B. This Agreement together with Schedule A constitutes the entire Agreement between the parties. This Agreement shall be effective commencing March 3, 2003, and shall continue in full force until such date as a new Collective Bargaining Agreement is negotiated.

Initial _____  Union _____  Management _____



# SIGNATURE PAGE

## B.A.C. LOCAL UNION NO. 13, ORGANIZING/LABOR BARGAINING AGREEMENT

Signed this 10 day of August 2002

Signature _Ricci Nappi_

Print Name _Raymond Nappi_

Title _Secretary Treasurer_

President
B.A.C. Local #13, Nevada
3640 S. Highland
Las Vegas, Nevada 89102

Company _Titan Interiors LLC_

Address _PO 5 Van Bluff_

Larry O'Leary
Secretary/Treasurer
B.A.C. Local #13, Nevada
3640 S. Highland
Las Vegas, Nevada 89103

City State Zip _Harrison NJ 07029_

Phone _973-484-3000_

Fax _973-484-6635_

# SIGNATURE PAGE

## NEVADA TILE, MARBLE, STONE AND TERRAZZO CONTRACTORS ASSOCIATION

Signed this 3rd day of March 2003

Signature

Robert F Hernan

Signature

Nick G. Marulli

Mark G. Fenstermaker

Signature

Printed Name

# APPENDIX B

January 29, 2001

Members of the Nevada Tile, Marble, Stone and Terrazzo Contractors Association as of:

Superior Tile and Marble, Inc.
T. Nicholas and Company
Western Tile & Marble Contractors, Inc

initial _____  Union _____  Management

initial _____  Union _____  Management

NV 0310

SIGNATURE PAGE

B.A.C. LOCAL UNION NO. 13, ORGANIZING/LABOR BARGAINING AGREEMENT

Signed this 31 day of _March_ , 2003.

_Raymond Keen_

_____
Signature

Raymond Keen
President
B.A.C. Local #13, Nevada
3640 S. Highland
Las Vegas, Nevada   89103

_____
Print Name

_____
Title

_____
Company

Larry O'Leary
Secretary/Treasurer
B.A.C. Local #13, Nevada
3640 S. Highland
Las Vegas, Nevada 89103

_____
Address

_____
City, State, Zip

_____
Phone

Fax _____

SIGNATURE PAGE
NEVADA TILE, MARBLE, STONE AND TERRAZZO
CONTRACTORS ASSOCIATION

Signed this 3rd day of March, 2003.

_____
Signature          PRESIDENT

_____
Signature   Nicholas G. Mamula Jr.   Pres.

_____
Robert F. Herman

_____
Nick G. Mamula

_____
Signature

_____
Signature

_____
Mark F. Fenstermaker

_____
Printed Name

SFRDOCS:30349037.1 038043- 1000                    22

Initial   Union   Management

RECEIVED
MAR 1 7 2004
COLLECTIVE BARGAINING SERVICES

24

09064100 DOL 11400091 CHADBOURNE

## APPENDIX C

### Designated Arbitrators

John Kagel (650) 325-0389
Sara Adler (310) 474-5170
Chuck Askin (925) 934-1929
Michael Prihar (818) 360-2091
Ken Perea (858) 756-6513
Fred Horowitz (310) 829-6064

Initial _____  Union _____  Management _____

| Signature | Date | Print Name/ Title | Date | Print Name | Date |
|---|---|---|---|---|---|
| Signature | Date | Print Name/ Title | Date | Signature | Date |
| Print Name | Date | Print Name/ Title | Date | Print Name/ Title | Date |
| Signature | Date | Signature | Date | Print Name | Date |

**CONTRACTOR**     NV TILE, MARBLE STONE AND TERRAZZO CONTRACTORS ASSOCIATION     BAC LOCAL 13 NEVADA

| Skill Level | Work Hours | Wage | Dues Chk-Off | Health & Welfare | Def. Con. Pension | IU en. Local | Local 13 compliance | Local 13 MI Training/ Training | Contract Admin Fund/ Promo | Promo | TOTAL PACKAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tile Setter | | $23.74 | 3.50% | $3.90 | $1.50 | $1.03 | $0.07 | $0.00 | $0.28 | $0.03 | $30.55 |
| Marble Mason | | $25.43 | 3.50% | $3.90 | $1.50 | $1.03 | $0.07 | $0.00 | $0.28 | $0.03 | $32.24 |
| 6th Period 90% | 750 | $22.89 | 3.50% | $3.90 | $1.50 | $1.03 | $0.07 | $0.00 | $0.28 | $0.03 | $29.70 |
| 5th Period 85% | 750 | $21.62 | 3.50% | $3.90 | $1.50 | $1.03 | $0.07 | $0.00 | $0.28 | $0.03 | $28.43 |
| 4th Period 80% | 750 | $20.34 | 3.50% | $3.90 | $1.50 | $1.03 | $0.07 | $0.00 | $0.28 | $0.03 | $27.15 |
| 3rd Period 70% | 750 | $17.80 | 3.50% | $3.90 | $1.50 | $1.03 | $0.07 | $0.00 | $0.28 | $0.03 | $24.61 |
| 2nd Period 60% | 750 | $15.26 | 3.50% | $3.90 | $1.50 | $1.03 | $0.07 | $0.00 | $0.28 | $0.03 | $22.07 |
| 1st Period 50% | 750 | $12.72 | 3.50% | $3.90 | $1.50 | $1.03 | $0.07 | $0.00 | $0.28 | $0.03 | $19.53 |

BAC LOCAL 13 NEVADA

| Skill Level | Work Hours | Wage | Dues Chk-Off | Health & Welfare | Def. Con. Pension | IU en. Local | Local 13 compliance | Local 13 MI Training/ Training | Contract Admin Fund/ Promo | Promo | TOTAL PACKAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Finisher Journey | | $16.28 | 3.50% | $3.90 | $1.00 | $1.18 | $0.07 | $0.00 | $0.00 | $0.03 | $22.74 |
| 5th Period 90% | 300 | $14.65 | 3.50% | $3.90 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $18.58 |
| 4th Period 85% | 300 | $13.84 | 3.50% | $3.90 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $17.77 |
| 3rd Period 70% | 300 | $11.40 | 3.50% | $3.90 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $15.33 |
| 2nd Period 60% | 300 | $9.77 | 3.50% | $3.90 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $13.70 |

**APPENDIX "A" LOCAL 13 NEVADA**     EFFECTIVE: 03/01/03-02/28/04

## APPENDIX "A" LOCAL 13 NEVADA EFFECTIVE: 03/01/05-02/28/06

| Skill Level | | Work Hours | Wage | Dues Chk-Off | Health & Welfare | Def. Con. en. Local | IU Pension | Local 13 ompliance | Local 13 Training | IMI Training/ Promo | Contract Admin Fund | TOTAL PACKAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1st Period | 60% | 300 | $10.49 | 3.50% | $4.30 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $14.82 |
| 2nd Period | 70% | 300 | $12.24 | 3.50% | $4.30 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $16.57 |
| 3rd Period | 80% | 300 | $13.98 | 3.50% | $4.30 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $18.31 |
| 4th Period | 85% | 300 | $14.86 | 3.50% | $4.30 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $19.19 |
| 5th Period | 90% | 300 | $15.73 | 3.50% | $4.30 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $20.06 |
| Finisher Journey | | | $17.48 | 3.50% | $4.30 | $1.00 | $1.30 | $0.11 | | $0.32 | $0.03 | $24.54 |

| Skill Level | | Work Hours | Wage | Dues Chk-Off | Health & Welfare | Def. Con. en. Local | IU Pension | Local 13 ompliance | Local 13 Training | IMI Training/ Promo | Contract Admin Fund | TOTAL PACKAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1st Period | 50% | 750 | $13.40 | 3.50% | $4.30 | $1.23 | $2.00 | $0.11 | $0.00 | $0.32 | $0.03 | $21.39 |
| 2nd Period | 60% | 750 | $16.08 | 3.50% | $4.30 | $1.23 | $2.00 | $0.11 | $0.00 | $0.32 | $0.03 | $24.07 |
| 3rd Period | 70% | 750 | $18.76 | 3.50% | $4.30 | $1.23 | $2.00 | $0.11 | $0.00 | $0.32 | $0.03 | $26.75 |
| 4th Period | 80% | 750 | $21.44 | 3.50% | $4.30 | $1.23 | $2.00 | $0.11 | $0.00 | $0.32 | $0.03 | $29.43 |
| 5th Period | 85% | 750 | $22.78 | 3.50% | $4.30 | $1.23 | $2.00 | $0.11 | $0.00 | $0.32 | $0.03 | $30.77 |
| 6th Period | 90% | 750 | $24.12 | 3.50% | $4.30 | $1.23 | $2.00 | $0.11 | $0.00 | $0.32 | $0.03 | $32.11 |
| Marble Mason | | | $26.80 | 3.50% | $4.30 | $1.23 | $2.00 | $0.11 | $0.00 | $0.32 | $0.03 | $34.79 |
| Tile Setter | | | $24.97 | 3.50% | $4.30 | $1.23 | $2.00 | $0.11 | $0.00 | $0.32 | $0.03 | $32.96 |

BAC LOCAL 13 NEVADA

NV TILE, MARBLE STONE AND TERRAZZO CONTRACTORS ASSOCIATION

CONTRACTOR

Signature Date Signature Date Signature Date

Print Name Date Print Name/ Title Date Print Name/ Title Date

Signature Date Print Name/ Title Date Signature Date

Print Name Date Print Name/ Title Date Print Name/ Title Date

## APPENDIX "A" LOCAL 13 NEVADA EFFECTIVE: 03/01/04-02/28/05

| Skill Level | | Work Hours | Wage | Dues Chk-Off | Health & Welfare | Def. Con. en. Local | IU Pension | Local 13 ompliance | Local 13 Training | IMI Training/ Promo | Contract Admin Fund | TOTAL PACKAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1st Period | 60% | 300 | $10.07 | 3.50% | $4.10 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $14.20 |
| 2nd Period | 70% | 300 | $11.75 | 3.50% | $4.10 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $15.88 |
| 3rd Period | 80% | 300 | $13.42 | 3.50% | $4.10 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $17.55 |
| 4th Period | 85% | 300 | $14.26 | 3.50% | $4.10 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $18.39 |
| 5th Period | 90% | 300 | $15.10 | 3.50% | $4.10 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $19.23 |
| Finisher Journey | | | $16.78 | 3.50% | $4.10 | $1.00 | $1.24 | $0.09 | $0.00 | $0.30 | $0.03 | $23.54 |

| Skill Level | | Work Hours | Wage | Dues Chk-Off | Health & Welfare | Def. Con. en. Local | IU Pension | Local 13 ompliance | Local 13 Training | IMI Training/ Promo | Contract Admin Fund | TOTAL PACKAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1st Period | 50% | 750 | $12.99 | 3.50% | $4.10 | $1.13 | $1.75 | $0.09 | $0.00 | $0.30 | $0.03 | $20.39 |
| 2nd Period | 60% | 750 | $15.58 | 3.50% | $4.10 | $1.13 | $1.75 | $0.09 | $0.00 | $0.30 | $0.03 | $22.98 |
| 3rd Period | 70% | 750 | $18.18 | 3.50% | $4.10 | $1.13 | $1.75 | $0.09 | $0.00 | $0.30 | $0.03 | $25.58 |
| 4th Period | 80% | 750 | $20.78 | 3.50% | $4.10 | $1.13 | $1.75 | $0.09 | $0.00 | $0.30 | $0.03 | $28.18 |
| 5th Period | 85% | 750 | $22.07 | 3.50% | $4.10 | $1.13 | $1.75 | $0.09 | $0.00 | $0.30 | $0.03 | $29.47 |
| 6th Period | 90% | 750 | $23.37 | 3.50% | $4.10 | $1.13 | $1.75 | $0.09 | $0.00 | $0.30 | $0.03 | $30.77 |
| Marble Mason | | | $25.97 | 3.50% | $4.10 | $1.13 | $1.75 | $0.09 | $0.00 | $0.30 | $0.03 | $33.37 |
| Tile Setter | | | $24.22 | 3.50% | $4.10 | $1.13 | $1.75 | $0.09 | $0.00 | $0.30 | $0.03 | $31.62 |

BAC LOCAL 13 NEVADA

NV TILE, MARBLE STONE AND TERRAZZO CONTRACTORS ASSOCIATION

CONTRACTOR

Signature Date Signature Date Signature Date

Print Name Date Print Name/ Title Date Print Name/ Title Date

Signature Date Print Name/ Title Date Signature Date

Print Name Date Print Name/ Title Date Print Name/ Title Date

APPENDIX "A" LOCAL 13 NEVADA EFFECTIVE: 03/01/03-02/28/04

| Skill Level | | Work Hours | Wage | Dues Chk-Off | Health & Welfare | Def Con. en Local | IU Pension | Local 13 ompliance | Local 13 Training | IMI Training/ Promo | Contract Admin Fund | TOTAL PACKAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1st Period | 60% | 300 | $9.77 | 3.50% | $3.90 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $13.70 |
| 2nd Period | 70% | 300 | $11.40 | 3.50% | $3.90 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $15.33 |
| 3rd Period | 80% | 300 | $13.02 | 3.50% | $3.90 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $16.95 |
| 4th Period | 85% | 300 | $13.84 | 3.50% | $3.90 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $17.77 |
| 5th Period | 90% | 300 | $14.65 | 3.50% | $3.90 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.03 | $18.58 |
| Finisher Journey | | $16.28 | $16.28 | 3.50% | $3.90 | $1.00 | $1.18 | $0.07 | $0.00 | $0.28 | $0.03 | $22.74 |

| Skill Level | | Work Hours | Wage | Dues Chk-Off | Health & Welfare | Def Con. en. Local | IU Pension | Local 13 ompliance | Local 13 Training | IMI Training/ Promo | Contract Admin Fund | TOTAL PACKAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1st Period | 50% | 750 | $12.72 | 3.50% | $3.90 | $1.03 | $1.50 | $0.07 | $0.00 | $0.28 | $0.03 | $19.53 |
| 2nd Period | 60% | 750 | $15.26 | 3.50% | $3.90 | $1.03 | $1.50 | $0.07 | $0.00 | $0.28 | $0.03 | $22.07 |
| 3rd Period | 70% | 750 | $17.80 | 3.50% | $3.90 | $1.03 | $1.50 | $0.07 | $0.00 | $0.28 | $0.03 | $24.61 |
| 4th Period | 80% | 750 | $20.34 | 3.50% | $3.90 | $1.03 | $1.50 | $0.07 | $0.00 | $0.28 | $0.03 | $27.15 |
| 5th Period | 85% | 750 | $21.62 | 3.50% | $3.90 | $1.03 | $1.50 | $0.07 | $0.00 | $0.28 | $0.03 | $28.43 |
| 6th Period | 90% | 750 | $22.89 | 3.50% | $3.90 | $1.03 | $1.50 | $0.07 | $0.00 | $0.28 | $0.03 | $29.70 |
| Marble Mason | | $25.43 | $25.43 | 3.50% | $3.90 | $1.03 | $1.50 | $0.07 | $0.00 | $0.28 | $0.03 | $32.24 |
| Tile Setter | | $23.74 | $23.74 | 3.50% | $3.90 | $1.03 | $1.50 | $0.07 | $0.00 | $0.28 | $0.03 | $30.55 |

| BAC LOCAL 13 NEVADA | | NV TILE, MARBLE STONE AND TERRAZZO CONTRACTORS ASSOCIATION | | CONTRACTOR | |
|---|---|---|---|---|---|
| Signature | Date | Signature | Date | Signature | Date |
| Print Name | Date | Print Name/ Title | Date | Print Name/ Title | Date |
| Signature | Date | Print Name/ Title | Date | Signature | Date |
| Print Name | Date | Print Name/ Title | Date | Print Name/ Title | Date |

NV 0310

APPENDIX C

Designated Arbitrators

John Kagel (650) 325-0389
Sara Adler (310) 474-5170
Chuck Askin (925) 934-1929
Michael Prihar (818) 360-2091
Ken Perea (858) 756-6513
Fred Horowitz (310) 829-6064

Initial Union Management

EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOHN FLYNN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-2221 (RWR) |
| | ) | |
| TITAN STONE, TILE & MASONRY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED JUDGMENT

The Summons and Complaint in this action having been duly served on the above-named Defendant on January 14, 2005, and the time for said Defendant to appear and defend herein having expired, and Defendant not having filed an Answer, and the Clerk having entered default on March 3, 2005, and Plaintiffs having moved for entry of judgment by default, and this Court having granted this motion and entered Judgment in favor of Plaintiffs in the amount of $258,661.70 on October 20, 2005, and Plaintiffs having now filed a Motion to Amend Judgment in order to exclude from the Judgment certain damages inadvertently included in the damage calculations upon which the Court's Judgment was based, it is hereby

ORDERED, ADJUDGED AND DECREED that the final judgment previously in favor of Plaintiffs and against Defendant is hereby amended and superseded as follows:

1.     That the Plaintiffs John Flynn, Dominic Spano, Kenneth Lambert, James Boland, Gerald O'Malley, Joseph Bramlett, Paul Songer, Charles Velardo, Eugene George, Matthew Aquiline, Gregory Hess, Vincent DeLazzero and Michael Schmerbeck, all of whom are Trustees of, and sue on behalf of, the Bricklayers & Trowel Trades

DSMDB.2021124.1

International Pension Fund ("IPF"), 1776 Eye Street, N.W., Fifth Floor, Washington, D.C. 20006, as well as the International Masonry Institute and the Bricklayers and Allied Craftworkers Locals 7, 52, 77 & 88 NY, pursuant to written assignments of claims, recover from the Defendant, Titan Stone, Tile & Masonry, Inc., 70 Supor Boulevard, Harrison, New Jersey, 07029-1912, the sum of $233,413.06;

2.    That Titan Stone, Tile & Masonry, Inc., be directed to submit all monthly reports and contributions that may come due under the collective bargaining agreements to which they are bound subsequent to the entry of this Amended Judgment;

3.    That said Amended Judgment is without prejudice to the right of Plaintiffs to seek recovery of any past or future delinquencies, interest, damages and reasonable attorney's fees and costs that may be owing to them from Titan Stone, Tile & Masonry, Inc.;

4.    That said Amended Judgment is without prejudice to the right of B.A.C. Local Unions Nos. 4, 20 & 24 New York benefit funds to seek full recovery of any past, current or future delinquencies, interest, damages and reasonable attorney's fees and costs that may be owing to B.A.C. Local Unions Nos. 4, 20 & 24 New York benefit funds from Titan Stone, Tile & Masonry;

5.    That Titan Stone, Tile & Masonry, Inc., comply with its obligation to make timely and full contributions, as required by the collective bargaining agreements to which they are bound; and.

6.    That this Amended Judgment replace the Judgment previously entered by the Court in this matter on October 20, 2005, which shall no longer have any legal effect.

2

DSMDB.2021124.1

ORDERED, ADJUDGED AND DECREED that Plaintiffs have execution therefore.

Dated: _____May 3_____, 2006

_____
Richard W. Roberts
United States District Judge

DSMDB.2021124.1

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| JOHN FLYNN, et al. | TITAN STONE, TILE & MASONRY, INC., et al. |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF     11001
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Ira R. Mitzner (202) 420-2200
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, DC 20006

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

◉ 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government
Defendant

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if
not administrative agency
review or Privacy Act

| O **G. Habeas Corpus/ 2255** | O **H. Employment Discrimination** | O **I. FOIA/PRIVACY ACT** | O **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| O **K. Labor/ERISA (non-employment)** | O **L. Other Civil Rights (non-employment)** | O **M. Contract** | O **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☒ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

ERISA - Complaint filed for recovery of delinquent contributions - 29 U.S.C. Sections 1002, 1132, 1145

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Check YES only if demanded in complaint

JURY DEMAND:    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE 10/12/07    SIGNATURE OF ATTORNEY OF RECORD _(signature)_

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.